UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

DENNIS KYNE, DUSTIN LANGLEY, and CHARLES DUNCAN,

                           Plaintiffs,

    - against -

PAUL WOLFOWITZ, SECRETARY OF THE DEPARTMENT OF DEFENSE
OF THE UNITED STATES OF AMERICA; THE CITY OF NEW YORK
("NYC"), a municipal entity; THE NEW YORK CITY POLICE
DEPARTMENT ("NYPD"); THE NEW YORK CITY DEPARTMENT OF
CORRECTIONS ("NYCDOC"); THE HUDSON RIVER PARK TRUST
("HRPT"), a joint City-State body; CONNIE FISHMAN,
HRPT PRESIDENT; THE REPUBLICAN NATIONAL CONVENTION
HOST COMMITTEE ("RNCHC"); ROLAND BETTS, CO-VICE CHAIR
OF THE RNCHC; NYC MAYOR MICHAEL BLOOMBERG; MARTIN
HORN, NYCDOC COMMISSIONER; JORGE OCASIO, NYCDOC
WARDEN; RAYMOND KELLY, NYPD COMMISSIONER; JOSEPH
ESPOSITO, NYPD CHIEF OF DEPARTMENT; STEPHEN L.
HAMMERMAN, NYPD DEPUTY COMMISSIONER OF LEGAL MATTERS;
BRUCE H. SMOLKA, ASSISTANT CHIEF, NYPD MANHATTAN SOUTH
TASK FORCE; THOMAS GRAHAM, COMMANDER, NYPD DISORDER
CONTROL UNIT; TERRENCE MONAHAN, ASSISTANT CHIEF, NYPD
BRONX BOROUGH COMMAND; JOHN J. COLGAN, EXECUTIVE
OFFICER, NYPD COUNTER-TERRORISM BUREAU; CHARLES
DERIENZO, NYPD DEPUTY COMMISSIONER OF ADMINISTRATION;
ROLAND MERCANDETTI, CAPTAIN, NYPD PATROL BORO BRONX
SOUTH TASK FORCE; JOHN SCOLARO, CAPTAIN, 78th PRECINCT;
DETECTIVE CHRISTOPHER AMBROSE, NYPD LEGAL BUREAU;
DANIEL ALBANO, LIEUTENANT, NYPD LEGAL BUREAU; NYPD
LIEUTENANT RAYMOND SPINELLA; NYPD LIEUTENANT JOE
MAHER; NYPD SERGEANT EDWARD MURPHY, PATROL BORO BRONX
ANTI-CRIME UNIT, SHIELD NO. 1502; MALE FIRST NAME AND
LAST NAME UNKNOWN NYPD BICYCLE SERGEANT ("UNIDENTIFIED
BICYCLE SERGEANT"); NYPD PATROL BORO BRONX SOUTH TASK
FORCE OFFICER MATTHEW WOHL, SHIELD NO. 6956; NYPD
OFFICER JOHN MARTINEZ, 112th PRECINCT, SHIELD NO.
23496; NYPD LEGAL BUREAU OFFICER JAMES ROSCHER, SHIELD
NO. 17208; UNIDENTIFIED NYPD SUPERVISORS AND OFFICERS
JOHN AND JANE DOES; and UNIDENTIFIED RICHARD AND MARY
ROE FEDERAL, STATE, AND/OR CITY LAW ENFORCEMENT
AGENTS, INCLUDING ONE SUCH "MARY ROE" UNIDENTIFIED
FEDERAL, STATE, OR CITY LAW ENFORCEMENT AGENT WEARING
A LIGHT-BLUE T-SHIRT ("BLUE"), individually and in
their official capacities, jointly and severally,

                          Defendants.

_____

COMPLAINT AND
DEMAND FOR
JURY TRIAL____

06-CV-2041

Plaintiffs DENNIS KYNE, DUSTIN LANGLEY, and CHARLES DUNCAN, by their attorneys, Lewis B. Oliver, Jr., and Gideon Orion Oliver, OLIVER & OLIVER, as and for their complaint, do hereby state and allege as follows:

## PRELIMINARY STATEMENT

1.   This is a civil rights action in which plaintiffs, who were arrested on August 31, 2004 at the height of the Republican National Convention ("RNC") in New York City, seek relief in connection with defendants' violation of plaintiffs' rights secured by the Civil Rights Act of 1871, 42 USC § 1983, the United States Constitution, including its First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and by the laws and Constitution of the State of New York.   Plaintiffs seek damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys' fees, and such other and further relief as this Court deems equitable and just.

## JURISDICTION

2.   This Court has original jurisdiction over plaintiffs' federal claims in this action by virtue of 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), since this action seeks redress for the violation of plaintiffs' federal constitutional and civil rights.

3.    This Court has supplemental jurisdiction over plaintiff Dennis Kyne's state constitutional and state law causes of action that are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367 (a).

4.    Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant plaintiffs the injunctive relief they pray for herein.

5.    The Federal Declaratory Judgment Act, 28 USC § 2201, authorizes this Court to grant plaintiffs the declaratory relief they pray for herein.

6.    42 USC § 1988 authorizes this Court to grant plaintiffs the attorneys' fees they pray for herein.

<u>VENUE</u>

7.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) on the grounds that the events complained of herein occurred in the Southern District.

<u>JURY DEMAND</u>

8.    Plaintiffs demand a jury trial in this action on each and every one of their damage claims.

<u>NOTICE OF CLAIM</u>

9.    In accordance with General Municipal Law § 50-h, plaintiff DENNIS KYNE filed a timely Notice of Claim dated

November 18, 2004 with the Comptroller of the City of New York on November 24, 2004, within ninety (90) days of Mr. Kyne's arrest on August 31, 2004, his subsequent detention by the defendants, and the commencement of the criminal proceeding against him in New York City Criminal Court corresponding to Docket No. 2004NY064937 on September 1, 2004.

10.  In accordance with General Municipal Law § 50-h and § 12 of 1998 Sess. Law News of N.Y. Ch. 592 (S. 7845) (McKINNEY'S), the Hudson River Park Act, Mr. Kyne filed a timely Notice of Claim dated November 18, 2004 with the Hudson River Park Trust on November 26, 2004, within ninety (90) days of Mr. Kyne's arrest on August 31, 2004 and his subsequent detention by the defendants on defendant HRPT's property located at Pier 57 on the West side of Manhattan on August 31 and September 1, 2004.

11.  On December 14, 2004, Mr. Kyne's jury trial commenced in Jury 1 in New York City Criminal Court before Hon. Gerald Harris.

12.  On December 16, 2004, the Office of the District Attorney, New York County, by Aaron Wolfson, Esq., Assistant District Attorney, moved to dismiss the charges against Mr. Kyne because "the People [did] not believe

[they could] prove the crimes charged beyond a reasonable doubt."

13.    Pursuant to General Municipal Law § 50-h, on June 20, 2005, the City of New York, by Ilana Grafstein, Esq., Jeffrey Samel & Associates, PC, held a hearing in response to Mr. Kyne's Notices of Claim, during which the City questioned Mr. Kyne about the criminal proceedings against him and their resolution.

## PARTIES

14.    Plaintiff DENNIS KYNE resides at 305 East Empire Street, San Jose,, California 95112.

15.    Plaintiff DUSTIN LANGLEY resides at 3284 31st Street, Apartment 1B, Long Island City, New York 11106.

16.    Plaintiff CHARLES DUNCAN resides at 202 Hillcrest Road, Raleigh, North Carolina 27605.

## DEFENDANTS

17.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act.

18.    Each individual defendant is sued in her or his individual and official capacities.

19. At all times complained of herein, defendant PAUL WOLFOWITZ was the SECRETARY OF THE DEPARTMENT OF DEFENSE OF THE UNITED STATES OF AMERICA ("DOD").

20. The DOD is an agency of the Executive Branch of the government of the United States of America which acts as its agent, *inter alia*, in the management of the United States Armed Forces, which has the authority to promulgate Directives regarding, *inter alia*, the wearing of United States Armed Forces uniforms.

21. At all times complained of herein, defendant Wolfowitz was a duly appointed and acting high-level policy official of the President of the United States of America, George Walker Bush, and an officer, servant, employee, and agent of the President acting under color of Federal law in the course and sscope of his employment and duties and functions as such and was acting for, and on behalf of, and with the power vested in him by the President.

22. Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York  10007.

23. NYC is authorized by law to maintain defendant NEW YORK CITY POLICE DEPARTMENT ("NYPD"), which acts as its agent in the area of law enforcement, and the defendant NEW

YORK CITY DEPARTMENT OF CORRECTIONS ("NYCDOC"), which acts as its agent in the area of incarcerating pre-trial detainees, among others.

24. NYC is ultimately responsible for its Departments, and assumes the risks incidental to the maintenance of its departments their employees.

25. Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policy making official for the City and its Departments.

26. Defendant RAYMOND KELLY is and was, at all times relevant herein, the Commmissioner of the NYPD and the chief policy making official for the NYPD.

27. Defendant JOSEPH ESPOSITO is and was, at all times relevant herein, the Chief of Department of the NYPD and a high-level policy making official for the NYPD.

28. Defendant STEPHEN L. HAMMERMAN was, at all times relevant herein, the Deputy Commissioner of Legal Matters of the NYPD, and a high-level policing making official for the NYPD.

29. Defendant BRUCE H. SMOLKA is and was, at all times relevant herein, the Assistant Chief of the Patrol Boro Manhattan South of the NYPD, and a high-level policy making official for the NYPD.

30.  Defendant THOMAS GRAHAM was, upon information and belief, at all times relevant herein, Commander of the Disorder Control Unit of the NYPD, and a high-level policy-making official for the NYPD.

31.  Defendant TERRANCE MONAHAN was, upon information and belief, at all times relevant herein, the Assistant Chief of the NYPD Bronx Borough Command, and a high-level policy-making official for the NYPD.

32.  Defendant JOHN J. COLGAN was, upon information and belief, at all times relevant herein, the Executive Officer of the NYPD Counter-Terrorism Bureau, and/or temporarily assigned to head the NYPD Criminal Justice Bureau, and a high-level policy-making official for the NYPD.

33.  Defendant CHARLES DERIENZO was, upon information and belief, at all times relevant herein, the NYPD Deputy Commissioner of Administration, and a high-level policy-making official for the NYPD.

34.  Defendant ROLAND MERCANDETTI was, upon information and belief, at all times relevant herein, a Captain in the NYPD Patrol Boro Bronx South Task Force.

35.  Defendant JOHN SCOLARO was, upon information and belief, at all times relevant herein, a Captain in the NYPD's 78th Precinct.

36. Defendant CHRISTOPHER AMBROSE was, upon information and belief, at all times relevant herein, a Detective in the NYPD Legal Bureau.

37. Defendant DANIEL ALBANO was and is, at all times relevant herein, a Lieutenant in the NYPD Legal Bureau and a high-level policy-making official for the NYPD.

38. Defendants JOE MAHER and RAYMOND SPINELLA were, upon information and belief, at all times relevant herein, NYPD Lieutenants.

39. Defendants EDWARD MURPHY and MALE FIRST NAME AND LAST NAME UNKNOWN NNYPD BICYCLE SERGEANT were, upon information and belief, at all times relevant herein, NYPD Sergeants.

40. Defendants MATHEW WOHL, JOHN MARTINEZ, and JAMES ROSCHER were, upon information and belief, at all times relevant herein, NYPD Officers.

41. Defendants UNIDENTIFIED NYPD SUPERVISORS AND OFFICERS JOHN AND JANE DOES were, upon information and belief, at all times relevant herein, duly appointed and acting supervisory officers, servants, employees and agents of defendant NYC and/or NYPD, responsible for the training, retention, supervision, discipline and control of police officers under their command. Said individual defendants are and were at all times relevant herein acting under

color of state law in the course and scope of their
employment and duties and functions as supervisory
officers, agents, servants, and employees of defendant NYC,
were acting for, and on behalf of, and with the power and
authority vested in them by defendants NYC and NYPD, and
were otherwise performing and engaging in conduct
incidental to the performance of their lawful functions in
the course of their duties.

42. Defendants UNIDENTIFIED RICHARD AND MARY ROE
FEDERAL, STATE, AND/OR CITY LAW ENFORCEMENT AGENTS,
INCLUDING ONE SUCH "MARY ROE" UNIDENTIFIED FEDERAL, STATE,
OR CITY LAW ENFORCEMENT AGENT WEARING A LIGHT-BLUE T-SHIRT
("BLUE") are unidentifiable State and/or Federal agents who
wereduly appointed and acting officers, servants, employees
and agents of defendants and/or other Federal, State,
and/or City law enforcement agencies, acting under color of
state and/or Federal law in the course and sscope of their
employment and duties and functions as officers, agents,
servants, and employees of defendants and/or other Federal,
State, and/or City law enforcement agencies, acting for,
and on behalf of, and with the power and authority vested
in them by defendants and/or other Federal, State, and/or
City law enforcement agencies, and were otherwise
performing and engaging in conduct incidental to the

performance of their lawful functions in the course of their duties at all times relevant herein.

43. At all times relevant herein, defendants Bloomberg, Horn, Ocasio, Kelly, Esposito, Hammerman, Smolka, Graham, Monahan, Colgan, DeRienzo, Mercandetti, Ambrose, Albano, Scolaro, Spinella, Maher, Murphy, Unknown Bicycle Sergeant, Wohl, Martinez, Roscher, and John and Jane Doe Unidentified NYPD Supervisors and Officers were duly appointed and acting officers, servants, employees and agents of defendants NYC, NYPD, and/or NYCDOC, acting under color of state law in the course and sscope of their employment and duties and functions as officers, agents, servants, and employees of defendants NYC, NYPD, and/or NYCDOC acting for, and on behalf of, and with the power and authority vested in them by defendants NYC, NYPD, and/or NYCDOC, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

44. At all times relevant herein, defendants NYC, NYPD, and/or NYCDOC ("Municipal Defendants"), acting through individual defendants acting under color of state law and in concert with other individual defendants, had de facto policies, practices, customs and usages which were a

direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

45. At all times relevant herein, defendants NYC, NYPD, and/or NYCDOC ("Municipal Defendants"), acting through individual defendants acting under color of state law and in concert with other individual defendants, had de facto policies, practices, customs and usages of failing properly to train, screen, supervise, or discipline employees and police officers, and of failing to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline said defendants which were a direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

46. At all times relevant herein, defendants acted and/or failed to act maliciously, intentionally, knowingly, with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions with respect to the unconstitutional conduct alleged herein.

47. Defendant HUDSON RIVER PARK TRUST ("HRPT") is a public benefit corporation created through State legislation as a joint City-State body, which has clear authority to operate all areas within the Hudson River Park on Manhattan's West Side, including Pier 57, a block-long,

three-story former bus depot located at 11th Avenue and 15th Street.

48. Defendant HRPT assumes the risks incidental to the maintenance and use of its structures, including Pier 57, and the employment of its employees.

49. Defendant CONNIE FISHMAN was, at all times relevant herein, and is, upon information and belief, the President of defendant HRPT.

50. At all times relevant herein, defendant Fishman was acting under color of state law and in the course and sscope of her employment and duties and functions as an official of defendant HRPT, was acting for, and on behalf of, and with the power and authority vested in her by defendant HRPT, and was otherwise performing and engaging in conduct incidental to the performance of her lawful function in the course of her duties.

51. Defendant THE RNC HOST COMMITTEE ("RNCHC") was, at all times relevant herein, an entity involved in planning for and administering the RNC held in NYC in August and September of 2004.

52. Defendant ROLAND W. BETTS was, at all times relevant herein, Co-Vice Chairman of the defendant RNCHC, and was and, upon information and belief, is Chair of Chelsea Pier Management, a former Director of the Lower

Manhattan Development Corporation, and a former college roommate, fraternity brother, and close personal friend of the President of the United States of America, George W. Bush.

## BACKGROUND AND FACTUAL ALLEGATIONS

53. Plaintiffs were falsely arrested in New York City on August 31, 2004, during the height of the RNC, pursuant to unconstitutional policies and practices defendants jointly and severally planned for and implemented.

54. Prior to their arrests, plaintiffs had never met.

55. Plaintiff DENNIS KYNE enlisted in the United States Army in January of 1987.

56. During his career with the United States Army, Mr. Kyne received, and was and/or is authorized to wear, the Presidential Unit Citation, Army Commendation Medal, the Good Conduct Medal, the Southwest Asia Service Medal with 3 Bronze Stars, the Kuwaiti Liberation Medal, the Saudi Defense Medal, the Army Service Ribbon, the Army Achievement Medal with Oak Leaf Cluster, the National Defense Service Medal, the Army Lapel Button, the Marksman Marksmanship Badge Rifle, M-16, the Marksman Marksmanship Badge, Grenade, the Expert Field Medical Badge, the Parachutist Badge, and the Driver and Mechanic Badge, Driver W-Bar.

14

57. From August of 1990 through April of 1991, Mr. Kyne served as a battlefield medic in the 24th Infantry Division in Iraq during Operation Desert Storm.

58. The 24th Infantry Division was the forward-most unit during Operation Desert Storm.

59. During Operation Desert Storm, Mr. Kyne treated United States troop casualties and Prisoners of War.

60. In 1993, Mr. Kyne achieved the rank of Sergeant, which he enjoyed until his honorable discharge from United States Military service in 2003.

61. In 1993 through 1995, Mr. Kyne enjoyed the title of Drill Sergeant, and served as such at Ft. Bliss, Texas and Ft. Sill, Oklahoma.

62. In its natural state, uranium is comprised of three (3) isotopes: U-234, U-235 and U-238.

63. At uranium enrichment plants, the concentration of U-235 is increased by separating U-238.

64. The byproduct – "depleted uranium" or "DU" – is mainly comprised of U-238.

65. U-238 has a half-life of approximately 4.5 billion years (the approximate current age of the earth).

66. DU is nearly twice as dense as lead.

67.  Upon information and belief, the United States Armed Forces used DU extensively in armor piercing ordnance and in armor plating during Operation Desert Storm.

68.  Upon information and belief, when DU ordnance is, for example, shot at high speeds, dropped from great heights, or subjected to high temperatures (including explosions), the DU is converted into submicronic uranium oxide particles.

69.  During Operation Desert Storm some U.S. tanks and U.S. aircraft fired DU munitions, which produced shrapnel and an aerosolized dust on impact.

70.  Upon information and belief, several hundred tons of DU were so aerosolized during United States Armed Forces military operations during Operation Desert Storm.

71.  Upon information and belief, mist or fog of aerosolized, submicronic uranium oxide particles – "poison dust" - can travel tens of kilometers or more.

72.  In approximately 1991, Mr. Kyne filed a complaint with the United States Department of Veterans Affairs ("VA") about recurring health problems from which he had suffered since returning to the United States from Iraq.

73.  In 1995, four (4) years later, the VA tested Mr. Kyne for ionizing radiation twice.

74.  Mr. Kyne has unsuccessfully tried to receive the results of those tests.

75.  From approximately May of 1996 to the present, the VA has compensated Mr. Kyne approximately between $175-225 a month as compensation for "undiagnosed illnesses" related to his service in Iraq during Operation Desert Storm.

76.  Mr. Kyne believes that his "undiagnosed illnesses" are in fact the result of his exposure to DU during Operation Desert Storm, through inhalation and otherwise.

77.  Upon information and belief, tens or hundreds of thousands of the 697,000 U.S. soldiers involved in Operation Desert Storm have reported serious, chronic illnesses.

78.  On April 3, 2004, the New York Daily News reported[1] that four (4) soldiers who had served in Iraq in 2003 with the 442nd Military Police of the New York Army National Guard were contaminated with radiation likely caused by dust from depleted uranium shells fired by United States troops.

---

[1]    See Gonzalez, John.  "Poisoned?" Daily News, April 3rd, 2004 ("Daily News Article").

79.  According  to  the  <u>Daily News</u>  Article,  "Uranium oxide dust, which lodges in the lungs once inhaled and is not  very  soluble,  can  emit  radiation  to  the  body  for years."

80.  The  442nd  is  based  in  Rockland  County  and  is largely  comprised  of  New  York  City  police  officers, firefighters,  and  correction  officers,  many  of  whom  were dispatched to Iraq around Easter of 2003.

81.  Mr. Kyne did not come to New York City in August of 2004 with any group or organization.

82.  Mr. Kyne came to New York City during the RNC in order to tell his story to the people of New York City, and to let its police officers and firefighters know that the United  States  Government  was  exposing  their  friends  and loved  ones  serving  in  Iraq – including  the  soldiers  from the 442nd - to depleted uranium on the battlefield.

83.  At  all  times  relevant  herein,  plaintiff  DUSTIN LANGLEY  was  working  in  an  unpaid  position  as  a  media coordinator  and  in  other  capacities  for  the  International Action Center ("IAC").

84.  Mr. Langley is a third-generation United States Navy Veteran.

85.  Mr. Langley enlisted in the United States Navy in 1986 as an Undesignated Seaman.

86.  After completing boot camp at the Navy's Orlando Recruit Training Center in Orlando, florida, Mr. Langley received meritorious promotion.

87.  Following boot camp and apprenticeship training in Orlando, Mr. Langley was stationed on the USS Charleston in Norfolk, Virginia.

88.  There, Mr. Langley's responsibilities included serving as a crewmember on a Landling Craft – Mechanized (LCM 8), performing damage control repair and maintenance work, general seamanship, and acting as a member of the ship's self-defense force.

89.  Mr. Langley's active duty ended in 1988.

90.  Mr. Langley was a member of the inactive reserve until 1994.

91.  The IAC is an organization founded by former Attorney General Ramsey Clark for the purposes of combating, *inter alia*, war and racism.

92.  In his capacity as an IAC volunteer organizer, Mr. Langley helped to organize, and participated in, an Iraq War Crimes Tribunal held the week before the RNC, at which speakers including Mr. Langley, Iraqi nationals, Ramsey Clark, and others discussed numerous issues relating to the War in Iraq, including the United States Military's use of DU.

93.  Specifically, Mr. Langley helped to organize a panel regarding GI Issues.

94.  On August 27, 2004, Mr. Langley participated in a press conference on the steps of City Hall.

95.  The purpose of the press conference was to address specifically what Mr. Langley and the IAC viewed as repression leading up to the RNC in the form of denials of permits for peaceful protests during the RNC.

96.  On August 31, 2004, the IAC had opened its offices for protesters to use in making placards, etc.

97.  Mr. Langley was at the IAC offices downtown until approximately 4:00 PM or 5:00 PM on August 31, 2004.

98.  At approximately that time, Mr. Langley and several other people left the IAC Offices to attend a protest.

99.  At all times relevant herein, plaintiff CHARLES DUNCAN was a full-time student at North Carolina State University in the final year of his studies in the University's writing program.

100. Mr. Duncan traveled to New York City during the RNC in order to as a writer and photographer for N.C. State's student newspaper, Technician, trailing his fellow N.C.S.U. students around the City and reporting on their activities.

NYC'S RNC BID, OPERATION OVERLORD II, AND PIER 57

101. Upon information and belief, defendant Bloomberg's campaign to convince the White House and the Republican National Committee to hold its 2004 Convention in New York City began as early as the winter of 2001.

102. Upon information and belief, on or about November 15, 2001, defendant Bloomberg went to the White House and "pressed" Vice President Dick Cheney "about the notion of awarding the 2004 Republican National Convention to New York."[2]

103. Upon information and belief, over the course of approximately the next year, defendant Bloomberg pursued the notion "in conversations with President Bush, in meetings between New York hoteliers and Republican National Committee leaders, even in a Powerpoint presentation that was fine-tuned by Emma Bloomberg, his eldest daughter."[3]

104. Upon information and belief, during the same time period, acting in concert with defendant Bloomberg,

---

[2]    Smith, Chris. "The Elephant in the Room: Bringing the Convention to New York Was Mayor Bloomberg Big Idea. But Who's Using Who?" New York Magazine, 6 September 2004 ("Smith").

[3]    See Smith.

defendant Betts worked to persuade President Bush and the White House to hold the RNC on the West Side of Manhattan.[4]

105. Upon information and belief, defendant Betts is a founder of the Chelsea Piers sports and entertainment complex in Manhattan and a prominent figure in City, State, and National politics.[5]

106. For example, from 2001 - 2005 Mr. Betts served as a Director of the Lower Manhattan Development Corporation, the City-State agency charged with rebuilding Lower Manhattan.[6]

107. In that capacity, Mr. Betts chaired the Site Committee charged with rebuilding the World Trade Center site.[7]

108. Upon information and belief, in serving as Director of the Lower Manhattan Development Corporation and acting as Chair of its Site Committee, defendant Betts had frequent close and personal contacts and communications

---

[4]    See Smith; see also Bumiller, Elisabeth. "For President and Close Friend, Forget the Politics." New York Times, 14 January 2005. ("Bumiller"); "New York Wins Bid for 2004 Republican National ConventionL RNC Site Selection Committee Recommends New York City to Host Presidential Convention." Press Release, Office of Michael R. Bloomberg, 6 January 2004. ("1/6/2004 PR").

[5]    See Smith; see also Rice, Andrew. "Who's Top New Yorker in Bush White House? Chelsea Piers' Betts." New York Observer, 29 January 2001 ("Rice").

[6]    See Wallace, Daniel, Ronda Kayson and Josh Rogers. "Pataki, Bloomberg Turn to Top Aids to Fill LMDC Posts." Downtown Express. Vol 8, Issue 17, 18-24 November 2005 ("Wallace").

[7]    See Wallace; Rice.

with several of the other defendants, including, but not limited to, defendant Bloomberg, and New York State Governor George Pataki (a non-party).[8]

109. Upon information and belief, defendant Betts and President Bush met as freshmen at Yale approximately forty (40) years ago and have been such close personal friends since that defendant Betts and his family enjoyed seats near the President and his during the President's most recent inauguration.[9]

110. On June 17, 2002, defendant Bloomberg and Governor Pataki presented defendant NYC's formal bid for the 2004 Republican National Convention at the RNC headquarters in Washington, D.C.[10]

111. Upon information and belief, at all times relevant herein, defendant Bloomberg and Governor Pataki were Honorary Chairs of defendant RNCHC.

112. Upon information and belief, Governor Pataki, defendant Bloomberg and former NYC Mayor Rudolph W.

---

[8]     See Rice; Wallace.

[9]     See Bumiller; Rice.

[10]    See "Mayor Michael R. Bloomberg Delivers New York City's Bid for 2004 Republican National Convention to Washington DC." Press Release, Office of Michael R. Bloomberg. 17 June 2002 ("6/17/2002 PR").

Giuliani led the effort to bring the RNC to NYC, working closely with defendants Betts and RNCHC.[11]

113. Defendant Bloomberg put defendant Betts on what defendant City has characterized as a "Dream Team" of City Republicans to handle the intense lobbying effort Governor Pataki, defendant Bloomberg, and former Mayor Giuliani began.[12]

114. Upon information and belief, as a part of this intense lobbying effort and/or in connection with their work on the RNCHC, defendants Betts and Bloomberg had frequent close and personal contacts with each other, with other defendants, and with Governor Pataki and the White House.[13]

115. Upon information and belief, through the course of the bidding process, one other City's bid emerged as competitive with defendant NYC's:  Tampa, Florida's.[14]

---

[11]    See DeFrank, Thomas M. "GOP Might Take Manhattan: Whitehouse and Mike Make Nicer for Convention." Daily News. 11 November, 2003.

[11]    See 1/6/2004 PR, Bumiller, Smith.

[12]    See 1/6/2004 PR.

[13]    See Salonstall, David. "New York Wins Out Over Tampa and New Orleans for 2004 GOP Convention." New York Daily News, 2003, via Hotel                                                    Online. http://www.hotelonline.com/news/pr2003_1st_Jan03_GOPNY.html; see also 1/6/2004 PR, Bumiller, DeFrank, Smith.

[14]    See Karp, David and Bill Adair.  "Timing, Glitz, Hotel Rooms Thwarted Group's Dream." St. Petersburg Times. 7 January, 2003 (Karp 1/7/2003); see also DeFrank.

116. Tampa, Florida's bid was led by Florida Governor Jeb Bush, the President's brother.[15]

117. Upon information and belief, the separate campaigns to court the RNC undertaken by defendant NYC and the City of Tampa, Florida developed into a contest between them.[16]

118. For example, upon information and belief, Florida "put on all the trimmings" when top Republicans associated with the RNC Site Selection Committee visited Tampa in August of 2002.[17]

119. For example, "When the committee visited in August, the pillowcases in each hotel room were embroidered with the Tampa host committee logo.  Chocolates were left every night.  Desserts covered an entire buffet table during a 1 ½-hour cruise on the Starship.  After dinner and dancing, a fireworks display lit up the sky."[18]

120. Upon information and belief, when providing hotel rooms for RNC delegates became a problem for Tampa, "they said, 'We'll put cruise ships in the harbor'", proposing to

---

[15]   See DeFrank, Karp 1/7/2003.

[16]   See Karp, David and Bill Adair.  "Here's What it Will Take to Get GOP Convention." St Petersburg Times. 17 November, 2002. (Karp 11/17/2002); see also Karp 1/7/2003.

[17]   See Karp 1/17/2002.

[18]   See Karp 1/7/2003.

use cruise ships docked near the St. Pete Times Forum for lodging delegates.[19]

121. However, upon information and belief, despite such lavish courting, Bush aides remained worried that choosing Tampa "would prompt massive demonstrations by Democrats alleging Bush stole Florida, and the presidency, in 2000."[20]

122. For example, the New York Times reported on January 14, 2005:  "'I had an anxious year, to tell you the truth,' said Mr. Betts, recalling that as the threat of protests grew, Mr. Bush took to tormenting him with comments like:  'You're ruining me politically.  Why did you make me come to New York?'  Mr. Betts chuckled.  'It was all good-natured,' he said, 'but I was thinking, 'Oh my God, there's probably a grain of truth in there.  Should he have gone to Tampa?''"[21]

123. Upon information and belief, defendants Betts and Bloomberg worked together to raise tens of millions of dollars worth of private finding.[22]

---

[19]    See Karp 1/7/2003.

[20]    See DeFrank.

[21]    See Bumiller.

[22]    See Karp 1/7/2003, Karp 11/17/2003, Salonstall.

124. Upon information and belief, defendant City's bid was the only bid to the RNC that was entirely privately financed and included no publicly appropriated funds.[23]

125. Upon information and belief, defendant Bloomberg and/or other defendant City agents signed agreements to secure more than 22,000 hotel rooms for the Convention from nearly 50 hotels, with nearly 17,000 rooms located within one mile of Madison Square Garden.[24]

126. Upon information and belief, defendant Bloomberg reached agreements with some of the City's labor unions to sign "no strike" agreements that would ensure all work during and around the convention.[25]

127. Upon information and belief, acting in concert with Mr. Kevin Sheekey, who was at that time coordinating RNC preparations for City Hall, defendants City, Bloomberg, and Betts, and Governor Pataki negotiated the use of the United States Postal Service's James A. Farley Post Office on Eighth Avenue at 33rd Street to use as a "media center"

---

[23]    See 1/6/2004 PR.

[24]    See 1/6/2004 PR.

[25]    See 1/6/2004 PR.

during the RNC for the approximately 15,000 journalists who were expected to cover the event.[26]

128. Upon information and belief, in his former capacity as Senator Daniel Patrick Moynihan's Chief of STaff, Mr. Sheekey worked closely with defendant Bloomberg, Governor Pataki, and other City, State, and Federal officials to "transform the grand old building at Eighth Avenue and 33rd Street into a train station, but even after securing federal, state, and city cooperation, no one could pin down the Postal Service on an exit date."[27]

129. Upon information and belief, in securing the former Post Office as a "media center" for the RNC, the defendants City, Betts, and Bloomberg, and Governor Pataki cleared the way for the New York Empire State Development Corporation took control of the property and begin development on the train station.[28]

130. Upon information and belief, in or about December of 2002, Bill Harris, the head of the RNC site selection team, "came to the City to talk about hotel rates" in a

---

[26]    See Slackman, Michael. "Neither Snow Nor Rain, But GOP Historic Midtown Post Office Will Vacate for Convention." New York Times. 13 August 2003 ("Slackman 8/13/03"); 1/6/2004 PR.

[27]    See Slackman 8/13/03.

[28]    See Slackman 8/13/03.

"final meeting" held at "the new Ritz-Carlton in Battery Park City."[29]

131. Upon information and belief, in approximately December of 2002, defendants Betts and Bloomberg had a dinner meeting with and Mr. Karl Rove, at or about which time the agreement that the defendant City would host the Republican National Convention was finalized.[30]

132. Upon information and belief, Al Austin, co-chair of the Tampa RNC Host Committee, had not spoken to RNC party leaders since mid-December.[31]

133. On or about January 6, 2003, the RNC Site Selection Committee recommended the City to host the 2004 RNC "for the first time in its history."[32]

134. Upon information and belief, on or about January 31, 2003, the announcement of defendant NYC as the host for the 2004 RNC "launched an extensive 19-month security coordination among City, State, and Federal entities."[33]

---

[29]    See Smith.

[30]    See Karp 1/7/2004.

[31]    See Karp 1/7/2004.

[32]    See 1/6/2004 PR.

[33]    See Perkins, Tom. "RNC: A Balancing Act for Security Planners." Emergency Management Times Online. Summer, 2004. http://www.nysemo.state.ny.us.pio/emt/2004/summer/rnc.html ("Perkins").

135. Upon information and belief, the United States Department of Homeland Security and/or other Federal agencies designated the RNC as a "National Security Special Event."

136. Upon information and belief, in the year preceding the RNC, defendants Bloomberg, Kelly, Esposito, Monahan, Colgan, DeRienzo, Spinella, Hammerman, Graham, and/or Smolka had numerous and frequent meetings with representatives from the United States Secret Service ("SS"), the United States Federal Bureau of Investigation ("FBI"), the New York City Fire Department, and the New York State Office of Emergency Management ("NYSOEM") in connection with developing and implementing a plan for policing planned and unplanned protests during the RNC.

137. Upon information and belief, the United States Secret Service and defendant NYPD served as lead agencies "with support from the FBI, FEMA, various State and local enforcement authorities, and other related organizations" in this effort.[34]

138. Upon information and belief, defendants called the operation "Operation Overlord II."

139. Upon information and belief, in connection with the approximately 19-month "Operation Overlord II" planning

---

[34]    See Perkins.

effort, defendant NYPD acted in concert with unidentified City, State, and/or Federal law enforcement agencies to engage in unlawful and unwarranted surveillance of individuals they believed might come to New York City to demonstrate prior to and/or during the RNC.

140. Throughout 2003 and 2004, organizers across the United States and beyond planned protests during the week of August 30th to September 2, 2004.

141. Many utilized the internet to publicly announce planned, unpermitted demonstrations and other events.

142. Some groops and organizations, such as United for Peace and Justice, applied for formal parks and/or parade permits for massive, planned demonstrations.

143. Upon information and belief, throughout 2003 and 2004, defendant NYPD was monitoring and surveilling such plans on the internet.

144. For example, the New York Times reported on November 12, 2003 that, according to defendant Kelly, "the police [were] monitoring the Internet and the organizing groups, . . . . They want to know what groups are coming to New York, who their leaders are and what their plans are,

31

long before anyone ever raises a billboard or turns on a bullhorn."[35]

145. According to the <u>New York Times</u>, defendant NYPD "created 30 committees within the department to address the myriad security concerns, including transportation around the city, safeguarding the 49 hotels that will house officials, delegates and news media, safeguarding restaurants, theatres and other entertainment sites and making sure that officers are adequately trained to handle it all."[36]

146. Upon information and belief, in connection with the approximately 19-month "Operation Overlord II" planning effort, defendant NYPD acted in concert with unidentified City, State, and/or Federal law enforcement agencies and determined to arrest and fully book individuals during the RNC for minor offenses such as disorderly conduct and parading without a permit, which are technically violations of law and not crimes, in contravention of normal NYPD procedures in connection with such offenses under which arrestees are generally issued summonses (i.e., not arrested and fully booked).

---

[35]    <u>See</u> Slackman, Michael.   "G.O.P. Convention Has Poliec Alert and Protesters Planning."   <u>New York Times</u>.   November 12, 2003 ("Slackman 11/12/03").

[36]    <u>See</u> Slackman 11/12/03.

147. In particular, defendants planned to engage in mass warrantless arrests as a means of crowd control and retaliation against individuals engaged in lawful, peaceful protest activity during the RNC.

148. Pursuant to New York State Criminal Procedure Law § 160.10(2), "a police officer who makes an arrest for any offense, either with or without a warrant, <u>may</u> take or cause to be taken the fingerprints of the arrested person. . .". See CPL § 160.10(2) (emphasis added).

149. Upon information and belief, in connection with the approximately 19-month "Operation Overlord II" planning effort, defendant NYPD acted in concert with unidentified City, State, and/or Federal law enforcement agencies and determined to systematically fingerprint those arrested for minor offenses during the RNC[37].

150. Upon information and belief, defendant NYPD subsequently planned to forward and actually forwarded those fingerprints (including plaintiffs') to unidentified City, State, and/or Federal law enforcement agencies.

---

[37] According to defendant Colgan, defendant NYPD "made a determination in policing the national special security event, that in as much as it is virtually impossible today, in an age of identity thefts, in an age where a 15-year-old with a computer with software can produce very high quality, official looking documents that would indicate who he or she might be, that we made a determination to effect arrests without the issuance of any summonses for non-crime violations, so as to ensure that we knew with whom we were dealing."

151. Upon information and belief, in approximately January of 2004, defendants presented the New York City Council with a proposed budget that would have earmarked approximately $17.5 million to pay for police overtime and to purchase items related to "crowd control, communications, and information technology" as part of an overall request for $25.9 million worth of funding for "costs related to" the RNC.

152. Upon information and belief, on or about March 11th, 2004, New York County District Attorney Robert Morgenthau testified before the New York City Council during a budget hearing to the effect that "We also know that the Republican National Convention will bring significantly increased arrests in the weeks before the convention. NYPD anticipates that we could have up to 1,000 arrests a day."

153. Accordingly, in 2003 and 2004, defendants were engaging in extensive surveillance of individuals and groups they believed would come to NYC during the RNC to engage in protest activities.

154. So, well in advance of the RNC itself, defendants had fulsome intelligence – some of it obtained by the SS, FBI, and/or other City, State, and/or Federal agencies through the use of warrantless surveillance and/or the

34

employment of undercover agents to infiltrate groups and gather intelligence about individuals perceived as protesters – regarding anticipated demonstrations and other protest activities.

155. Defendants planned to make "up to 1,000 arrests a day" in connection with RNC protest activities for minor offenses such as disorderly conduct and parading without a permit.

156. In ancitipation of those plans, the New York State Office of Court Administration ("OCA") more than doubled arraignment capacity, staffing four (4) day arraignment parts, four (4) night arraignment parts, and a midnight stiff.

157. The Office of the District Attorney of New York County added additional staff and kept its complaint room open extra hours.

158. The defense bar, including the Legal Aid Society and volunteer attorneys associated with the National Lawyers Guild, also committed to fully staffing the additional arraignments parts during the RNC, in order to facilitate the speedy initation of criminal proceedings for RNC-related offenses and quick release of RNC-related detainees.

159. Defendants' mass arrest plans were maliciously designed and intended to punish and discourage dissent.

160. Defendants' RNC-related mass arrest processing plans were designed and intended to slow down the processing of those arrested during the RNC.

161. The use of Pier 57 as a primary mass arrest processing center was central to defendants' plans in this connection.

162. Upon information and belief, in approximately 2003, the New York City Transit Authority stopped using Pier 57 as a bus depot.

163. Upon information and belief, in 2003 and 2004, defendant HRPT was seeking a developer to transform Pier 57 into a commercial and park destination.

164. At or about the same time, upon information and belief, defendants Betts, Bloomberg, Fishman, and HRPT and/or Governor Pataki had close and frequent personal contacts regarding defendant Betts's bid as Chairman of Chelsea Piers Management for the private development rights over Pier 57.

165. Upon information and belief, at or around approximately December of 2003, defendant RNCHC came to an agreement with defendant HRPT to use the second floor of Pier 57 as a parking facility during the RNC, apparently in

connection with its plans to house conventioneers aboard the Norwegian Dawn, a ship owned by Norwegian Cruise Lines that flew under the flag of the Bahamas.

166. According to defendant Colgan, "in anticipation of RNC related protests, . . . a special RNC arrest process was designed."

167. Upon information and belief, as part of that special RNC mass arrest processing, defendants planned to make mass arrests without ensuring that those arrests could be individual determinations of probable cause in each case, employing such resources as scooters, nets, and plainclothes and/or undercover law enforcement officers to trap individuals without warning and without giving individuals so trapped dispersal orders or meaningful opportunities to disperse.

168. Upon information and belief, in 2003 and/or 2004, defendants planned for and implemented training programs regarding making mass arrests for defendant NYPD and/or other law enforcement agents.

169. Defendants also planned to order individual "arresting officers" to "process" the arrests of detainees in groups of five (5).

170. Upon information and belief, as a matter of policy and/or practice, defendants ordered such "arresting

officers" to swear out accusatory instruments alleging that such "arresting officers" had observed alleged violations of law when, in fact, they had not.

171. One clear purpose of this police and practice was to relatiate against individuals who engaged in protest activity, and/or bystanders, by subjecting them to criminal prosecutions for minor violations of law based on falsely sworn statements.

172. According to defendant Colgan, during the 19 or so months prior to the RNC, defendant Colgan was temporarily re-assigned from his position as the Executive Officer of defendant NYPD's Counter-Terrorism Bureau so that he could act as the temporary head of defendant NYPD's Criminal Justice Bureau during the RNC and oversee mass arrest processing at Pier 57.

173. According to defendant Colgan, the first stages of this mass arrest processing involved six (6) steps: (1) prisoner sorting; (2) prisoner searching; (3) prisoner property vouchering; (4) interview by defendant NYPD attorneys of arresting officers; (5) review of the arresting officers' paperwork by NYPD Criminal Justice Bureau Online Booking System supervisors; and (6) transportation of the prisoner out of the facility.

174. Many of these steps were unnecessary and dilatory
and designed to delay detainees' movement through the mass
arrest processing system.

175. For example, defendant Colgan has stated that
defendants planned to prepare "line by line" typed property
vouchers as part of Step 3.

176. Additionally, defendants' final three (3) mass
arrest processing steps were not designed, as defendants
claim, to ensure the legality of each arrest, but to allow
defendant NYPD officers and supervisors and/or other
unidentified defendants to prosecute the maximum number of
arrestees as a post-hoc justification for having made the
arrests in the first place.

177. The use of Pier 57 was thus part of a broader law
enforcement plan to limit the number of demonstrators on
the streets during the RNC by arresting as many people as
possible, detaining them as long as possible in unsafe
conditions without any access to the outside world
whatsoever, and lodge patently false charges against many.

178. The plan further included using Pier 57 as a site
for RNC-related mass detention, without providing any
processing equipment to expedite moving the detainees
through the system at Pier 57 (such as LiveScan machines),
then using events that occurred at Pier 57 as an excuse for

doggedly refusing to follow normal abbreviated procedures for processing violation-related arrests.

179. According to defendant Colgan, Operation Overlord II "called for additional arrest processing sites, the Post Arrest Staging Site (PASS) at Pier 57, space that was obtained by the City to serve as a preliminary processing site during the RNC, and the Mass Arrest Processing Center (MAPC) at 100 Centre/125 White Street."

180. According to defendant Colgan, "[w]ith respect to RNC arrests, the arrest processing for all arrestees began at PASS, continued through MAPC and ended at MCS located at 100 Centre Street."

181. Upon information and belief, defendants planned to conduct the six (6) above-detailed special RNC mass arrest processing steps at Pier 57.

182. By letter dated June 22, 2004, defendant DeRienzo contacted defendant Fishman in order to request defendant HRPT's permission to use Pier 57 "to accommodate the temporary holding of prisoners . . . for mass arrests during the convention."

183. Defendant DeRienzo requested that defendant HRPT grant defendant NYPD access to Pier 57 "effective July 1, 2004 . . . in order to commence the necessary building

repairs/modifications" to the Pier, which included installation of "fencing with razor wire."

184. Less than three weeks later, on July 9, 2004, defendant Fishman executed a Memorandum of Understanding ("MOU") on behalf of defendant HRPT granting defendant NYPD "the right to exclusively occupy and use the entire first floor of the facility located on Pier 57 . . . for the period August 2 through September 7, 2004" for use as "a secondary arrest processing and temporary holding center for detainees."

185. In fact, in violation of the MOU, defendant NYPD planned to use, and actually used, Pier 57 as its "primary arrest processing and detention center rather than as its secondary facility" for all RNC-related arrests.

186. Despite that the defendants had pre-determined to fingerprint all RNC-related arrestees, there were no fingerprinting machines at Pier 57 at all.

187. In fact, defendants only had ten (10) LiveScan fingerprinting machines, "allowing for the printing of two separate groups of five prisoners at a time" at its downtown MAPC.

188. Upon information and belief, in connection with what were then ongoing efforts to rehabilitate Pier 57 for commercial use, defendant HRPT paid contractors to inspect

the premises and produce reports analyzing the environmental and other conditions within Pier 57.

189. According to an April 2004 Inspection Report prepared for the HRPT by Ove Arup & Partners Consulting Engineers PC documenting "the structural, mechanical, electric and plumbing inspections conducted for the purpose of determining existing conditions of systems and immediate requirements for repair and winterization of the facility," as of April 2004,

- The pier's exhaust and ventilation systems were "in very poor condition" and "beyond their useful service life".

- "The piping throughout the building is in very poor condition. Much of it is disconnected and corroded. Most of the insulation is stained, torn, and damaged by water leaks. . . . [All such systems should be] decommissioned and removed."

- "The building's electrical and life safety systems have code deficiencies, are in poor physical conditions and are in need of replacement."

- "The majority of the wiring is from the original 1953 construction and has outlived its design life. . . . This violates present electrical codes. . . [and i]t is possible that some of the support and cable spacers for the 'aerial' wiring system may contain hazardous materials."

- "There is no emergency power system installed at Pier 57."

- "The emergency lighting system layout is inadequate and would need to be redesigned to meet present codes."

- "The exit signs with phosphorescence material have outlived their usefulness and are inoperable."

- "Key components of the existing plumbing and fire protection systems have code deficiencies and/or are in poor physical condition and are in need of replacement."

- Inspectors "could not locate any detection devices such as smoke and/or heat detection in the facility. The system appears to have been modified throughout the years but has exceeded its design life. The audible devices do not meet code-required coverage and visual devices will need to be installed to comply with current codes."

- It is unclear from the Report whether the sprinkler system was even operable.

190. The next month, in May of 2004, AKRF, Inc. the consulting agency defendant HRPT hired to do the overall park's Final Environmental Impact Statement, released its Pier 57 Preliminary Asbestos and Lead Paint Inspection Report, which found that:

- "Floor tiles and associated mastics, spray-applied fireproofing, heater (radiator) insulation, window caulk and glazing, pipe and pipe fitting insulation, duct insulation, transite siding and panels, linonelum, fire door insulation, door frame insulation, door caulk, and roof flashing materials were determined to be 'Asbestos Containing Materials.'"

- ". . . Friable ACMs in damaged condition, including spray-applied fireproofing, duct insulation, and pipe and pipe fitting insulation, were observed above the hung plaster ceiling on the second floor and basement of the head house

and within pipe chases through the pier. Access to these areas must be limited until these materials can be removed."

- Paint containing toxic levels of lead was found in metal elevator doors and casing, concrete stair risers, handrails, stringers and balusters, concrete walls and floors, metal columns, guardrails, piping, conduit and electrical panels, and metal overhead doors, throughout the pier."

191. AKRF recommended "removal of all affected ACMS in the building by a qualified, licensed asbestos abatement contractor prior to commencing the renovation project."

192. Despite that its lead paint screening was so cursory that it did not even meet United States Housing and Urban Development Standards, ARKF also warned that "renovation and demolition activities with the potential to disturb lead paint must be performed in accordance with the applicable Occupational Safety and Health Administration regulation."

193. On or about May 3, 2004, a "Preliminary Engineering Estimate" based on a series of site visits conducted at Pier 57 in November 2003 by engineers and inspectors from Arup Consulting Engineers and AKRF Environmental Consultants that included "costs associated with establishment of basic building services and life safety systems and environmental cleanup of asbestos, lead

44

and contaminated soils, spills, tanks and miscellaneous equipment" put the total of such costs at $33,690,302.00.

194. Upon information and belief, at no time did defendants take any steps to remediate the aforementioned unsafe conditions, although defendants Fishman, Betts, Bloomberg, Kelly, Esposito, Hammerman, Smolka, Graham, Monahan, Colgan, and/or DeRienzo actually knew or should have known about the same.

195. Upon information and belief, at some time between on or about August 2, 2004 and August 27, 2004, the NYPD erected eleven (11) chain-link pens within Pier 57, ten of which had the capacity to hold approximately sixty (60) people each and one of which "had the capacity to hold several hundred."

196. Upon information and belief, prior to July 16, 2004, "the anticipated mass arrests of the [RNC] protesters had been in the planning stages by the New York City Police Department (NYPD) for some time" when defendant NYPD requested defendant NYCDOC's assistance "to detain the protestors at the Bernard B. Kerik – 100 Centre Street Court Detention facility."

197. Upon information and belief, on July 22, 2004, unidentified agents of defendant NYPD requested that the New York State Commission on Correction ("NYSCOC") conduct

a "site visit to One Police Plaza . . . in order to discuss the re-opening of several closed holding cells."

198. The NYSCOC is a New York State agency established pursuant to NYC Corrections Law that has jurisdiction and authority over prisons, jails, station houses, and other detention facilities throughout New York State, including detention facilities set up to hold detainees prior to arraignment such as Pier 57.

199. The NYSCOC has promulgated and enforces minimum standards for such detention facilities.

200. Upon information and belief, even though the NYPD had already signed a MOU with the HRPT to use Pier 57 as a "secondary" arrest processing center during the RNC when defendant NYCDOC reached out to the NYSCOC to monitor the situation for liability purposes, defendants never mentioned the MOU or the plans to use Pier 57 to the NYSCOC.

201. On July 27, 2004, an agent of the NYSCOC called an agent of defendant NYCDOC "in order to inquire further about the plans to assist the NYPD with holding pre-arraigned detainees."

202. During the course of that phone call, an agent of defendant NYCDOC requested that the NYSCOC monitor "the situation for liability reasons."

203. Upon information and belief, NYSCOC staff met with a Chief Grant, an agent of defendant NYCDOC, on August 17, 2004 and "discussed the anticipated plans for the upcoming monitoring project", during which meeting Chief Grant explained that "the Bernard B. Kerik Correctional Center (BBKC), the Brooklyn House of Detention Center (BKHD), and the Queens House of Detention Center (QNHD) were to be utilized by the NYC DOC to hold the pre-arraigned detainees."

204. Upon information and belief, in preparation for its RNC Monitoring Project, the NYSCOC prepared a pre-operation plan, established monitoring objectives, and actually conducted tours of court detention centers based on the defendants' representations that some combination of up to three (3) locations - the BBKC, BKHD, and QNHD – would be used to hold pre-arraigned detainees.

205. Upon information and belief, at no time prior to the RNC did defendants inform the NYSCOC of their intention to use Pier 57 during the RNC at all.

206. Accordingly, the NYSCOC monitored all areas of the BBKC/MAPC under defendant NYCDOC's care and control from approximately 3:00 PM on Sunday, August 29, 2004 and ending at approximately 7:00 AM on Friday, September 3, 2004.

207. The NYSCOC monitoring staff was comprised of two (2) five (5) person teams working twelve (12) hour shifts around the clock at the BBKC.

208. Upon information and belief, the NYSCOC monitoring staff toured the facilities at the BBKC and 100 Centre Street at least every other hour and made regular notations of RNC arrestee count numbers.

209. Throughout the week, defendant NYCDOC "utilized an additional log book to document the appropriate housing of the RNC detainees and any other significant documentation."

210. Additionally, NYSCOC Counsel Michael Donegan "maintained a command center in mid-town Manhatan in order to supervise staff and provide liaison with NYC executive and command personnel as needed."

211. Rather than attempt to use existing resources, such as Old Central Booking, Central Booking, or the numerous precincts throughout NYC, including the at least twenty (20) precincts in Manhattan, all of which were capable of adequately processing arrests, and/or the Brooklyn and/or Queens Houses of Detention, defendants used Pier 57 as part of arrest processing procedures which were malicious, retaliatory, and intended to unreasonably delay

the period of time that those perceived as protesters would be held in custody following their arrests.

212. Upon information and belief, defendants Bloomberg, Kelly, Esposito, Hammerman, Smolka, Graham, Monahan, Colgan, DeRienzo, Mercandetti, Albano and/or other unidentified defendants designed and implemented training procedures for supervisory and/or rank and file defendant NYPD officers regarding the planned RNC mass arrests and planned RNC mass arrest processing.

213. In the course of planning for and implementing those training procedures, defendants Bloomberg, Kelly, Esposito, Hammerman, Albano, Smolka, Graham, Monaham, Colgan, DeRienzo, and/or other defendants intentionally and/or negligently failed to train defendants Scolaro, Mercandetti, SMaher, Murphy, Unidentified Bicycle Sergeant, Wohl, Martinez, Roscher, and/or other unidentified defendants regarding, *inter alia*, the Constitution and laws of the United States and the State of New York, proper procedures for using plastic handcuffs, use of force.

214. For example, upon information and belief, defendants Hammerman and Albano, acting in concert with other defendants, promulgated internal Legal Guidelines for the RNC.

215. Those Legal Guidelines included numerous pages detailing tactics that protesters "might" use during the RNC, which were calculated to, and had the effect of, giving defendant NYPD Officers (and others) the impression that demonstrations during the RNC would be violent and chaotic.

216. In the period just before the RNC, defendants, acting in concert with other City, State, and/or Federal law enforcement agencies including, but not limited to, the FBI, embarked on a press campaign that led to prominent articles demonizing protesters in mainstream newspapers with titles including, but not limited to, "Finest Prep for Anarchy", "Protests May Turn Bloody, Feds Warn", "Anarchists Hot for Mayhem", "Top Troublemakers on Cops' Sights", and "Kelly: Peaceful Must Ax Anarchy".

217. Thus was the stage set for the widespread civil rights violations the defendants acted in concert to plan for and effect during the RNC.

### MCSORLEY'S ALEHOUSE – AUGUST 30, 2004

218. On Sunday, August 29, 2004, Mr. Kyne spoke to many NYPD officers about DU.

219. Upon information and belief, some of those interactions were recorded by NYPD officers and/or other unidentified City, State, and/or Federal law enforcement

agents using videocameras and/or other means of surveillance.

220. On Monday, August 30, 2004, at approximately 10:00 PM, Mr. Kyne arrived at McSorley's Alehouse on 15 East 17th Street along with two (2) of his friends.

221. Upon information and belief, RNC delegates and others, including Governor Pataki, had gathered at McSorley's Alehouse for an RNC-related event.

222. When he arrived, Mr. Kyne observed numerous NYPD cars and other unmarked vehicles that appeared to be affiliated with the NYPD and other vehicles that appeared to be affiliated with City, State, and/or Federal law enforcement agents parked across the street from and in the general vicinity of McSorley's Alehouse.

223. When Mr. Kyne and his friends approached the door to McSorley's Alehouse, an NYPD officer or NYPD officers barred him from entering and told Mr. Kyne that the event inside was a "private party."

224. Mr. Kyne was then instructed by an NYPD officer or NYPD officers that he could not stand on the sidewalk near McSorley's Alehouse, either.

225. Mr. Kyne asked why he was not allowed to remain on the public sidewalk.

226. People inside the bar were looking out at him, grinning.

227. Mr. Kyne yelled, "The troops hate you" a number of times to the people in the bar.

228. A group of approximately five (5) to ten (10) uniformed NYPD officers then approached and began to back Mr. Kyne and others on the sidewalk away from the entrance to the bar.

229. Approximately as Mr. Kyne began to back up and/or backed up, he yelled words to the effect of "they lied to you, they lied to me, they're taking away our civil rights."

230. Upon information and belief, some of those interactions were recorded by NYPD officers and/or other unidentified City, State, and/or Federal law enforcement agents using videocameras and/or other means of surveillance.

231. As Mr. Kyne backed up, one NYPD officer said to him, "You made your point, let's head home."

232. At or about that time, Mr. Kyne asked an NYPD officer in a white shirt whose badge indicated her last name was Donohue if she knew members of the 442nd, including NYPD officers and NYC firefighters, were being exposed to depleted uranium in Iraq, and told her that he could not

believe that she and the other NYPD officers at McSorley's Alehouse were "protecting fat folks like that in the bar."

233. Mr. Kyne continued to disperse and left peacefully.

A31

234. On August 31, 2004 alone, defendants arrested over 1,200 people for allegedly engaging in protest activity in NYC.

235. On August 31, 2004, Mr. Kyne brought twelve (12) copies of Support the Truth, the book he has written concerning, *inter alia*, the dangers of depleted uranium, and six (6) copies of a CD he produced of the same name, into New York City, intending to distribute them.

236. Upon information and belief, on August 31, 2004, defendant Smolka was an "Incident Commander" of defendants' RNC-related mobilization, and as such actually supervised and directed mass arrests that day.

237. Upon information and belief, defendants Bloomberg, Esposito, and/or Kelly were in communication with each other and other defendants on August 31, 2004 regarding the events of the day as the unfolded.

238. Upon information and belief, on August 31, 2004, defendants Graham and Monahan were acting as defendant NYPD supervisors.

53

239. In the late afternoon of August 31, 2004, Mr. Kyne and Mr. Seth Rick arrived at the Fox News Building near 1211 Avenue of the Americas between 47th and 48th Streets.

240. There, Mr. Kyne observed pedestrians, protesters, bystanders, onlookers, uniformed NYPD officers, and other City, State, and/or Federal law enforcement officers had gathered.

241. Upon information and belief, a heavily policed, unpermitted peaceful protest event ensued.

242. In the late afternoon of August 31, 2004, Mr. Kyne met Ms. Tatyana Semanova, who identified herself to Mr. Kyne as a filmmaker making a film entitled "Profiles in Protest."

243. Between approximately 5:30 and 5:45 PM, Mr. Kyne, Mr. Rick, and Ms. Semanova began to walk toward the New York City Public Library on 42nd Street ("the library").

244. Upon information and belief, Canadian citizens Jean Sebastian Lalumiere and Stephan Lahoud arrived at the library as Mr. Kyne, Mr. Rick, and Ms. Semanova were still en route.

245. When Mr. Lalumiere and Mr. Lahoud arrived at the library, there were a number of people sitting, standing,

and/or walking on the several levels of steps and plazas leading up to the library entrance .

246. Several groups of uniformed NYPD officers were positioned approximately to the north and south of the first set of steps leading approximately from the northwestern edge of the sidewalk to the library entrance.

247. Some of the NYPD officers wore a uniform consisting of a pair of short pants, a pair of short-sleeve t-shirts, and a white headband on which the words "NYPD RNC" separated by a picture of a bicycle were stitched in blue.

248. The front side of the short-sleeve t-shirts of these "bicycle squad" uniforms each bore a stitched NYPD shield on the left.

249. Upon information and belief, there was also a Velcro area on the right side of such short-sleeve t-shirts onto which some officers had affixed separate pieces of fabric bearing their last names and badge numbers.

250. Among the officers wearing such uniforms was defendant "John Doe," an NYPD Sergeant whose identity plaintiffs have been unable to ascertain because he was not wearing any shield or Velcro or other identification badge ("Unidentified Bicycle Sergeant").

251. Others among the groups of officers were outfitted in riot gear helmets and equipped with batons.

252. Upon information and belief, some or all of those officers equipped in riot gear helmets were members of the Bronx Patrol Boro Task Force who were actually under the command of defendants Mercandetti, Kelly, Smolka, Graham, Monahan, Hammerman, and/or other unidentified NYPD supervisors and/or City, State, and/or Federal law enforcement agents.

253. Upon information and belief, others so outfitted were assigned to other NYPD and/or NYPD Task Force units that had been pre-positioned in the immediate area of the library under the command of defendants Mercandetti, Kelly, Smolka, Graham, Monahan, and/or other unidentified NYPD supervisors and/or City, State, and/or Federal law enforcement agents.

254. Some of those uniformed NYPD officers also carried plastic handcuffs.

255. Upon information and belief, some or most of said plastic handcuffs were bundled in groups of five (5).

256. Upon information and belief, some such pairs of pre-bundled plastic handcuffs bore writing or other markings indicating the name and/or Shield Number of the NYPD officer to whom the bundle had been issued.

257. Between approximately 5:30 and 5:45PM, various forms of pedestrian traffic proceeded without difficulty on the sidewalk and up and down the steps leading to the library entrance.

258. Between approximately 5:30 and 5:45PM, Mr. Lalumiere, Mr. Lahoud, and Ms. Amber Tejada began to place a banner on one of the lions at the top of the library steps.

259. As Mr. Lalumiere and Mr. Lahoud spread and/or draped the banner across the lion, defendant Mercandetti approached them and said, "You can't hang a sign on Parks Department Property.  You can hold it, but you can't hang it."

260. As Ms. Tejada looked on, Mr. LaLumiere and Mr. Lahoud immediately took the banner off the lion and began to put it away.

261. Within approximately five (5) seconds, at least two (2) NYPD Captains and several other uniformed NYPD officers rushed in at Mr. LaLumiere, Mr. Lahoud, and Ms. Tejada from behind defendant Mercandetti.

262. Without addressing any of them verbally, defendant Mercandetti, the two (2) unidentified NYPD Captains, and several other unidentified NYPD Officers

physically grabbed Mr. Lalumiere, Mr. Lahoud, and Ms. Tejada.

263. Numerous bystanders reacted to the apparent arrests by chanting "Let them go" and/or "shame" and/or asking "What did they do?"

264. Defendant Mercandetti spoke into a cellular telephone and, upon information and belief, called for a "task force."

265. Upon information and belief, defendant Mercandetti was referring to the Bronx Borough and/or Manhattan South Task Forces, which were, upon information and belief, under the command of defendants Mercandetti, Kelly, Smolka, Graham, Monahan, Hammerman, and/or other unidentified NYPD supervisors and/or City, State, and/or Federal law enforcement agents at that time.

266. As a group of NYPD officers led Mr. Lalumiere, Mr. Lahoud, and Ms. Tejada down the steps away from the lion, one bystander yelled, "What did they do? They put up a banner."

267. Others yelled, "You fucking fascists" and "You think this is a free country?"

268. Defendants Albano and Roscher were within sight and sound and within approximately five (5) feet of Mr.

Lalumiere, Mr. Lahoud, and Ms. Tejada as they were detained and led away.

269. Mr. Langley observed Mr. LaLumiere, Mr. Lahoud, and Ms. Tejada prior to and as they were placed under arrest.

270. A large group of NYPD officers, some of whom were holding Mr. LaLumiere, Mr. Lahoud, and Ms. Tejada, then walked unobstructed down the library steps, across 5th Avenue in the crosswalk at approximately 41st Street, and approximately northeast on the eastern side of the roadway, until they arrived at a marked NYPD Prisoner Transport Vehicle bearing the label "CJB 4214" near the northeastern corner of 42nd Street and 5th Avenue.

271. The back area of the Prisoner Transport Vehicle was open and empty at that time.

272. At or shortly after Mr. LaLumiere and Mr. Lahoud arrived at the back of the Prisoner Transport Vehicle, they met defendant Wohl and NYPD Officer Kerri Mitchell, Shield No. 14657, for the first time.

273. Upon information and belief, defendant Wohl was not present within sight or sound of the location at which Mr. LaLumiere and Mr. Lahoud were placed under arrest on the library plaza immediately prior to or before they were physically seized by other NYPD officers.

274. Nevertheless, upon information and belief, defendant Wohl swore out an accusatory instrument and/or accusatory instruments charging each of them with violations and/or misdemeanors based on allegations that he personally observed them engage in unlawful conduct.

275. Upon information and belief, at or shortly after Ms. Tejada arrived at the back of the Prisoner Transport Vehicle, she met Officer Mitchell for the first time.

276. Upon information and belief, Officer Mitchell was not present within sight or sound of the location at which Ms. Tejada was placed under arrest on the library plaza immediately prior to or before she was physically seized by other NYPD officers.

277. Nevertheless, upon information and belief, Officer Mitchell swore out an accusatory instrument charging Ms. Tejada with violations and/or misdemeanors based on allegations that she personally observed her engage in unlawful conduct.

278. Upon information and belief, at all times related hereafter up until and including plaintiffs' arrests, defendant Wohl remained at or near the Prisoner Transport Vehicle, well beyond sight or sound of Mr. Kyne, Mr. Duncan, Mr. Langley, or the library steps and plaza areas.

279. When Mr. Kyne arrived at approximately 5:45 PM, a few minutes after the first library arrests had already occurred, there were numerous people spread across the steps and plazas.

280. Upon information and belief, among the people on the steps and plazas at the library at that time were an unknown number of plainclothes and/or other defendant "Richard and Mary Roe" NYPD and/or other City, State, and/or Federal agents, including defendant "Blue", a City, State, and/or Federal agent wearing a light blue t-shirt.

281. A stationary phalanx of uniformed NYPD police officers in riot gear was positioned approximately next to where two (2) young women were seated playing the guitar and singing on the southwestern end of one of the plaza areas.

282. A separate row of uniformed NYPD officers dressed in riot gear helmets and equipped with and/or holding batons stood in a line blocking the library entrance.

283. Upon information and belief, some or all of those officers were the "Task Force" officers defendant Mercandetti summoned over his cell phone.

284. With the exception of the aforementioned uniformed NYPD presence, the scene was entirely peaceful.

285. Pedestrian traffic proceeded without difficulty on the sidewalk and up and down the steps leading to the library.

286. Defendant Maher appeared to be supervising the phalanx of officers closest to the two (2) young women singing and playing the guitar.

287. Mr. Kyne and Mr. Rick approached Defendant Maher and Mr. Rick asked if he needed a permit to unfurl a large United States flag.

288. Defendant Maher refused to respond to Mr. Rick's question, and ordered Mr. Rick to get back.

289. Mr. Rick responded immediately and stepped away from defendant Maher and the phalanx of police officers.

290. As Mr. Rick stepped away, an unidentified NYPD Captain approached an unidentified NYPD "Task Force" Sergeant at the rear of the phalanx, put his hand on the Sergeant's chest, and said, "Let's go."

291. The two (2) then walked a few northerly steps to the east of the phalanx.

292. The unidentified NYPD Captain then repeated "Grab him" at least three (3) times in quick succession.

293. The unidentified NYPD "Task Force" Sergeant and other unidentified City, State, and/or Federal agents,

including defendant Blue, forcefully grabbed a "John Doe" arrestee wearing a backpack.

294. The sudden police activity stunned bystanders and onlookers.

295. One reacted by pointing in surprise and saying, "Hey!"

296. Almost immediately, unidentified persons began to say, "Let him go."

297. NYPD Officers wearing riot helmets held onto the John Doe arrestee.

298. At approximately the same time, within a few feet of where Mr. Kyne was standing, NYPD Officer Felicia Alfred of the 94th Precinct, Shield Number 20292, and other unidentified NYPD Officers physically placed their hands on a black-haired "Jane Doe" arrestee and, acting in concert unidentified City, State, and/or Federal agents, searched her backpack, and subsequently released her.

299. Mr. Kyne approached defendant Blue as she and other unidentified City, State, and or Federal agents forcefully took the "John Doe" arrestee's backpack off of his person a few feet away from the black-haired "Jane Doe" arrestee.

300. Mr. Kyne expressed his alarm that at the NYPD Officers' and other unidentified City, State, and/or

Federal agents' conduct peacefully, by verbally addressing the individuals he believed were effecting an unconstitutional search and seizure.

301. Mr. Kyne indicated that, as a United States Army Veteran of Operation Desert Storm, he had risked his life to defend the Constitution of the United States of America.

302. Mr. Kyne asked why defendant Blue and the uniformed officers were searching the "John Doe" individual's backpack without any apparent legal justification whatsoever.

303. Mr. Kyne received no response.

304. The plaza suddenly hummed with police activity.

305. Unidentified NYPD Officers and other City, State, and/or Federal agents began to grab an unknown number of persons, apparently at random.

306. At approximately the same time, within a few feet of where Mr. Kyne was standing, an unknown number of unidentified City, State, and/or Federal agents, acting in concert with NYPD Officer "John" Ganci, Shield Number 4646, NYPD Sergeant "John Doe", Shield Number 2743, and a NYPD Officer apparently from the 84th Precinct, Shield Number 4483, physically arrested a blonde "Jane Doe" arrestee, throwing her onto the ground.

307. Unidentified persons began to shout, "Shame," "Let them go," "Illegal search!" and "I do not consent to this search."

308. At approximately that time, defendant Maher and other unidentified NYPD Officers formed a "police line" running approximately north to south approximately between where Mr. Kyne was standing and where the blonde "Jane Doe" arrestee was being arrested and/or searched.

309. Defendant Maher and other unidentified NYPD Officers physically pushed bystanders, including individuals who appeared to be members of the press and individuals acting as legal observers, back and away from the blonde "Jane Doe" arrestee.

310. At approximately the same time, to approximately the south of where Mr. Kyne was standing, unidentified City, State, and/or Federal agents formed a "police line" running approximately north to south.

311. As people were forced suddenly backward, unidentified persons shouted, "Shame" and "You're violating our constitutional rights," among other things.

312. Mr. Duncan arrived at the library at approximately that time.

313. A few minutes earlier, Mr. Duncan and his friend Ms. Ana Pardo had been walking toward the library, coming from a protest.

314. Mr. Duncan and Ms. Pardo then observed several individuals wearing bright green hats talking about "arrests" and hastened to the library to take photographs.

315. At or about the time Mr. Duncan arrived, Mr. Langley was taking photographs of an unidentified person or persons being arrested.

316. Defendant Mercandetti stated "Move back" toward unidentified persons approximately six (6) times in rapid succession as he moved from approximately the northwest through a crowd of people toward Mr. Langley.

317. Defendant Mercandetti was physically touching and pushing unidentified persons as he moved through the crowd saying "move back".

318. It was difficult, unsafe, and/or impossible for those persons defendant Mercandetti was addressing to move back, because they were already being pushed by NYPD Officers into others behind them.

319. Mr. Langley began to move back by walking backwards, along with other unidentified persons, as defendant Mercandetti approached.

320. Mr. Langley moved back as quickly as he could without physically knocking over the people behind him, who were also moving back and/or attempting to move back.

321. Defendant Mercandetti pushed Mr. Langley on the chest, forcing him backward, and said, "Move back".

322. Defendant Mercandetti pushed Mr. Langley on the chest a second time, forcing him backward so that he collided with other unidentified persons, and said, "Move back" a second time.

323. Immediately after saying "Move back" a second time, defendant Mercandetti grabbed Mr. Langley's left arm and shouted the word "collar" twice.

324. As defendant Mercandetti said "collar," defendant Murphy moved rapidly toward Mr. Langley.

325. Defendant Murphy jumped on and grabbed Mr. Langley so forcefully that he was pushed into the people behind him.

326. One of the people said, "What are you doing?" to the police officers.

327. Approximately twenty-five (25) or thirty (30) seconds had elapsed from the moment the unidentified NYPD Captain and Sergeant grabbed the first "John Doe" arrestee to the moment of Mr. Langley's arrest.

328. Defendants Murphy and Mercandetti and an unidentified NYPD Captain with a baton physically pushed bystanders backward after defendants Murphy and Mercandetti pushed Mr. Langley onto the ground.

329. The unidentified NYPD Captain held his wooden baton outstretched in front of him with both hands and physically pushed it into unidentified persons as he pushed them backward.

330. The unidentified NYPD Captain with the baton also pushed people with his body.

331. Defendant Mercandetti, an unidentified NYPD Captain, and an unidentified uniformed NYPD Officer placed Mr. Langley in plastic handcuffs as he lay face-down on the ground.

332. Defendant Mercandetti did not continue to say "move" after he said "collar."

333. Mr. Langley was physically and otherwise compliant at all times.

334. Defendant Mercandetti physically touched Mr. Langley on the arms and wrists and assisted in placing plastic handcuffs on Mr. Langley.

335. In effecting the aforementioned arrests and moving unidentified bystanders and onlookers and other persons on the steps and plazas at the library, the NYPD

Officers and other City, State, and/or Federal agents had created a clearing on at least one of the plazas and created broad approximately east-west pathways to approximately the north and south of the clearing.

336. Mr. Duncan was within a few feet of defendant Mercandetti and Mr. Langley as defendant Mercandetti and the other NYPD Officers placed Mr. Langley under arrest, taking photographs of the rapidly unfolding events from within that clearing.

337. As defendant Mercandetti was still physically touching and/or within approximately one (1) foot of Mr. Langley, the unidentified NYPD Captain with the baton and/or defendants Murphy and Unidentified Bicycle Sergeant pulled Mr. John Frances Mulligan onto the ground several feet away and behind defendant Mercandetti.

338. Defendants Murphy and Unidentified Bicycle Sergeant then pushed Mr. Mulligan face-first to the ground.

339. At approximately the same time, defendant Mercandetti shouted words to the effect of, "Come on, let's go, what are you waiting for, let's go!"

340. Apparently in response, an unidentified NYPD Officer in a white shirt then said words to the effect of, "Sarge, bring the Task Force up" over a handheld radio.

341. Upon information and belief, Mr. Langley was subsequently transported by unidentified NYPD officers down the library steps, across 5th Avenue, and to the marked NYPD Prisoner Transport Vehicle bearing the label "CJB 4214" near the northeastern corner of 42nd Street and 5th Avenue, at which, upon information and belief, defendant Wohl remained.

342. At approximately that time, an unidentified NYPD Officer told Mr. Langley, "Your rights end where my rights begin."

343. At approximately the same time, an unidentified NYPD Deputy Commissioner of Legal Matters Officer walked approximately from the northeast to southwest toward Mr. Mulligan, waving his hands in the air, not to dissuade defendants Murphy and Unidentified Bicycle Sergeant from arresting Mr. Mulligan, but to push back bystanders and onlookers to approximately the south, some of whom had reacted to seeing Mr. Mulligan thrown to the ground by continuing to say words to the effect of "Shame" and "Let them go", among others.

344. Mr. Mulligan grimaced as defendant Unidentified Bicycle Sergeant twisted Mr. Mulligan's right arm around his back and defendant Murphy placed Mr. Mulligan's hands in a pair of plastic handcuffs.

345. Mr. Duncan knelt down approximately five (5) to fifteen (15) feet to the south and west of Mr. Mulligan, in the clearing, as Mr. Mulligan was being handcuffed and took a picture or pictures of defendants Murphy and Unidentified Bicycle Sergeant handcuffing Mr. Mulligan.

346. Defendant Roscher and an unidentified NYPD Officer wearing a Deputy Commmissioner of Legal Matters uniform were standing within sight and sound and within approximately five (5) feet of Mr. Langley as he was arrested, and standing within approximately five (5) to ten (10) feet of Mr. Ducan when Mr. Duncan knelt down and took the aforementioned picture or pictures.

347. At approximately the same time, defendant Martinez knelt down and tightened Mr. Mulligan's handcuffs.

348. Witnessing the tightening of the plastic handcuffs, an observer said, "Not too tight, guys."

349. The observer then stood up and stepped away from Mr. Mulligan, as defendant Murphy responded, "You want to do it?"

350. The observer then asked defendant Unidentified Bicycle Sergeant, "Sarge, can I get his name?"

351. Defendant Scolaro then placed himself physically between the observer and Mr. Mulligan and stated, "You're not gonna get it here."

71

352. As defendant Scolaro placed himself physically between the observer and Mr. Mulligan, defendant Murphy grabbed Mr. Mulligan by his left arm and/or shoulder.

353. Defendant Martinez grabbed Mr. Mulligan by his right arm and/or shoulder.

354. Defendant Unidentified Bicycle Sergeant grabbed Mr. Mulligan by his right leg and/or ankle.

355. An unidentified NYPD Officer wearing a Deputy Commissioner of Legal Matters uniform grabbed Mr. Mulligan by his left leg and/or ankle.

356. The four (4) NYPD officers then lifted Mr. Mulligan off the ground and began to carry him approximately northeast down the steps.

357. The four (4) NYPD officers carried Mr. Mulligan past defendant Albano.

358. Defendant Mercandetti was located approximately in front of them.

359. Defendant Scolaro followed behind them.

360. Mr. Duncan was standing approximately ten (10) to fifteen (15) feet to the southeast of the four (4) officers as they carried Mr. Mulligan down the steps.

361. Mr. Duncan was holding his cellular telephone up to his left ear with his left hand, attempting to get in

touch with Ms. Pardo, while holding his camera in his right hand.

362. Mr. Duncan was facing the entrance to the library, away from where the defendants were carring Mr. Mulligan.

363. Mr. Duncan was talking on his cellular telephone.

364. As the four (4) NYPD Officers carried Mr. Mulligan approximately northeast down the steps to the north of where Mr. Duncan stood, a phalanx of NYPD Officers dressed in riot gear helmets and equipped with and/or holding batons proceeded up the steps in formation traveling the opposite direction.

365. Approximately one (1) second after passing Mr. Duncan, defendant Unidentified Bicycle Sergeant dropped Mr. Mulligan's right leg and/or ankle without warning.

366. Defendant Unidentified Bicycle Sergeant spun around and ran directly at Mr. Duncan, whose back was to defendant Unidentified Bicycle Sergeant.

367. Defendant Unidentified Bicycle Sergeant forcibly grabbed Mr. Duncan from behind with both hands and began to pull him onto the ground.

368. Defendants Scolaro and Unidentified Bicycle Sergeant forced Mr. Duncan face-down on the ground together so quickly that at least two (2) of the people standing

near him physically jumped away from the police officers, colliding with other people.

369. Unidentified persons responded by saying, "Whoa" and "No" and "He wasn't doing anything" and "he didn't do anything."

370. Mr. Duncan was physically and otherwise compliant at all times.

371. Defendant Unidentified Bicycle Sergeant held Mr. Duncan pinned to the ground by twisting Mr. Duncan's right arm around his back and applying pressure for approximately one (1) minute while he consulted with at least three (3) other unidentified NYPD Officers.

372. During that one (1) minute, Mr. Duncan asked defendant Unidentified Bicycle Sergeant several times, "What did I do" and stated "I didn't do anything."

373. Mr. Duncan was subsequently placed in tight plastic handcuffs.

374. At approximately the same time, to Mr. Duncan's south and west, an unidentified NYPD Captain cupped his hands over his mouth and shouted words to the effect of, "The plaza is closed.  You must clear the plaza.  You are blocking pedestrian traffic.  If you do not clear the plaza, you will be arrested."

375. Apparently in response, one person shouted, "We are pedestrian traffic."

376. Mr. Kyne was approximately ten (10) or fifteen (15) feet away from the unidentified NYPD Captain as he gave the aforementioned order, verbally addressing several unidentified NYPD officers.

377. Defendant Maher was standing approximately next to the unidentified NYPD Captain as he gave the aforementioned order.

378. Defendant Maher walked a few steps over to a table at which two (2) young women were sitting.

379. Within a few seconds, the two (2) young women stood up.

380. Mr. Kyne stood approximately to the west of the two (2) young women as they stood up.

381. As Mr. Kyne addressed the unidentified NYPD Captain who had given the orders, Defendant Maher physically pushed one (1) of the young women – who appeared to be approximately sixteen (16) years of age - onto the ground.

382. Mr. Kyne said words to the effect of, "I didn't almost die for this."

383. As the unidentified NYPD Captain turned and began to walk away, he said words to the effect of "Please, please" and "I understand."

384. Mr. Kyne said, "Captain, come on," and the unidentified NYPD Captain walked away.

385. Mr. Kyne then pointed his finger at the unidentified NYPD Captain and said, "You nazi."

386. In the next approximately three (3) to four (4) seconds, Mr. Kyne then said, "You fucking nazi" and repeated "You fucking nazis" twice in rapid succession.

387. In the next approximately three (3) to four (4) seconds, Mr. Kyne then turned and began to walk toward the sidewalk in compliance with the unidentified NYPD Captain's orders, again stating "You fucking nazis" as he continued walking toward the sidewalk, passing the two (2) young women whose arrests Defendant Maher appeared to order, stating "You fucking nazis" and "You're all fucking nazis" and "all of you" as he walked.

388. In the next approximately two (2) to three (3) seconds, Mr. Kyne walked down one set of library steps toward the sidewalk, stating "Fucking nazis" approximately two (2) times.

389. At approximately the bottom of the steps, Mr. Kyne turned and pointed at a pair of unidentified NYPD officers and stated, "Fucking nazis" a third time.

390. In response to brief words from the pair of unidentified NYPD officers to the effect of "Clear the steps", Mr. Kyne stopped for approximately two (2) seconds and said words to the effect of, "I am clearing the steps" and "Fuck you."

391. Over the course of the next approximately two (2) to three (3) seconds, Mr. Kyne turned and continued walking down the steps and toward the sidewalk, past where Mr. Duncan lay face-down on the ground in plastic handcuffs.

392. As Mr. Kyne began to turn, defendant Scolaro placed his left hand on Mr. Kyne and pushed him toward the stairs and sidewalk.

393. As Mr. Kyne walked past Mr. Duncan and defendants Scolaro, Murphy, and Unidentified Bicycle Sergeant, Mr. Kyne said, "Fucking nazis" and "You're all fucking nazis."

394. When Mr. Kyne reached the bottom of the steps, as Mr. Kyne continued walking approximately to the north, defendant Rose pushed Mr. Kyne as he walked by, and Mr. Kyne said, "Fucking nazis" again.

395. Mr. Kyne continued walking approximately north, past defendant Murphy.

396. As defendant Unidentified Bicycle Sergeant and an unidentified NYPD Officer pulled Mr. Duncan off the ground a few feet away, Mr. Duncan asked defendant Unidentified Bicycle Sergeant, "What did I do?"

397. Defendant Unidentified Bicycle Sergeant responded, "You spit in my face."

398. Mr. Duncan responded, "I did not."

399. At approximately that time, defendants Mercandetti, Martinez, and/or Murphy physically restrained Mr. Kyne without warning.

400. At all times, Mr. Kyne was completely compliant with the defendants.

401. Either defendant Mercandetti, Martinez, or Murphy then said, "Get on your knees."

402. Defendant Mercandetti placed his hands on Mr. Kyne's back and forcefully pushed Mr. Kyne onto his knees.

403. Defendant Martinez placed his right hand on the back of Mr. Kyne's neck, forcefully pushing him onto his knees.

404. As defendants Mercandetti and Martinez forcefully pushed Mr. Kyne onto his knees, defendants Ambrose and Hammerman looked on.

405. Defendant Murphy then handed defendant Mercandetti a pair of plastic handcuffs.

406. Defendant Hammerman walked over and pointed at Mr. Kyne and said words to the effect of, "This one is dis con and resisting."

407. Defendant Mercandetti responded to defendant Hammerman's orders by saying, "Yes sir."

408. Mr. Kyne responded by repeating "I'm not resisting" several times.

409. Mr. Kyne was handcuffed less than two (2) feet away from where the defendants had placed Mr. Mulligan, face-up.

410. Defendant Mercandetti stated words to the effect of, "We'll carry him and get him out."

411. Upon information and belief, defendant Mercandetti was referring to Mr. Mulligan.

412. Defendant Mercandetti then stated, "Bring him, he's going right to my wagon in the back. Just inform whoever you're giving it –."

413. Defendant Unidentified Bicycle Sergeant then walked Mr. Duncan across 5th Avenue and approximately northeast on the eastern side of the roadway, until they arrived at a marked NYPD Prisoner Transport Vehicle bearing the label "CJB 4214" near the northeastern corner of 42nd Street and 5th Avenue.

414. Defendant Martinez walked Mr. Kyne behind defendant Unidentified Bicycle Sergeant and Mr. Duncan.

415. Upon information and belief, the NYPD Prisoner Transport Vehicle bearing the label "CJB 4214" was the "wagon" defendant Mercandetti had referred to – that is, "his" wagon..

416. At the back of the Prisoner Transport Vehicle, defendants Martinez and Unidentified Bicycle Sergeant encountered defendant Wohl, who had remained at the Prisoner Transport Vehicle and did not witness the events leading up to plaintiffs' arrests.

417. Upon information and belief, at or about that time, unidentified NYPD officers carried Mr. Mulligan approximately to the area of NYPD Prisoner Transport Vehicle "CJB 4214."

418. Upon information and belief, defendant Wohl did not witness any of the events leading up to the arrests of Mr. Kyne, Mr. Duncan, Mr. Langley, Mr. LaLumiere, Mr. Lahoud, or Mr. Mulligan.

419. At the back of the Prisoner Transport Vehicle, unidentified NYPD officers took an unknown number of Polaroid photographs of Mr. Kyne and/or other plaintiffs and NYPD officers, including, but not limited to, one or

several Polaroid photographs of Mr. Kyne and defendant
Martinez.

420. The NYPD Patrol Guide, § P.G. 213-06(6) through
(11), specifically requires that, as part of as part of its
Large Scale Arrest Processing Procedure, an Arrest
Supervisor must "ensure that each prisoner is photographed
with their arresting/assigned officer before boarding
patrol wagon and affix MASS ARREST PEDIGREE LABEL (PD244-
093) to back of each Polaroid, with all relevant captions
completed" (emphasis added).

421. At approximately the same time, at the library
steps, defendant Hammerman approached defendant Albano and
said words to the effect of, "Hey Danny, one of the guys
was the troublemaker from Pataki's from the night before,
so we got him now."

422. Upon information and belief, defendant Hammerman
was referring to Mr. Kyne.

423. Upon information and belief, in physically
restraining and arresting Mr. Kyne, defendants Hammerman,
Mercandetti, Ambrose, Martinez, and Murphy were acting in
concert with and/or under the orders of defendants Kelly,
Esposito, Smolka, Graham, and/or Monahan.

424. Mr. Kyne, Mr. Langley, and Mr. Duncan sat with
their hands cuffed behind their backs in the back of the

Prisoner Transport Vehicle for approximately forty-five (45) minutes before the Prisoner Transport Vehicle Left the library area.

425. At some point during that time period, shortly after he was loaded into the wagon, Mr. Kyne began to lose sensation in his wrists due to tight cuffing.

426. Mr. Kyne complained, which prompted another arrestee to yell that Mr. Kyne needed to have his cuffs loosened.

427. At some point, unidentified NYPD Officers responded to Mr. Kyne's complaints.

428. Accordingly, Mr. Kyne backed up inside the wagon toward the door, kneeling down with his back toward the door and offering his cuffed hands to the unidentified NYPD Officers for loosening.

429. As Mr. Kyne knelt down, his chest facing the front of the wagon, he craned his neck around to see what was going on outside the wagon behind him.

430. Mr. Kyne observed defendant Wohl leaning and/or sitting on the front of the NYPD vehicle facing the back of the wagon, smoking a cigarette.

431. An unidentified NYPD Officer said words to the effect of, "Whose collar is this?" and "There's no numbers on his plastic."

82

432. Defendant Wohl said words to the effect of, "I'll take him" or "I'll take care of him."

433. A NYPD Officer then adjusted the position of Mr. Kyne's wrists so that his circulation was less constrained by the handcuffs.

434. Mr. Kyne, Mr. Langley, Mr. Duncan, Mr. Lahoud, Mr. LaLumiere, Mr. Christopher Thomas, an unidentified Canadian male, and Mr. Mulligan remained in the back of the wagon for approximately forty-five (45) minutes.

435. Upon information and belief, Ms. Gallitzer and Ms. Tejada remained in the front of the wagon during that time.

436. After approximately forty-five (45) minutes, plaintiffs and the others in the wagon were driven around for an unknown period of time.

437. The wagon subsequently stopped.

438. Plaintiffs and the others in the wagon were subsequently unloaded.

439. Plaintiffs observed that it was getting dark outside by that time.

440. Plaintiffs observed that they appeared to be stopped on the side of the road, somewhere on Manhattan's West side, along with another Prisoner Transport Vehicle and numerous other marked NYPD vehicles.

441. Mr. Kyne overheard an NYPD Officer indicate that they had stopped because their destination was "too full."

442. Officer Wohl approached Mr. Kyne and asked his name and birth date.

443. Officer Wohl removed the plastic handcuffs Mr. Kyne was wearing and replaced them with another pair of plastic handcuffs.

444. At some point during that time period, defendant Wohl told Mr. Langley words to the effect of, "You guys are being arrested for bullshit, we'll take you in, you'll be processed, and you'll be let out."

445. At least one (1) or two (2) Polaroid photograph(s) of Mr. Duncan and defendant Wohl were taken at that location.

446. Defendant Wohl asked Mr. Duncan, "What are you, 5'11'?", to which Mr. Ducan responded, "I wish – I'm about 5'8"."

447. Defendant Wohl then appeared to write on the back of one of the Polaroid photographs.

448. At least one (1) or two (2) Polaroid photograph(s) of Mr. Langley and defendant Wohl were taken.

## PIER 57

449. Upon information and belief, when the defendants arrived at Pier 57 on the evening of August 31, 2004,

defendants Kelly, Colgan, Hammerman, and/or Mercandetti
were actually present at Pier 57.

450. According to the NYSCOC, as early as 3:00 PM the
previous day, NYSCOC staff noted that detainees emerging
from Pier 57 were "complaining about the holding conditions
at the West 57th Street Pier. And that NYSCOC staff were
"informed by the detainees that they were coming close to
being detained longer than 24 hours."

451. In New York State, "arrestees held in custody for
more than 24 hours without arraignment are entitled to
release unless an acceptable explanation for the delay is
given" and "a period of delay over 24 hours raises a
presumption that the delay is unnecessary within the
meaning of CPL 140.20(1)." See People ex Rel. Maxian on
Behalf of Roundtree v. Brown, 77 NY2d 422, 424, 426 (1991).

452. The NYSCOC apparently did not even know the
location of Pier 57 on August 30, 2004, although several
hundred arrests had already been made in connection with
the RNC by August 30, 2004.

453. NYSCOC staff then informed an unidentified
defendant NYCDOC Captain and defendant Ocasio that the
detainees were complaining that they were being detained
close to the 24 hour limit.

454. Accordnig to the NYSCOC, defendant Ocasio "called his counsel's office and discussed this matter with them" and then informed NYSCOC staff that "this rule did not apply to the detainees."

455. After the close of the NYSCOC shift at 3:00 AM on August 31, 2004, the 3:00 AM to 3:00 PM NYSCOC staff on duty "were informed by the previous shift supervisor that they were awaiting a response from Michael Donegan, who would inform [them] if in fact [they] would be permitted to take a tour of the NYPD operated West 57th Street Pier."

456. NYSCOC staff on that tour also contacted Mr. Donegan and "discussed the conditionsof the West 57th Street Pier as well as the RNC detainees' complaints that they were not receiving their phone call while detained at the pier."

457. At or about 1:05 PM on August 31, 2004, Mr. Donegan informed Paul D. Annetts, NYSCOC Supervisor, that "he spoke with Chief Colgan and informed him of the detainee's complaints."

458. At or about 7:05 PM on August 31, 2004, Mr. Donegan informed William Benjamin, NYSCOC Supervisor, that the NYSCOC "would not be going to the 57th Street holding pens."

459. At some time between 3:00 PM on August 31, 2004 and 3:00 AM on September 1, 2004, NYSCOC staff "met with NYPD personnel who informed them that there had been over 1,000 arrests and that they were all being sent to this location for processing" and that defendant NYCDOC "had to adjust their operations in order to accommodate the temporary closing of the West 57th Street Pier detention area."

460. Plaintiffs were unloaded from the Prisoner Transport Vehicle inside Pier 57 and ordered to join a line of arrestees and NYPD Officers.

461. Defendant Wohl waited with Mr. Kyne, Mr. Langley, and Mr. Duncan in line.

462. According to defendant Colgan, as a matter of course during NYPD RNC mass arrest processing at Pier 57, at the "Intake area" in Pier 57, "two Polaroid photographs were taken of the arrestee and the arresting officer. One photograph of the arresting officer with his/her arrestee was given to the arresting officer to provide to the District Attorney's Office and the other to the intake sergeant to use as a movement photograph."

463. As Mr. Kyne and Mr. Duncan waited in line, an NYPD Officer with a Polaroid camera approached defendant

Wohl and said words to the effect of, "We need you to take some more pictures."

464. A second set of one (1) or two (2) Polaroid photographs of Mr. Duncan and defendant Wohl were then taken.

465. For the first time, defendant Wohl was also photographed with Mr. Kyne.

466. At or about that time, defendant Wohl took Mr. Langley's water bottle off his back and assisted plaintiffs in taking a drink of water.

467. As plaintiffs and defendant Wohl waited in line, Mr. Duncan observed a group of people he believed to be NYPD Officers in white shirts approximately ten (10) or twenty (20) yards away.

468. Defendant Wohl then left the plaintiffs and walked over to the group of NYPD officers.

469. Mr. Duncan then observed defendant Wohl return and say to Mr. Kyne, "You must have really pissed someone off," or words to the effect thereof.

470. Mr. Langley heard Officer Wohl say to Mr. Kyne words to the effect of, "I don't know what the hell you did, you must have pissed somebody off. That was the Commissioner."

471. According to Mr. Kyne, defendant Wohl said words to the effect of, "What did you do out there?", to which Mr. Kyne responded by saying words to the effect of, "Nothing," to which defendant Wohl replied by saying words to the effect of, "You must have done something to piss them off" and "That's the Commissioner, he talks to the President."

472. Plaintiffs were each subsequently searched by unidentified NYPD officers and/or other City, State, and/or Federal law enforcement agents physically and with a magnetometer.

473. Mr. Kyne's twelve (12) copies of Support the Truth, the book he has written concerning, *inter alia*, the dangers of DU, and six (6) copies of a CD he produced of the same name, were seized and vouchered as alleged "arrest evidence."

474. Mr. Duncan's camera bag and everything in it, along with all of the flyers Mr. Duncan had gathered the past two days, were seized and vouchered as alleged "arrest evidence."

475. Mr. Langley's property was seized and vouchered as alleged "arrest evidence."

476. Plaintiffs and approximately sixty (60) other people were subsequently ordered into another metal, chain-link cage within Pier 57.

477. Each plaintiff, in turn, was subsequently summoned from the cage and searched.

478. As Mr. Kyne was being searched, and while defendant Wohl stood closeby and within earshot, an unidentified NYPD Sergeant interrogated Mr. Kyne, asking Mr. Kyne if he were affiliated with any "organizers," what Mr. Kyne was doing in New York, and whether he came to New York to get arrested.

479. As Mr. Duncan was being searched, an unidentified NYPD Officer referred to the flyers Mr. Duncan had gathered over the course of the two (2) days preceding his arrest as "seditious material."

480. Mr. Duncan asked defendant Wohl and the unidentified NYPD Officer what he was being charged with.

481. Both shrugged but did not reply verbally.

482. Mr. Duncan stated he believed it was his right to know what he was being charged with.

483. Defendant Wohl said words to the effect of, "I don't give a fuck."

484. As Mr. Langley was being searched, defendants asked him why he had been carrying four (4) containers of saline solution.

485. Mr. Langley replied that it was for use in washing pepper spray out of peoples' eyes.

486. Defendants seized a USB Drive that was on Mr. Langley's person at that time, on which Mr. Langley had stored personal information, including information regarding his activities as an organizer with the IAC.

487. Upon information and belief, the USB Drive was not vouchered as "arrest evidence" or other evidence.

488. The USB Drive was never returned to Mr. Langley.

489. As plaintiffs were searched and re-searched – and throughout their detention at Pier 57 – buses and other vehicles used by the defendants for prisoner transport were driven in and out of Pier 57, sometimes idling with their motors on for long periods of time on the Pier's poorly-ventilated first floor.

490. The temperature at Pier 57 fluctuated from hot to cold, depending on where plaintiffs were ordered to stay.

491. The floor at Pier 57 was covered in what Mr. Duncan later described as a "thick coat of oil and soot."

492. At Pier 57, approximately six (6) "Raw Materials Storage Signs" hung just outside some of the pens, listing

words including, but not limited to, "Mobil XHP 222 Special
diesel oil, antifreeze, 15 w-40, TranSynd heavy-duty
automatic transmission fluid, soap, and ZEP drying agent."

493. After plaintiffs were searched and their property
was vouchered, plaintiffs were ordered into a metal, chain-
link cage approximately fifteen (15) feet high, the top of
which was surrounded by barbed wire, along with
approximately sixty (60) other people.

494. There plaintiffs remained until the early morning
of September 1, 2004.

495. Although defendants had bent over backwards to
accommodate the Republicans who had come to town, assigning
hundreds of police officers to "protect" them at
restaurants and hotels, and despite that defendants had
been considering using Pier 57 as a parking garage for RNC
delegates' cars prior to the RNC, defendants paid little
attention to the basic needs or civil rights of the "1,000
or more" alleged protesters they planned to arrest during
the RNC.

496. So, at Pier 57, there were no beds for detainees
to sleep in or even chairs for detainees to sit on.

497. All told, in the cage in which plaintiffs were
primarily housed at Pier 57, there were one (1) or two (2)

benches available for the approximately sixty (60) arrestees to share.

498. During that time period, plaintiffs sat and/or lay on the ground, and their clothing and exposed parts of their bodies, including, but not limited to, their hands and face, came into contact with the "soot."

499. During that time period, plaintiffs had access to a single bathroom in the form of one (1) port-a-potty, and food in the form of cheese sandwiches, which Mr. Kyne declined to eat because he believed they were inedible.

500. During that time period, Mr. Duncan witnessed numerous individuals experience asthma attacks.

501. At no time during their detentions at Pier 57 were any of the defendants read their Miranda rights or offered access to legal counsel.

502. At no time during their detentions by the defendants did any of the plaintiffs engage in so-called "jail solidarity" by, for example, refusing to eat or refusing to identify themselves.

503. At no time during their detentions by the defendants did any of the plaintiffs refuse to identify themselves.

504. At no time during plaintiffs' detention at Pier 57 were plaintiffs allowed to make telephone calls to contact friends or family members or attorneys.

505. According to defendant Colgan, after the first three (3) steps of the mass arrest processing – prisoner sorting, searching, and property vouchering were completed – the arrestees were "lodged . . . in an outgoing pen to await transfer to MAPC" while the final three (3) steps of the mass arrest processing were completed.

506. According to defendant Colgan, in Step 4, interview by NYPD attorneys of arresting officers, "the arresting officer then prepared all of the arrest paperwork and, to ensure that the arrest was proper and the individual should be charged, conferred with a representative from the Police Department's Legal Bureau concerning the appropriate charges given the circumstances surrounding the arrest."

507. Upon information and belief, during plaintiffs' detention at Pier 57, there were placards displayed at Pier 57 containing words that appeared to be boilerplate narratives regarding violations such as parading without a permit and disorderly conduct.

508. Upon information and belief, at some time during plaintiffs' detentions, defendants Kelly, Hammerman,

94

Colgan, Mercandetti, Ambrose, Albano, Scolaro, Murphy, Wohl, Martinez, Unidentified Bicycle Sergeant, and/or Roscher and/or other defendants and/or Officers Mitchell and Deckert met and discussed the circumstances surrounding plaintiffs' (and other persons') arrests at the library.

509. Upon information and belief, between approximately the time plaintiffs and defendant Wohl arrived at Pier 57 on the evening of August 31, 2004 and the time plaintiffs and defendant Wohl arrived at the MAPC prior to approximately 10:00 AM on September 1, 2004, defendant Wohl met with defendant Mercandetti and/or defendants Kelly, Hammerman, and/or Colgan and other unidentified defendants and/or City, State, and/or Federal law enforcement agents in connection with defendants' RNC mass arrest processing and plaintiffs' arrests.

510. Upon information and belief, at or about that time, defendant Wohl was ordered by defendant Mercandetti and/or defendants Kelly, Hammerman, and/or Colgan and/or other unidentified defendants and/or City, State, and/or Federal law enforcement agents to fill out arrest paperwork with respect to plaintiffs and Mr. Lahoud and Mr. LaLumiere and the events surrounding their arrests.

511. Upon information and belief, at or about that time, NYPD Officer Michael Deckert, Shield Number 27304 of

the Patrol Boro Bronx Task Force, was ordered by defendant Mercandetti and/or defendants Kelly, Hammerman, and/or Colgan and other unidentified defendants and/or City, State, and/or Federal law enforcement agents to fill out arrest paperwork with respect to Mr. Mulligan and the events surrounding his arrest.

512. Upon information and belief, at or about that time, Officer Mitchell was ordered by unidentified and/or City, State, and/or Federal law enforcement agents to fill out arrest paperwork with respect to the events surrounding the arrests of Ms. Amber Tejada and/or Ms. Gwynn Gallitzer, among others.

513. According to defendant Colgan, in Step 5, review of the arresting officers' paperwork by NYPD Criminal Justice Bureau Online Booking System supervisors, "[a]fter conferring with the Legal Bureau, the arresting officer proceeded to a Criminal Justice Bureau supervisor to have the arrest paperwork reviewed and signed."

514. According to defendant Colgan, after Step 5, the arrestee was ready for Step 6 - transportation to the MAPC.

515. According to defendant Colgan, "[o]nce an arrestee was ready to be transferred to MAPC, the movement photograph and the DAT investigation worksheet were attached to the On-Line Booking Sheet (an arrest document)

worksheet and the prisoner transport dispatch sheet was prepared."

516. Plaintiffs were detained at Pier 57 for between eight (8) and fourteen (14) hours.

### SEPTEMBER 1, 2004

517. At approximately 4:00 AM on September 1, 2004, NYSCOC staff met with defendant NYSDOC Chief Barry, who informed them that "the West 57th Street Piers were in fact open it was just that the NYPD were processing the detainees at a much faster rate."

518. According to defendant Colgan, "[w]henever arrestees [were] transported from one venue to another or there [was] a change of custody," the arrestees went through "a new intake and search process."

519. Upon information and belief, some RNC arrestees reported being searched as many as ten (10) and twenty (20) times at the MAPC and MCS.

520. According to defendant Colgan, upon arrival at the MAPC, arrestees were separated by gender at 100 Centre Street, moved to the third floor of 125 White Street through a foot bridge, and lodged in intake cells.

521. According to defendant Colgan, approximately eight (8) to ten (10) data entry clerks then entered

"arrest information" into a computer and generated "an on-line arrest number" for each arrestee.

522. According to defendant Colgan, "[a]fter an arrest number was created, the arrestees were removed, in groups of five, to be fingerprinted on a LiveScan machine."

523. In fact, defendant NYPD only had ten (10) LiveScan fingerprinting machines, "allowing for the printing of two separate groups of five prisoners at a time," at its MAPC downtown (and none at Pier 57).

524. Upon information and belief, by approximately 10:00 AM on September 1, 2004, plaintiffs were all in the custody of the defendants NYPD and/or NYCDOC at the MAPC at 125 White Street and/or the MCS at 100 Centre Street, accompanied by defendant Wohl.

525. Plaintiffs were subsequently brought to an area of the MAPC under the care and control of defendant NYPD Officers and/or other unidentified City, State, and/or Federal agents (but not defendant NYCDOC Officers).

526. Plaintiffs were subsequently fingerprinted.

527. According to defendant Colgan, "[a]s arrestees were being fingerprinted, the arresting officers were interviewed by an Assistant District Attorney at 100 Centre Street in the Early Case Assessment Bureau (ECAB). The Assistant District Attorney determined whether there was

sufficient evidence to prosecute the arrestee, and the Assistant District Attorney prepared the Criminal Court Complaint."

528. The accusatory instruments defendant Colgan referred to as "Criminal Court Complaints" contained the following words, in bold-face, just above the "Deponent" signature line:    "False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law."

529. According to defendant Colgan, "[f]rom August 27, 2004 through September 2, 2004, the New York County District Attorney's Office declined to prosecute only 3 RNC arrests out of the approximately 1,800 it reviewed."

530. However, by the time defendants presented plaintiffs' cases to the District Attorney's Office, defendants had already conspired to swear to falsehoods regarding the events leading up to plaintiffs' arrests.

531. Upon information and belief, in accordance with the foregoing, plaintiffs' fingerprints were taken just before or as or after defendant Wohl met with an Assistant District Attorney ("ADA").

532. Upon information and belief, on September 1, 2004, other NYPD officers, including defendant Mercandetti and Officers Deckert and Mitchell, met with an ADA or ADA's

regarding the events surrounding Mr. Mulligans's, Ms. Tejada's, and Ms. Gallitzer's arrests, among others.

533. Upon information and belief, at approximately 3:15 AM, Officer Deckert swore out an accusatory instrument swearing that, on August 31, 2004, at about 18:00 hours opposite of 505 5th Avenue, he

> observed the defendant [John Mulligan] in a group of approximately one hundred (100) people on the steps of the library and on the sidewalk at the above location, blocking pedestrian traffic, in that numerous people were forced to walk around the defendant. Deponent further states that deponent observed Captain Roland Mercandetti of the Patrol Boro Bronx Task Force repeatedly ask the defendant to move and the defendant refused.

> Deponent further states that deponent observed Captain Roland Mercandetti of the Patrol Boro Bronx Task Force advise the defendant that he was under arrest for the offenses described above, and thereafter, deponent observed the defendant lay on the ground and refuse to get up or put his hands behind his back, and that five (5) police officers had to carry the defendant.

534. Upon information and belief, Officer Mitchell swore out accusatory instrument(s) alleging that she had personally observed Ms. Tejada and/or Ms. Gallitzer engage in certain allegedly unlawful conduct prior to her arrest and/or indicated that she had personally arrested Ms. Tejada and/or Ms. Gallitzer.

535. At approximately 10:11 AM on September 1, 2004, defendant Wohl swore out at an accusatory instrument

swearing that, on August 31, 2004, at about 18:00 hours, on the southwest corner of 42nd Street and 5th Avenue in the County and State of New York, he observed Mr. Langley

> congregated with a crowd of people at the above location, obstructing the entire intersection, so that no cars or pedestrians could pass through said intersection. Deponent further states that he told the defendant to leave the area on numerous occasions and the defendant refused.

> Deponent further states that the defendant sat down and refused to move.

> Deponent further states that he observed the defendant parading upon the street at the above location, a public place, with at least fifty other individuals without a permit from the police commissioner.

536. At approximately 10:11 AM on September 1, 2004, defendant Wohl swore out at an accusatory instrument swearing that, on August 31, 2004, at about 18:00 hours, at the intersection of 42nd Street and 5th Avenue, he observed Mr. Kyne

> at the above location yelling and screaming an dbehaving in a violent, tumultuous, and threatening manner, as follows: inciting a crowd by yelling: "Look what they are doing. The government is taking away our rights. They lied to you; they lied to me.

> Deponent further states that the defendant's conduct created a public disturbance and inconvenience in that it caused a crowd to gather, disruption of the normal flow of traffic, and people to express alarm.

Deponent further states that the defendant was told repeatedly to calm down and leave the area and the defendant refused.

Deponent further states that when he was placing the defendant under arrest for the offenses described above, the defendant was punching and kicking and trying to throw himself onto the ground to prevent the officers from effecting the arrest.

Deponent further states that the defendant's above described behavior prevented the police officers from effectively managing the crowd and maintaining peace among the individuals congregated at the above location.

537. Upon information and belief, at or about the same time, defendant Wohl also swore out accusatory instruments swearing that he personally observed Mr. Lahoud, Mr. LaLumiere, and Mr. Duncan engaged in unlawful conduct.

538. Defendant Wohl did not observe the events leading up to plaintiffs' arrests at all.

539. The sworn statements in the accusatory instruments defendant Wohl signed regarding the same were false.

540. Upon information and belief, defendant Wohl also swore to falsehoods in the accusatory instruments he swore out in connection with Mr. Lahoud's, Mr. LaLumiere's, and Mr. Duncan's arrests.

541. Defendant Wohl knew the sworn statements in the accusatory instruments he and Officers Deckert and Mitchell swore out were false.

542. Defendant Mercandetti also knew the sworn statements in those accusatory instruments were false.

543. Defendant Wohl and Officers Decekert and Mitchell were acting under supervisory defendants' orders and pursuant to their training in defendants' special RNC mass arrest processing procedures in knowingly swearing out false accusatory instruments.

544. By approximately 1:00 PM on September 1, 2004, "detainees were coming in from the 57th St. pen continuously and in great numbers. . . [they] were coming into the court pens extremely dirty from the 57th Street Pen."

545. Upon information and belief, between the time plaintiffs were fingerprinted and the time each was arraigned, plaintiffs were shuffled from cell to cell within the MAPC, without any apparent rhyme or reason.

546. Upon information and belief, at approximately 8:00 PM on September 1, 2004, Mr. Duncan met with an attorney, who informed him that he would be arraigned shortly thereafter and charged with at least two (2) counts of disorderly conduct.

547. Upon information and belief, Mr. Duncan was charged with several violations of law based on an accusatory instrument defendant Wohl swore out swearing that he had observed Mr. Duncan engage in allegedly unlawful conduct, although defendant Wohl did not observe Mr. Langley engage in any such conduct.

548. Upon information and belief, at Mr. Duncan's arraignment on approximately the evening of September 1, 2004, the ADA offered, and Mr. Duncan accepted, an Adjournment in Contemplation of Dismissal ("ACD") pursuant to CPL § 170.10.

549. Upon information and belief, at Mr. Langley's arraignment on September 1, 2004, Mr. Langley was charged with violating PL §§ 240.20(5) and (6) and New York City Administrative Code ("NYCAC") § 10-110 based on an accusatory instrument defendant Wohl swore out swearing that he had observed Mr. Langley engage in allegedly unlawful conduct, although defendant Wohl did not observe Mr. Langley engage in any such conduct.

550. Immediatley prior to his arraignment, Mr. Langley met with an attorney from the Legal Aid Society, who showed him the accusatory instrument defendant Wohl had sworn out.

551. Mr. Langley indicated that he wished to plead not guilty because the statements in the accusatory instrument were false.

552. Mr. Langley pleaded not guilty to the charges.

553. Shortly thereafter, at approximately 6:00 PM on September 1, 2004, Mr. Langley was released.

554. At his next court appearance, Mr. Langley accepted an ACD in order to avoid having to return to Court repeatedly.

555. As a result of Mr. Duncan's false arrest and unlawful and excessive detention, Mr. Duncan was unable to file the story and pictures he had intended to file for his school newspaper.

556. As a result of their false arrest and unlawful and excessive detention, Mr. Duncan and Mr. Kyne lost wages and/or earnings.

557. By falsely arresting plaintiffs and detaining them unlawfully for an excessive period of time in unsafe conditions, defendants intentionally and/or negligently inflicted emotional distress on plaintiffs and/or maliciously retaliated against them for exercising their Constitutional rights.

558. As a result of Mr. Duncan's false arrest and unlawful and excessive detention, Mr. Duncan feared to

return to the streets after his release from defendants'
custody, and remained largely indoors from his release on
September 1, 2004 until he left NYC on September 3, 2004.

559. As a result of the excessive force defendants
used in effecting Mr. Duncan's arrest, Mr. Duncan had pain
in his wrists for several weeks.

560. Mr. Duncan sought treatment for the same from his
parents, who are doctors.

561. As a result of the excessive force defendants
used in effecting Mr. Kyne's arrest, Mr. Kyne experienced
pain in his wrists for approximately six (6) weeks

562. As a result of plaintiffs' false arrests,
unlawful and excessive detentions, and malicious
prosecutions, plaintiffs believe that defendants and/or the
SS, FBI, and/or other City, State, and/or Federal agencies
have engaged in and/or continue to engage in unlawful
surveillance of them, which has actually chilled their
ability to engage in lawful political organizing and other
constitutionally and otherwise protected activities.

## DENNIS KYNE'S MALICIOUS PROSECUTION

563. Shortly before approximately 9:00 PM on September
1, 2004, Mr. Kyne spoke briefly with a Legal Aid Society
attorney.

564. At his arraignment at approximately 9:00 PM on September 1, 2004 before Hon. Patricia Nunez in Part AR3 of the New York City Criminal Court, Mr. Kyne was charged with engaging in Riot in the Second Degree in violation of PL § 240.05, Resisting Arrest in violation in PL § 205.30, Obstruction of Governmental Administration in the Second Degree in violation of PL § 195.05, and four (4) counts of Disorderly Conduct in violation of PL §§ 240.20 (1), (2), (5), and (6), based on an accusatory instrument defendant Wohl swore out swearing that he had observed Mr. Kyne engage in allegedly unlawful conduct, although defendant Wohl did not observe Mr. Kyne engage in any such conduct.

565. Mr. Kyne pleaded not guilty to all of the charges.

566. Upon information and belief, Judge Nunez set bail in Mr. Kyne's case at $500.00.

567. Mr. Kyne was not released from the defendants' custody until approximately 5:30 PM on September 2, 2004, after his mother posted bail.

568. Mr. Kyne's case was adjourned for Response and Decision to Part C on October 25, 2004.

569. Monyca White, Esq., an attorney associated with the Legal Aid Society, served a Notice of Omnibus Motion

and supporting papers in connection with Mr. Kyne's case on or about October 5, 2004.

570. Mr. Kyne appeared in Part C on 10/25/04 before Hon. Melissa C. Jackson.

571. At that appearance, Oliver & Oliver filed a Notice of Appearance as Mr. Kyne's defense counsel.

572. Defense counsel adopted Attorney White's Motion.

573. The People filed a response thereto.

574. Hon. Jackson denied Mr. Kyne's omnibus motion in its entirety.

575. Mr. Kyne's case was adjourned to Novemeber 17, 2004 for hearings and trial in Part JP2.

576. On or about November 15, 2004, the People faxed defense counsel a Voluntary Disclosure Form indicating that the People intended to call defendants Mercandetti and Wohl at Mr. Kyne's trial.

577. On November 17, 2004, Mr. Kyne appeared in Part JP2 before Hon. Neil Ross, at which time there were no Court parts available.

578. The People dismissed the charge of Riot in the Second Degree (PL § 240.05).

579. Judge Ross granted defense counsel leave to file and serve an additional motion to dismiss some of the

charges on constitutional grounds by November 30, 2004, which defense counsel did.

580. Mr. Kyne's case was adjourned for hearings and trial until 12/13/04 in Part C.

581. Mr. Kyne's jury trial began on or about December 14, 2004 in New York City Criminal Court, Jury Part 1, before Hon. Gerald Harris.

582. Mr. Kyne's trial was the first jury trial to result from the thousands of arrests made during the RNC.

583. Mr. Kyne arrived at his trial wearing his United States Army uniform.

584. The People turned over a Witness List in connection with Mr. Kyne's case indicating that the People intended to call defendants Wohl and Mercandetti to testify against Mr. Kyne.

585. Prior to jury selection, the People produced a copy of a United States Department of Defense Directive Number 1334.1 dated May 17, 2004 signed by defendant Wolfowitz, who was then Deputy Secretary of Defense of the United States of America ("DOD Directive").

586. The DOD Directive prohibited the wearing of the uniform by members of the Armed Forces, including retired members and members of Reserve components,

3.1.1    At any meeting or demonstration that is a function of, or sponsored by an organization, association, movement, group or combination of persons that the Attorney General of the United States has designated, under E.O. 10450 as amended (reference (b)), as totalitarian, fascist, communist, or subversive, or as having adopted a policy of advocating or approving the NYSCOC or acts of force or violence to deny others their rights under The Constitution of the United States, or as seeking to alter the form of Government of the United States by unconstitutional means.

3.1.2    During or in connection with the furtherance of political activities, private employment or commercial interests, when an inference of official sponsorship for the activity or interest may be drawn.

3.1.3    Except when authorized by competent Service authority, when participating in activities such as public speeches, interviews, picket lines, marches, rallies or any public demonstration (including those pertaining to civil rights), which may imply Service sanction of the cause for which the demonstration or activity is conducted.

3.1.4    When wearing of the uniform would tend to bring discredit upon the Armed Forces.

3.1.5    When specifically prohibited by regulations of the Department concerned.

587. The DOD Directive also prohibited former members of the Armed Forces from wearing the uniform in many cases:

3.2   Former members of the Armed Forces, unless under another provision of this Directive or under the terms of 10 USC 722 (reference(c)), who served honorably during a declared or undeclared war and whose most recent service was terminated under honorable conditions may wear the uniform in the highest grade held during such war service only upon the following occasions and in the course of travel incident thereto:

3.2.1   Military funerals, memorial services, weddings, and inaugurals.

3.2.2   Parades on National or State holidays' or other parades or ceremonies of a patriotic character in which any Active or Reserve United States military unit is taking part.

3.2.3   Wearing of the uniform or any part thereof at any other time or for any other purposes is prohibited.

588. Presented with the DOD Directive, Hon. Harris was hesitant to send out for a panel and begin voir dire.

589. Having preserved their objection to the People's position, defense counsel suggested that Mr. Kyne remove his dress jacket, which would have left him wearing a plain white shirt and pants with a stripe on them.

590. The People objected, stating, "As your Honor duly noted, they are military pants. People will be introducing an arrest photo of the defendant when he was – in which, in that photo, he is wearing a camouflage jacket. It is the People's position that could undulate uniforms to the jury.

There may be former military people on the jury who may recognize his pants. There may be other people who has family in the military who recognize the United States army pants."

591. In the interests of proceeding with the trial, defense counsel suggested that Mr. Kyne simply swap pants with a witness's, which is precisely what happened.

592. The next morning, defense counsel presented the Court with a letter-application requesting that Mr. Kyne be allowed to wear his uniform.

593. *Inter alia*, defense counsel argued that, if the DOD Directive were interpreted to prohibit from wearing the uniform in the Court, it would violate the First Amendment of the United States Constitution.

594. The People argued, "If they have regulations prescribed by the President to allow them to wear that uniform in this court, we have have no objections to that."

595. The Trial Court denied defense counsel's motion to allow Mr. Kyne to wear his uniform during the trial.

596. At trial, the People first presented testimony from defendant Wohl.

597. Defendant Wohl testified that he arrived at the library as part of an eight-officer detail under the supervision of a Lieutenant and Captain assigned to a

"demonstration in pront of a public library . . . probably an hour prior" to the time the alleged demonstration started.

598. Defendant Wohl testified that he personally observed Mr. Kyne yelling in a "boisterous" manner just before he was placed under arrest, although he could not specifically remember what Mr. Kyne was yelling.

599. Significantly, defendant Wohl twice testified that he did not remember Mr. Kyne ever shouting "fucking Nazis."

600. Defendant Wohl testified that he personally effected Mr. Kyne's arrest along with two other unidentified officers.

601. According to him, Mr. Kyne was "screaming, yelling, and moving around" throughout the process.

602. When asked how Mr. Kyne had resisted arrest, defendant Wohl testified that his "mouth, heart, and eyes" were moving, and that he lunged in a number of different directions, "almost like what a little kid would do."

603. Defendant Wohl also testified that Mr. Kyne "went down to the ground himself" and that defendant Wohl and three others had to pick him up and carry him across the street "while he squirmed and screamed" all the way to the back of the NYPD transport vehicle.

604. Defendant Wohl also testified that he arrested four (4) others along with Mr. Kyne.

605. During Mr. Kyne's trial, the People entered a photograph of Mr. Kyne as identification evidence.

606. Mr. Kyne's defense counsel objected, and asked defendant Wohl whether, prior to putting Mr. Kyne into the police transport vehicle for prisoners, pictures of him were taken.

607. Defendant Wohl confirmed that there were.

608. The Peoplemade a motion *in limine* asking that the Court direct that Mr. Kyne's defense counsel not ask defendant Wohl as to the arrest photo of Mr. Kyne and the alleged Polaroid.

609. The People took the position that it was not Rosario, Brady, or evidence, and that "[t]his photo was taken during the arrest processing time, as were all photos in these protesting cases. It has nothing to do with the issues at hand and the issues Mr. Kyne is on trial for."

610. The Court granted the People's motion *in limine* insofar as it directed Mr. Kyne's defense counsel to establish "the fact that such a photo was taken and the fact that this officer has no knowledge of its present whereabouts could be established."

611. The Peoplethen stated "I'll tell you the issue we are having is the last time the case was on for trial, the officer was here with that photograph and claims he gave that photograph to me. It is not with my file. It is not with everything else that we have."

612. Later, when asked who else defendant Wohl had arrested at the library long with Mr. Kyne, defendant Wohl identified Mr. Langley as an arrestee.

613. When questioned about where Mr. Langley was when defendant Wohl arrested him, defendant Wohl responded, "I would have to look back at my notes. . . . My arrest processing sheet.  It gives the story that was on the pictures. . . . The photographs we took next to the arrest van, I wrote on the back where, and then, obviously, I would know the story because I was there."

614. Defendant Wohl testified that two (2) Polaroid pictures were taken of him and Mr. Kyne at the back of the prisoner transport van, and that he kept the pictures.

615. Defendant Wohl testified that he did not have the picture that was taken there that he had made notes on the back of.

616. Upon information and belief, the New York County District Attorney's Office also intended to present testimony from defendant Mercandetti at Mr. Kyne's trial.

617. In fact, defendant Mercandetti was actually present at 100 Centre Street inside the courthouse directly outside the courtroom in which Mr. Kyne's trial was proceeding and prepared to testify against Mr. Kyne.

618. However, at the close of defendant Wohl's testimony, Mr. Kyne's attorneys produced a copy of a videotape that showed that material elements of defendant Wohl's testimony had been patently false.

619. The next morning, after reviewing the videotape and discussing its contents with defendant Wohl, the People moved to dismiss the charges against Mr. Kyne, stating on the record:

> the People have reviewed the videotape provided by defense counsel yesterday and the photos provided by defense counsel this morning. The events depicted on the tape and in the photographs are, in some respects, inconsistent with the People's original theory of prosecution. We have discussed this matter with our witnesses and shown him the video. Under these circumstances, and as a result, the People do not believe we can prove the crimes charged beyond a reasonable doubt, and, therefore, we are moving to dismiss the crimes charged.

620. In granting the motion to dismiss on December 16, 2004, Hon. Harris stated:

> Ladies and gentlemen of the jury, this case has been disposed of. The District Attorney's Office acted in accord with the highest standards of proper exercise of quasi judicial authority and has made further investigation and has concluded

the defendant's guilt cannot be proven beyond a reasonable doubt.

621. Plaintiffs were further injured by Mr. Kyne's malicious prosecution in that plaintiffs traveled to New York City for Mr. Kyne's trial – either as the defendant, in Mr. Kyne's case, or as witnesses – missing work and wages and incurring travel and other expenses in the process.

622. Defendants' policies and practices of engaging in unlawful surveillance, making mass arrests of persons lawfully participating in or observing demonstrations without making individualized determinations of probable cause, using excessive force in effecting those arrests, effecting widespread illegal seizures and searches, detaining those arrested on minor offenses for prolonged periods of time in unhealthy conditions without access to phones, lawyers, or adequate medical, sleeping, sanitary, and/or bathroom facilities, routinely fingerprinting persons arrested for minor offenses, ordering and/or encouraging and/or facilitating the swearing out of false accusatory instruments, maliciously prosecuting, and otherwise retaliating against individuals for exercising their Constitutional rights violated the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United

States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law.

623. By their acts and omissions, defendants acted in concert under color of State and/or Federal law intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, and caused injury and damage to plaintiffs in violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law.

624. By failing properly to train and/or to remedy the wrongs committed by their subordinates and/or co-defendants, defendants supervisory and other fellow officers and/or agents deprived plaintiffs of liberty and property and caused plaintiffs to suffer bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and otherwise damaged and injured them.

## AS AND FOR A FIRST CAUSE OF ACTION

625. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 624 above as if fully set forth hereat and incorporate the same herein by reference.

626. Plaintiffs' false and retaliatory arrests, which were made without probable cause or other justification in the law, violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

627. Plaintiffs were arrested in retaliation for exercising their First Amendment rights while speaking out on matters of public concern and/or attempting to observe individuals who were so doing and/or attempting to observe law enforcement responses thereto.

628. The mass arrests of individuals at demonstrations substantially chills the exercise of First Amendment rights, particularly when the mass arrests in question pay short thrift to the doctrine of probable cause.

629. When the police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to be comfortable engaging in future protest activity.

630. When such arrests take place at highly publicized events such as the Republican National Convention, the

public at large is given the message that participation in protest activity - or even observation of protest activity or law enforcement responses thereto - is likely to lead to arrest.

## AS AND FOR A SECOND CAUSE OF ACTION

631. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 630 above as if fully set forth hereat and incorporate the same herein by reference.

632. Defendants' use of excessive force in connection with plaintiffs' false and retaliatory arrests violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

## AS AND FOR A THIRD CAUSE OF ACTION

633. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 632 above as if fully set forth hereat and incorporate the same herein by reference.

634. Defendants' subjection of plaintiffs to unlawful and excessive detentions in connection with plaintiffs' false and retaliatory arrests violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

## AS AND FOR A FOURTH CAUSE OF ACTION

635. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 634 above as if fully set forth hereat and incorporate the same herein by reference.

636. Defendants' subjection of plaintiffs to cruel and unusual and/or otherwise inadequate and/or unsafe conditions of confinement without access to phones, lawyers, or adequate medical, sleeping, sanitary, and/or bathroom facilities in connection with their unlawful and excessive detentions springing from their plaintiffs' false and retaliatory arrests violated the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

## AS AND FOR A FIFTH CAUSE OF ACTION

637. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 636 above as if fully set forth hereat and incorporate the same herein by reference.

638. Defendants' subjection of plaintiffs to unlawful surveillance prior to and/or after their arrests violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New

York State Constitution and New York State statutory and common law.

### AS AND FOR AN SIXTH CAUSE OF ACTION

639. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 637 above as if fully set forth hereat and incorporate the same herein by reference.

640. Defendants' subjection of plaintiffs to criminal prosecution was malicious and violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

### AS AND FOR A SEVENTH CAUSE OF ACTION

641. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 640 above as if fully set forth hereat and incorporate the same herein by reference.

642. The DOD Directive is unconstitutional on its face and/or as applied to Mr. Kyne.

643. Defendants' promulgation of the same and/or articulation of the same against Mr. Kyne violated the First and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

### AS AND FOR A EIGHTH CAUSE OF ACTION

644. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 643 above as if fully set forth hereat and incorporate the same herein by reference.

645. Defendants did inflict assault and battery upon plaintiffs and in so doing directly and proximately caused plaintiffs injury and damage and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

AS AND FOR AN NINTH CAUSE OF ACTION

646. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 645 above as if fully set forth hereat and incorporate the same herein by reference.

647. Defendants caused plaintiffs to be falsely arrested and/or falsely arrested plaintiffs and in so doing directly and proximately caused plaintiffs injury and damage and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

AS AND FOR A TENTH CAUSE OF ACTION

648. Plaintiffs restate and realleged the allegations contained in ¶¶ 1 through 647 above as if fully set forth hereat and incorporate the same herein by reference.

649. Defendants engaged in extreme and outrageous conduct, intentionally and/or negligently causing severe

emotional distress to plaintiffs and violating plaintiffs'
statutory and common law rights as guaranteed by the laws
and Constitution of the State of New York.

<u>AS AND FOR A ELEVENTH CAUSE OF ACTION</u>

650. Plaintiffs restate and realleged the allegations
contained in ¶¶ 1 through 649 above as if fully set forth
hereat and incorporate the same herein by reference.

651. Defendants employed regularly issued process
against plaintiffs compelling the performance or
forbearance of prescribed acts, the purpose of which was
defendants' intent to harm plaintiffs without economic or
social excuse or justification, and defendants were seeking
a collateral advantage or corresponding detriment to
plaintiffs which were outside the legitimate ends of the
process, and in so doing directly and proximately caused
plaintiffs injury and damage and violated their statutory
and common law rights as guaranteed by the laws and
Constitution of the State of New York.

WHEREFORE, each plaintiff demands the following relief
jointly and severally against all of the defendants:

A.    A declaratory judgment declaring that the DOD
      Directive is unconstitutional and that its
      implementation with respect to Mr. Kyne was
      unconstitutional;

B.    A declaratory judgment declaring that New York City Administrative Code § 10-110 and its implementing regulations are facially unconstitutional and/or unconstitutional as applied to Mr. Langley and/or Mr. Duncan;

C.    Permanent injunctive relief in the form of an order enjoining defendants from engaging in the policies, practices, and/or customs complained of herein;

D.    An award of $1,000,000.00 in compensatory damages;

E.    An award of $3,000,000.00 in punitive damages;

F.    An award of attorney's fees and costs and disbursements; and

G.    And other such relief as this Court may deem just and proper.

DATED:    NEW YORK, NEW YORK
            March 15, 2006

RESPECTFULLY SUBMITTED,


_____/S/_____
GIDEON ORION OLIVER (GO 8799)
LEWIS B. OLIVER, JR. (LO 5153)
OLIVER & OLIVER
ATTORNEYS FOR PLAINTIFFS
c/o 200 E. 10th St. #917
New York, New York   10003
(646) 602-9242

125