UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

DENNIS KYNE, DUSTIN LANGLEY, CHARLES DUNCAN, DANIEL GROSS, JOHN FRANCIS MULLIGAN, AMBER TEJADA, STEPHANE LAHOUD, and JULIEN BOISVERT,

Plaintiffs,

- against -

THE CITY OF NEW YORK ("NYC"), a municipal entity; THE HUDSON RIVER PARK TRUST ("HRPT"), a joint city-state body; THE REPUBLICAN NATIONAL COMMITTEE ("COMMITTEE"); THE REPUBLICAN NATIONAL HOST COMMITTEE ("RNCHC"); PAUL WOLFOWITZ, DEPUTY SECRETARY OF THE UNITED STATES DEPARTMENT OF DEFENSE; THOMAS RIDGE, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY; STEPHEN G. HUGHES, UNITED STATES SECRET SERVICE SPECIAL AGENT; ROBERT MUELLER, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION; CONNIE FISHMAN, HRPT PRESIDENT; ROLAND BETTS, RNCHC CO-VICE CHAIR; MICHAEL BLOOMBERG, NYC MAYOR; MARTIN HORN, NYCDOC COMMISSIONER; RAYMOND KELLY, NYPD COMMISSIONER; STEPHEN L. HAMMERMAN, NYPD DEPUTY COMMISSIONER OF LEGAL MATTERS; DAVID COHEN, NYPD DEPUTY COMMISSIONER OF INTELLIGENCE; BRUCE H. SMOLKA, ASSISTANT CHIEF, NYPD MANHATTAN SOUTH TASK FORCE; THOMAS GRAHAM, COMMANDER, NYPD DISORDER CONTROL UNIT; JOHN J. COLGAN, EXECUTIVE OFFICER, NYPD COUNTER-TERRORISM BUREAU; JAMES O'NEILL, NYPD DEPUTY INSPECTOR; RONALD MERCANDETTI, CAPTAIN, NYPD PATROL BORO BRONX SOUTH TASK FORCE; DANIEL ALBANO, LIEUTENANT, NYPD LEGAL BUREAU; NYPD SERGEANT EDWARD MURPHY, PATROL BORO BRONX ANTI-CRIME UNIT, SHIELD NO. 1502; NYPD SERGEANT MICHAEL HOLMES; NYPD PATROL BORO BRONX SOUTH TASK FORCE OFFICER MATTHEW WOHL, SHIELD NO. 6956; NYPD PATROL BORO BRONX SOUTH TASK FORCE OFFICER GLENN HUDECEK, SHIELD NO. 18059; NYPD PATROL BORO BRONX SOUTH TASK FORCE OFFICER MICHAEL DECKERT, SHIELD NO. 27304; NYPD OFFICER JOHN MARTINEZ, 112th PRECINCT, SHIELD NO. 23496; UNIDENTIFIED NYPD AGENTS JOHN AND JANE DOES; and UNIDENTIFIED RICHARD AND MARY ROE FEDERAL, STATE, AND/OR CITY LAW ENFORCEMENT AGENTS, INCLUDING ONE SUCH "MARY ROE" INDIVIDUAL, individually and in their official capacities, jointly and severally,

Defendants.

_____

AMENDED
COMPLAINT AND
DEMAND
FOR JURY TRIAL

06-CV-2041

(KMK) (JCF)

Plaintiffs   DENNIS   KYNE,   DUSTIN   LANGLEY,   CHARLES   DUNCAN,

DANIEL  GROSS,  JOHN  FRANCIS  MULLIGAN,  AMBER  TEJADA,  STEPHANE

LAHOUD, and JULIEN BOISVERT, by their attorneys, Lewis B. Oliver, Jr., and Gideon

Orion Oliver, OLIVER & OLIVER, as and for their complaint in this matter, do hereby

state and allege as follows:

PRELIMINARY STATEMENT

1.    This is a civil rights action in which plaintiffs, who were arrested in

August of 2004 at the height of the Republican National Convention ("RNC") in New

York City, seek relief in connection with defendants' violations of their rights secured by

the Civil Rights Act of 1871, 42 USC § 1983, the United States Constitution, including

its First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and by the

corresponding provisions of the Constitution and laws of the State of New York.

Plaintiffs seek damages, both compensatory and punitive, affirmative and equitable relief,

an award of costs and attorneys' fees, and such other and further relief as this Court

deems equitable and just.

JURISDICTION

2.    This Court has original jurisdiction over plaintiffs' federal claims by virtue

of 28 USC §§ 1331 and 1343(a)(3) and (4) since this action seeks redress for violations of

their federal constitutional and civil rights.

3.    This Court has supplemental jurisdiction over plaintiff Dennis Kyne's

state constitutional and state law causes of action that are so related to the within federal

claims that they form part of the same case or controversy pursuant to 28 USC § 1367 (a).

4.    Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to

grant plaintiffs the injunctive relief they pray for herein.

5.      The Federal Declaratory Judgment Act, 28 USC § 2201, authorizes this Court to grant plaintiffs the declaratory relief they pray for herein.

6.      42 USC § 1988 authorizes this Court to grant plaintiffs the attorneys' fees they pray for herein.

<u>VENUE</u>

7.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 USC § 1391(b) on the grounds that the events complained of herein occurred in the Southern District.

<u>JURY DEMAND</u>

8.      Plaintiffs demand a jury trial in this action on each and every one of their damage claims.

<u>KYNE NOTICE OF CLAIM</u>

9.      In accordance with General Municipal Law § 50-h, plaintiff DENNIS KYNE filed a timely Notice of Claim dated November 18, 2004 with the Comptroller of the City of New York on November 24, 2004, within 90 days of his arrest on August 31, 2004, his subsequent detention, and the commencement of the criminal proceeding against him in New York City Criminal Court corresponding to Docket No. 2004NY064937 on September 1, 2004.

10.      In accordance with General Municipal Law § 50-h and § 12 of 1998 Sess. Law News of N.Y. Ch. 592 (S. 7845) (McKINNEY'S), the Hudson River Park Act, Mr. Kyne filed a timely Notice of Claim dated November 18, 2004 with the Hudson River Park Trust on November 26, 2004, within 90 days of his arrest on August 31, 2004 and

his subsequent detention on defendant HRPT's property located at Pier 57 on the West side of Manhattan on August 31 and September 1, 2004.

11.    On December 14, 2004, Mr. Kyne's jury trial commenced in the New York City Criminal Court before Hon. Gerald Harris.

12.    On December 16, 2004, the Office of the District Attorney, New York County, by Aaron Wolfson, Esq., Assistant District Attorney, moved to dismiss the charges against Mr. Kyne because "the People [did] not believe [they could] prove the crimes charged beyond a reasonable doubt."

13.    Pursuant to General Municipal Law § 50-h, on June 20, 2005, the City, by Ilana Grafstein, Esq., Jeffrey Samel & Associates, PC, held a hearing in response to Mr. Kyne's Notices of Claim, during which the City questioned Mr. Kyne about, *inter alia*, the criminal proceedings against him and their resolution.

<u>PLAINTIFFS</u>

14.    Plaintiff DENNIS KYNE resides at 305 East Empire Street, San Jose, California 95112.

15.    Plaintiff DUSTIN LANGLEY resides at 3284 31st Street, Apartment 1B, Long Island City, New York 11106.

16.    Plaintiff CHARLES DUNCAN resides at 202 Hillcrest Road, Raleigh, North Carolina 27605.

17.    Plaintiff DANIEL GROSS resides at 350 West 55th Street #GR-3, New York, New York 10019.

18.    Plaintiff JOHN FRANCES MULLIGAN resides at 23 East 124th Street #6B, New York, New York 10035.

19.    Plaintiff AMBER TEJADA resides at 1934 Northeast Rosa Parks Way, Portland, Oregon 97211.

20.    Plaintiff STEPHANE LAHOUD resides at 175 St-Germain Ouest Appt 103, Rimouski, QC, G5: -4B8, Canada.

21.    Plaintiff JULIEN BOISVERT resides at 175 St-Germain Ouest Appt 103, Rimouski, QC, G5: -4B8, Canada.

<u>DEFENDANTS</u>

22.    Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

23.    At all times relevant herein, as set forth more fully below, defendants acted and/or failed to act maliciously, intentionally, knowingly, with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

24.    Each individual defendant is sued in her or his individual and official capacities.

25.    The United States Department of Defense ("DOD") is an agency of the Executive Branch of the government of the United States of America which acts as its agent, *inter alia*, in the management of the United States Armed Forces, and has the authority to promulgate Directives regarding, *inter alia*, the wearing of United States Armed Forces uniforms.

26.    At all times complained of herein, defendant PAUL WOLFOWITZ was DOD's Deputy Secretary, a duly appointed and acting high-level policymaking official of the President of the United States of America, George Walker Bush (the "President,") delegated full power and authority to act for the Secretary of Defense and to exercise the powers of the Secretary on any and all matters for which the Secretary is authorized to act pursuant to law, and was as such, an officer, servant, employee, and agent of the President acting for, on behalf of, and with the power vested in him by the President, under color of Federal law, in the course and scope of his employment and duties and functions.    Pursuant to law, the Secretary of Defense is a member of the President's Cabinet and of the National Security Council and acts as the principal defense policy adviser to the President and is responsible for the formulation of general defense policy and policy related to all matters of direct concern to the DOD, and for the execution of approved policy.

27.    Upon information and belief, on or about May 17, 2004, defendant Wolfowitz signed Directive Number 1334.1, making it effective as official DOD policy.

28.    The United States Department of Homeland Security ("DHS") is an agency of the Executive Branch of the government of the United States of America established by the Homeland Security Act of 2002, Pub. L. No. 296 (2002), which acts as its agent, *inter alia*, in the areas of leveraging resources within federal, state, and local governments, coordinating the transition of multiple agencies and programs into a single, integrated agency focused on protecting the American people and their homeland from terrorist attacks and responding to natural disaster.    In January 2003, DHS became the Nation's 15th and newest Cabinet department, consolidating 22 previously disparate

agencies under one unified organization, and its components include the United States Secret Service ("USSS,") Immigrations and Customs Enforcement ("ICE,") and the Federal Law Enforcement Training Center ("FLETC.")

29.     Upon information and belief, beginning on January 24, 2003 and at all times thereafter complained of herein, defendant THOMAS RIDGE was DHS's Secretary,  a duly appointed and acting high-level policymaking official of the President delegated full power and authority to act for the President in the areas under DHS's jurisdiction, and was as such, an officer, servant, employee, and agent of the President acting for, on behalf of, and with the power vested in him by the President, under color of Federal law, in the course and scope of his employment and duties and functions.

30.     Beginning in January 2003, the United States Secret Service ("USSS") was, and it remains, a DHS component agency mandated by statute and executive order to protect the President and Vice President, their families, heads of state, and other designated individuals, and to plan and implement security designs and assume other responsibilities in connection with events designated as National Special Security Events ("NSSEs.")

31.     At all times relevant herein, defendant STEPHEN G. HUGHES, Special Agent, was the USSS Coordinator for the 2004 Republican National Convention and as such was a duly appointed and acting high-level policy official of the President, and an officer, servant, employee, and agent of the President acting under color of Federal law with the power vested in him by the President in the course and scope of his employment and duties and functions.

32.     The Federal Bureau of Investigation ("FBI") is the principal investigative arm of the United States Department of Justice, which has the authority and responsibility to investigate specific crimes assigned to it, and is authorized to provide other law enforcement agencies with cooperative services, such as fingerprint identification, laboratory examinations, and police training; its mission is to uphold the law through the investigation of violations of federal criminal law; to protect the United States from foreign intelligence and terrorist activities; to provide leadership and law enforcement assistance to federal, state, local, and international agencies; and to perform these responsibilities in a manner that is responsive to the needs of the public and is faithful to the Constitution of the United States.

33.     At all times relevant herein, defendant ROBERT S. MUELLER, III was the Director of the FBI, appointed by the President, confirmed by the Senate on August 2, 2001, and sworn in on September 4, 2001, and as such was a duly appointed and acting high-level policy official of the President, and an officer, servant, employee, and agent of the President acting under color of Federal law with the power vested in him by the President in the course and scope of his employment and duties and functions.

34.     Defendant THE CITY OF NEW YORK ("NYC" or "the City") is a municipal entity created and authorized under the laws of the State of New York, with general offices located at City Hall, New York, New York 10007. NYC is authorized by law to maintain the NYPD, which acts as its agent in the area of law enforcement, and the New York City Department of Corrections ("NYCDOC,") which acts as its agent in the area of incarcerating pre-trial detainees, among others, and defendant NYC is ultimately

responsible for these Departments and assumes the risks incidental to the maintenance of them and their employees..

35.    Defendant MICHAEL BLOOMBERG is and was, at all times relevant herein, the Mayor of the City of New York and the chief policymaking official for the City and its Departments.

36.    At all times relevant herein, defendants RAYMOND KELLY was the NYPD Commissioner and its chief policymaking official, defendant STEPHEN L. HAMMERMAN was the NYPD Deputy Commissioner of Legal Matters, defendant BRUCE H. SMOLKA was the Assistant Chief of NYPD Patrol Boro Manhattan, defendant THOMAS GRAHAM was the Commander of the NYPD Disorder Control Unit, defendant JOHN J. COLGAN was the Executive Officer of the NYPD Counter-Terrorism Bureau, and/or temporarily assigned to head the NYPD Criminal Justice Bureau, defendant JAMES O'NEILL was an NYPD Deputy Inspector, defendant RONALD MERCANDETTI was a Captain in the NYPD Patrol Boro Bronx South Task Force, defendant DANIEL ALBANO was a Lieutenant in the NYPD Legal Bureau, and these defendants were each and all high-level NYPD policymaking officials personally involved in the unconstitutional policies, practices, and conduct complained of herein as set forth more specifically below.

37.    At all times relevant herein, defendants EDWARD MURPHY and MICHAEL HOLMES were NYPD Sergeants, and defendants MATHEW WOHL, GLENN HUDECEK, MICHAEL DECKERT, and JOHN MARTINEZ were NYPD officers, who were personally involved in depriving plaintiffs of their constitutional rights, as set forth more specifically below.

38.     At all times relevant herein, defendants UNIDENTIFIED RICHARD AND MARY ROE FEDERAL, STATE, AND/OR CITY LAW ENFORCEMENT AGENTS, INCLUDING ONE SUCH "MARY ROE" UNIDENTIFIED FEDERAL, STATE, OR CITY LAW ENFORCEMENT AGENT WEARING A LIGHT-BLUE T-SHIRT ("BLUE") were as-yet-unidentifiable city, state and/or federal agents duly appointed and acting as officers, servants, employees and/or agents of defendants NYC, Wolfowitz, Ridge, Hughes, and/or Mueller, and/or other city, state, and/or federal law enforcement agents, acting for, on behalf of, and with the power and authority vested in them under color of state and/or federal law in the course and scope of their employment and duties and functions or engaging in conduct incidental to the performance of their lawful functions as such officers.

39.     At all times relevant herein, as set forth more fully below, defendant NYC, by individual defendants acting under color of state law and in concert with other individual defendants, had *de facto* policies, practices, customs and usages of failing properly to train, screen, supervise, and discipline agents, employees, and police officers, and of failing to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline said defendants, which were a direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

40.     At all times relevant herein, as set forth more fully below, DOD, DHS, USSS, and the FBI, by individual defendants acting under color of federal law and in concert with other individual defendants, had *de facto* policies, practices, customs and usages of failing properly to train, screen, supervise, and discipline agents, employees, and police officers, and of failing to inform the individual defendants' supervisors of their

need to train, screen, supervise or discipline said defendants, which were a direct and proximate cause of the unconstitutional conduct alleged herein and the damages attendant thereto.

41.     Defendant HUDSON RIVER PARK TRUST ("HRPT") is a public benefit corporation created through State legislation as a joint City-State body, which has clear authority to operate all areas within the Hudson River Park on Manhattan's West Side, including Pier 57, a block-long, three-story former bus depot located at 11th Avenue and 15th Street.  Defendant HRPT assumes the risks incidental to the maintenance and use of its structures, including Pier 57, and the employment of its employees.

42.     Defendant CONNIE FISHMAN was, at all times relevant herein, and is, upon information and belief, the President of defendant HRPT.  At all times relevant herein, defendant Fishman was acting under color of state law and in the course and scope of her employment and duties and functions as an official of defendant HRPT, was acting for, and on behalf of, and with the power and authority vested in her by defendant HRPT, and was otherwise performing and engaging in conduct incidental to the performance of her lawful function in the course of her duties.

43.     At all times relevant herein, defendant REPUBLICAN NATIONAL COMMITTEE ("Committee") was and is a political action committee and/or political association doing business in the State of New York, *inter alia*, comprised, *inter alia*, of the RNC Committee on Arrangements ("COA"), a subsidiary and/or subcommittee of defendant Committee (hereinafter included in references to the "Committee") which participated in and/or was responsible for the selection of NYC as the host city for and participated in and/or was responsible for the coordination and planning of details for the

Republican party's national convention in 2004.  At all times hereinafter mentioned, the Committee planned, organized, managed, supervised, and held the RNC in NYC from August 30 through September 2, 2004.

44.     At all times relevant herein, defendant RNC HOST COMMITTEE ("RNCHC") was an entity doing business in the State of New York involved in planning for and administering the RNC.  Upon information and belief, at all times relevant herein, defendant Bloomberg and New York State Governor George Pataki were Honorary Chairs of the RNCHC.

45.     Defendant ROLAND W. BETTS was, at all times relevant herein, Co-Vice Chairman of the RNCHC, and was and, upon information and belief, is Chair of Chelsea Pier Management, a former Director of the Lower Manhattan Development Corporation, and a former college roommate, fraternity brother, and close personal friend of the President.

<u>BACKGROUND AND FACTUAL ALLEGATIONS</u>

<u>PLAINTIFFS</u>

46.     Plaintiff DENNIS KYNE enlisted in the United States Army in January of 1987, served as a battlefield medic in the 24th Infantry Division in Iraq during Operation Desert Storm from August of 1990 through April of 1991, and was honorably discharged from United States Military service in 2003.

47.     In approximately 1991, Mr. Kyne filed a complaint with the United States Department of Veterans Affairs ("VA") about recurring health problems from which he had suffered since returning to the United States from Iraq, which he believes were

caused in large part by his exposure to so-called depleted uranium ("DU") during United States Armed Forces military operations during Operation Desert Storm.

48. On April 3, 2004, a <u>New York Daily News</u> article by Juan Gonzalez reported that four (4) soldiers who had served in Iraq in 2003 with the 442nd Military Police of the New York Army National Guard, a Rockland County-based outfit comprised largely of New York City police officers, firefighters, and correction officers, had been contaminated with radiation likely caused by dust from depleted uranium shells fired by United States troops.

49. Mr. Kyne came to New York City in August of 2004 in order to exercise his First Amendment rights by informing New York City police officers and firefighters that the United States Government was exposing their friends and loved ones serving in Iraq – including the soldiers from the 442nd - to DU on the battlefield.

50. Upon information and belief, as a result of Mr. Kyne's work as an anti-war and anti-DU activist, and/or in connection with preparations for the RNC, unidentified city, state, and/or federal law enforcement agents subjected Mr. Kyne to surveillance prior to and during August of 2004.

51. At all times relevant herein, plaintiff DUSTIN LANGLEY, a third-generation United States Navy veteran, was working in an unpaid position as a media coordinator and in other capacities for the International Action Center ("IAC,") an organization founded by former Attorney General Ramsey Clark for the purposes of combating, *inter alia*, war and racism.

52. In his capacity as an IAC volunteer organizer, Mr. Langley helped to organize, and participated in, an Iraq War Crimes Tribunal held the week before the

RNC, at which speakers including Mr. Langley, Iraqi nationals, Ramsey Clark, and others discussed numerous issues relating to the war in Iraq, including the United States military's use of DU.

53.     On August 27, 2004, Mr. Langley participated in a press conference on the steps of City Hall, the purpose of which was to address specifically what Mr. Langley and the IAC viewed as repression leading up to the RNC in the form of denials of permits for peaceful protests during the RNC.

54.     Upon information and belief, as a result of Mr. Langley's work as an anti-war and anti-DU activist, and/or in connection with preparations for the RNC, unidentified city, state, and/or federal law enforcement agents subjected Mr. Langley to surveillance prior to and during August of 2004, including, but not limited to, surveillance of the aforementioned Iraq War Crimes Tribunal.

55.     At all times relevant herein, plaintiff CHARLES DUNCAN was a full-time student at North Carolina State University in the final year of his studies in the University's writing program.  Mr. Duncan traveled to New York City during the RNC in order to as a writer and photographer for N.C. State's student newspaper, Technician, trailing his fellow N.C.S.U. students around the City and reporting on their activities.

56.     At all times relevant herein, plaintiff DANIEL GROSS was an accepted student at Fordham Law School who worked as a barista at the Starbucks at 200 Madison Avenue in New York City.  In May of 2004, as part of a campaign for the Industrial Workers of the World ("IWW,") Mr. Gross co-founded the first-ever Starbucks Workers Union in the United States.

57.     At all times relevant herein, plaintiff JOHN FRANCIS MULLIGAN was a resident of New York City.

58.     At all times relevant herein, plaintiff AMBER TEJADA was an Assistant Teacher in a pre-school classroom at Fruit and Flower Childcare Center in Portland, Oregon, who came to NYC during the RNC to be show her disapproval of President Bush's foreign and domestic policies.

59.     At all times relevant herein, plaintiffs STEPHANE LAHOUD and JULIEN BOISVERT were Canadian citizens who came to New York during the RNC as part of a video collective, "Les Lucioles," that had received a grant from the National Film Board of Canada to produce several short films, including a film about the RNC.

<u>RNC PLANNING 2001-2002</u>

60.     Upon information and belief, shortly after September 11, 2001, defendant Bloomberg, Governor Pataki,  and former NYC Mayor Rudolph W. Giuliani led an intense lobbying effort to bring the RNC to NYC, working closely with defendants Betts and the RNCHC, in connection with which and/or in connection with their work on the RNCHC, defendants Betts and Bloomberg had numerous contacts with one another, agents of the defendant Committee, with other defendants, including, but not limited to, defendant Kelly, as well as with Governor Pataki, and agents of the White House, including, but not limited to, Mr. Karl Rove,  and then-Director of Political Affairs Mr. Ken Mehlman.

61.     Upon information and belief, during the same time period, acting in concert with defendant Bloomberg, defendant Betts used his personal relationship with

the President to persuade the President and other White House officials to hold the RNC on the West Side of Manhattan.

62.     Upon information and belief, on June 17, 2002, defendant Bloomberg and Governor Pataki presented defendant NYC's formal bid for the 2004 RNC at the RNC headquarters in Washington, D.C., and defendant City issued a press release, touting: "New York City's experience hosting large, security-intensive events is unparalleled as demonstrated at this year's World Economic Forum."

63.     Upon information and belief, defendant NYC's and the City of Tampa, Florida's separate campaigns to court defendant Committee developed into a contest between the two cities in which each attempted to win the host city award by promising representatives of defendant Committee, *inter alia*, indemnification and legal representation, private funding, easy access to the press and the media, lodging for delegates and conventiongoers, city police, security, and other services for delegates and conventiongoers at locations related to the RNC, and other, similar amenities and incentives as parts of their competing bid packages.

64.     Upon information and belief, the President and defendant Betts discussed the President's growing concerns about choosing NYC as the host city for the RNC as the treat of protests grew, and defendant Betts lobbied for the RNC in NYC.

65.     Upon information and belief, the likelihood of RNC-related demonstrations worried the President and factored into the White House's recommendations to defendant Committee representatives as to the relative appropriateness of NYC and Tampa as potential RNC venues, and the President was

specifically concerned that choosing Tampa "would prompt massive demonstrations by Democrats alleging Bush stole Florida, and the presidency, in 2000."

66.     Upon information and belief, defendants Betts and Bloomberg worked together to raise tens of millions of dollars worth of private finding in order to bring the RNC to NYC.

67.     Upon information and belief, defendant Bloomberg and/or other defendant NYC agents signed agreements to secure more than 22,000 hotel rooms for the Convention from nearly 50 hotels, with nearly 17,000 rooms located within one mile of Madison Square Garden, the proposed location of the RNC.

68.     Upon information and belief, defendant Bloomberg reached agreements with some of the City's labor unions to sign "no strike" agreements that would ensure all work during and around the RNC.

69.     Upon information and belief, prior to September 11, 2002, defendant Bloomberg's concerns that the increased security measures required for Presidential attendance at the commemoration at the World Trade Center site would have inconvenienced or delayed family members of 9/11 victims prompted the President to pay his respects in other ways.

70.     Upon information and belief, following September 11, 2002, representatives of the White House, including, but not limited to, Mr. Rove, complained that defendant Bloomberg was "needlessly difficult during the negotiations preceding the President's visit to the city for the first anniversary of the terror attacks" in that defendant Bloomberg did not "make it convenient for the President to come and pay his respects."

71.     Upon information and belief, at some time between September 11, 2001, and December of 2002, unidentified sources within defendant Committee informed Thomas M. DeFrank, Daily News Washington Bureau Chief, or other agents of the Daily News that Mr. Rove had informed political allies "that Bloomberg was an impediment to the city's winning its first Republican convention" because he had a "reputation around the White House for being 'not as cooperative as he should be.'"

72.     Upon information and belief, in or about December of 2002, defendants Betts and Bloomberg met with Mr. Rove in order to "clear the air by addressing White House concerns that the mayor [was] a prickly one-man band."

73.     Upon information and belief, defendant Committee's site selection committee discussed the relative bids of defendant NYC and Tampa in a conference call scheduled for late in the week of December 11, 2002.

74.     Upon information and belief, during that time period, Mr. Rove and Marc Racicot, chairman of the defendant Committee, were the key advisers on the RNC site question.

75.     Upon information and belief, in or about December of 2002, William Harris, the head of the RNC site selection team, "came to the City to talk about hotel rates" in a meeting held at "the new Ritz-Carlton in Battery Park City."

76.     Upon information and belief, in approximately December of 2002, defendants Betts and Bloomberg had a dinner meeting with Mr. Rove, at or about which time the agreement that defendant NYC would host the RNC was finalized.

RNC PLANNING 2003-2004: "OPERATION OVERLORD II"

77.     Upon information and belief, on or about January 6, 2003, the RNC Site Selection Committee formally recommended NYC to host the 2004 RNC.

78.     On January 31, 2003, defendants NYC and Committee entered into a Site City Agreement for the 2004 Republican National Agreement ("Site Cite Agreement") between them and/or defendant RNCHC, and defendant NYC, by defendant Bloomberg, and the RNCHC entered into a City Agreement for the 2004 Republican National Convention ("City Agreement") (collectively, the "City Agreements") in which defendant NYC undertook to provide, at its own cost, police assistance as specified in a Convention Security Plan that was to be prepared by defendants Committee, RNCHC, and the NYPD, *inter alia*, subject to approval by defendant Committee, with advice from a professional security consultant designated by defendant Committee and paid for by defendant RNCHC.

79.     Upon information and belief, pursuant to the City Agreements, the convention planning process contemplated, without limitation, defendant Committee's use of defendant NYPD police officers and provision for security and crowd control inside and outside of all applicable venues and traffic control for activities related to the convention, including, but not limited to, events and activities sponsored by entities or organizations other than defendants Committee or the RNCHC, which events and activities were associated with but not comprising the Convention, and the venues in and around the City as might have been used to carry out any such events.

80.     Upon information and belief, the Convention Security Plan developed as aforementioned set forth the respective roles and responsibilities of City law enforcement personnel, the DOD, the DHS, the USSS, the FBI, and other federal, state, and local

agencies, taking into account the requirements for security, crowd control, and traffic control in other cities in which earlier presidential nomination conventions of both political parties had been held.

81.     During his State of the Union on January 28, 2003, the President stated, "Tonight, I am instructing the leaders of the FBI, the CIA, the Homeland Security and the Department of Defense to develop a Terrorist Threat Integration Center to merge and analyze all threat information in a single location."

82.     Upon information and belief, on or about January 31, 2003, the announcement of defendant NYC as the host for the 2004 RNC "launched an extensive 19-month security coordination among City, State, and Federal entities" in which the USSS and NYPD served as lead agencies with support from, *inter alia*, DOD, DHS, and the FBI, which was dubbed "Operation Overlord II."

83.     Upon information and belief, in connection with their Operation Overlord II planning efforts, agents of defendant RNCHC and/or other defendants engaged the services of Transportation Management Services ("TMS,") a private consultant, and/or another private consultant, to develop a Transportation Plan and/or Traffic Control Plan.

84.     Upon information and belief, on July 9, 2003, DHS announced that the 2004 RNC had been designated as a National Security Special Event ("NSSE.")

85.     Upon information and belief, when an event is designated a National Special Security Event, the USSS assumes its mandated role as the lead federal agency for the design and implementation of the operational security plan and Federal resources are deployed to maintain the level of security needed for the event and the area in order to prevent terrorist attacks and other criminal acts.

86.     Pursuant to presidential directives and other authority, once a NSSE is designated, DHS assumes federal control of security measures normally employed by local law enforcement, and federal funding is released for security plans, while the USSS is charged with employing and coordinating all federal and local agencies including the various bureaus of DHS, the FBI, and local police departments.

87.     Upon information and belief, in 2003 and 2004, pursuant to the City Agreements, the USSS, by defendant Hughes and other unidentified agents, developed an RNC plan, the stated purpose of which was "[t]o protect our democratic process and the lives and safety of those who come to New York City to participate in the RNC," and defendant Hughes coordinated the USSS's efforts to discharge its RNC planning duties by, *inter alia*:  establishing a steering committee; establishing subcommittees; identifying and acquiring resources; establishing command and control protocols; establishing interagency communication; conducting training; executing the plan; and completing after-action and other reports.

88.     Upon information and belief, also defendant Hughes coordinated the USSS's efforts to implement its RNC plan by, *inter alia*: establishing the "RNC Law Enforcement and Public Safety Steering Committee," which was comprised of agents from the FBI, the Federal Emergency Management Agency, Madison Square Garden Management, the New York City Fire Department, the New York City Office of Emergency Management, the NYPD, the New York State Emergency Management Office, the New York State Office of Homeland Security, the New York State Police, the United States Attorney's Office, the United States Coast Guard, and the USSS.

89.     Upon information and belief, defendant Hughes coordinated the USSS's efforts to implement its RNC plan by establishing the following inter-agency subcommittees, *inter alia*:  Airspace Security; Civil Disturbance/Prisoner Processing; Credentialing; Critical Systems Protection; Dignitary/VIP Protection; E.O.D.; Fire/Life Safety/Contingency Planning; Hazmat; Incident Management; Intelligence/Counter-Terrorism; Interagency Communication; Legal; Public Affairs; Response and Recovery Operations; Tactical; Training; Transportation/Traffic; and Venue Security.

90.     Upon information and belief, in connection with their Operation Overlord II inter-agency planning efforts, in 2003 and 2004, defendant Kelly and/or his agents, including defendants Hammerman and Graham and then-Assistant Chief Patrick Devlin, a non-party, drew on the NYPD's institutional resources, including experienced agents from the Office of the Deputy Commissioner of Legal Matters ("DCLM"), the Disorder Control Unit ("DCU"), and the Criminal Justice Bureau ("CJB"), respectively, to develop cadres of, respectively, attorneys trained in legal matters regarding the challenges associated with arrests and mass arrests in the contexts of First Amendment activities, officers trained in disorder control,  and CJB officers trained in post-arrest to arraignment prisoner processing in mass arrest situations and the challenges involved in designing mass arrest processing plans.

91.     Upon information and belief, in 2003 and 2004, in connection with their Operation Overlord II inter-agency planning efforts, defendants Bloomberg, Kelly, Horn, Cohen, Hammerman, Graham, Smolka, O'Neill, Mercandetti, Albano, and/or their agents, among other unidentified agents of defendant NYC ("NYC Planning Officials,") had numerous meetings with representatives from the USSS, including defendant

Hughes, and other agents of the USSS, the DHS, the DOD, the FBI, and other city, state, and/or federal agencies, ("Inter-Agency Planning Officials,") in connection with developing and implementing plans for policing formally permitted and "unpermitted" First Amendment assemblies during the RNC and handling the arrest processing and criminal prosecutions of persons arrested at RNC-related events, *inter alia*.

92.    Upon information and belief, in 2003 and 2004, in connection with their Operation Overlord II inter-agency planning efforts, defendants NYC Planning Officials and Inter-Agency Planning Officials (collectively, "RNC Planning Officials") jointly explored legal issues emanating from mass arrest situations, and shared their experiences and institutional memories in connection with handling, *inter alia*, security, crowd control, and traffic control in other cities in which earlier presidential nominating conventions of both political parties and other similar large-scale events had been held, and legal issues and lawsuits arising therefrom, including lawsuits challenging the policing of demonstrators – and particularly anti-Bush, anti-war, and anti-globalization demonstrators - in connection with NSSE's and other, similar events.

93.    Specifically, for example, upon information and belief, throughout 2003 and 2004, RNC Planning Officials organized and participated in a Legal Subcommittee, co-chaired by defendants NYPD and the USSS, the United States Attorney's Office ("USAO"), and DANY, which included representatives of defendant City, by New York City Corporation Counsel and the New York City Mayor's Office, along with representatives of the FBI, AMTRAK Police, MTA Police Department, New Jersey Attorney General's Office, and New York State Office of Homeland Security.  Upon information and belief, an explicit objective of the Legal Subcommittee was to coordinate

interagency responsibilities regarding arrest, jurisdiction, prosecution and litigation, as well as address the First Amendment protection of potential demonstrators, and, working with contacts in the USAO, affidavits were explicitly prepared in draft format in anticipation of litigation well in advance of the RNC.

94.     Upon information and belief, in 2003 and 2004, defendants Wolfowitz, Ridge, and Mueller were each final policymakers of the DOD, DHS, and FBI, respectively, in the areas of their agencies' RNC-related efforts, who were personally involved in attending RNC planning meetings and otherwise contributing to RNC planning and/or who supervised John and Jane Doe defendant agents who did so.

95.     In 2003 and 2004, in connection with their Operation Overlord II inter-agency planning efforts, defendants Kelly, Bloomberg, and other unidentified defendant NYPD supervisors, including such officials associated with the NYPD Intelligence Division, acted in concert with defendant USSS, the FBI, Joint Terrorist Task Force(s), and other city, state, and/or federal law enforcement agencies to increase the NYPD's intelligence gathering capabilities in order to tap all available sources to develop information that might influence the Operation Overlord II planning process, through the use of, *inter alia*, unidentified undercover NYPD officers and other law enforcement agents to gather strategic intelligence concentrated on determining which individuals and/or groups had given indications that they would be engaging in protest activity during the RNC, and the locations that any such activities would be staged from.

96.     In 2003 and 2004, in connection with their Operation Overlord II inter-agency planning efforts, defendants Kelly, Hammerman, Cohen, Graham, and other unidentified defendant NYPD supervisors, including such officials associated with the

NYPD Intelligence Division, acted in concert with the USSS and/or other DHS components, the FBI, Joint Terrorist Task Force(s), the DOD, and other city, state, and/or federal law enforcement agencies to gather and share information about plans for policing other events at which large-scale demonstrations related to the events had occurred or were anticipated and the legality and effectiveness of, *inter alia*, the disorder control and arrest processing elements of those policing plans.

97.    Upon information and belief, in 2003 and 2004, in connection with their Operation Overlord II inter-agency planning efforts, defendant Graham and other unidentified defendant NYPD supervisors, including such officials associated with the NYPD Intelligence Division, acted in concert with the USSS and/or other DHS components, the FBI, Joint Terrorist Task Force(s), the DOD, and other city, state, and/or federal law enforcement agencies to gather and share information about demonstrators they considered "anarchists" or "extremists" and the tactics that such individuals had used at large-scale demonstrations in the past, including such demonstrations at earlier, prior NSSE's and other events.

98.    Upon information and belief, on September 16, 2003, by Homeland Security Presidential Directive-6, the President established the Terrorist Threat Integration Center ("TTIC") to "(1) develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism ("Terrorist Information"); and (2) use that information as appropriate and to the full extent permitted by law to support (a) Federal, State, local, territorial, tribal, foreign-

government, and private-sector screening processes, and (b) diplomatic, military, intelligence, law enforcement, immigration, visa, and protective processes."

99.     On August 27, 2004, by Executive Order 13354, the President established the National Counterterrorism Center ("NCTC") to serve as the government's primary organization for integrating and analyzing all intelligence pertaining to terrorism and counterterrorism and to conduct strategic operational planning by integrating all instruments of national power, and the NCTC assumed operations that had been assigned to the TTIC.

100.     HSPD-6 also directed the Attorney General to establish an organization to consolidate the government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes, required the Attorney General, in coordination with the Secretary of State, defendant Ridge, and the Director of Central Intelligence, to implement appropriate procedures and safeguards with respect to all such information about United States persons, and directed defendant Ridge to develop guidelines to govern the use of such information to support State, local, territorial, and tribal screening processes, and private sector screening processes that have a substantial bearing on homeland security.

101.     On September 16, 2003, defendants Ridge, Mueller, and other officials of the government, including Attorney General John Ashcroft, Secretary of State Colin Powell, and Director of Central Intelligence George Tenet, announced the establishment of the Terrorist Screening Center ("TSC") to consolidate terrorist watchlists and provide 24/7 operational support for thousands of federal screeners across the country and around the world, in order to ensure that government investigators, screeners and agents are

working off the same unified, comprehensive set of anti-terrorist information, and that they have access to information and expertise when a suspected terrorist is screened or stopped, creating a bridge between the intelligence and law enforcement communities to facilitate real time information sharing based on daily "terrorist" encounters.

102.    Upon information and belief, the TSC is a multi-agency center authorized by HSPD 6, anchored by the Departments of Justice, Homeland Security, and State, and the Intelligence Community, administered by the FBI, and implemented through a Memorandum of Understanding ("MOU") between and among the Attorney General, the Secretaries of Homeland Security and State, and the Director of Central Intelligence.

103.    Upon information and belief, in connection with the TSC's launch, defendant Ridge characterized the TSC's job as "to make sure we get this information out to our agents on the borders and all those who can put it to use on the front lines - and to get it there fast."

104.    Since December 1, 2003, TSC has been providing key resources including a single point for terrorist screening data, a 24/7 call center for encounter identification assistance, access to a coordinated law enforcement response, a formal process for tracking encounters, and feedback to appropriate entities, consolidating the names of all known or suspected terrorists within the Terrorist Screening Database ("TSDB,") fed from sources including the TTIC, its successor agency, the National Counterterrorism Center ("NCTC,") and the FBI, *inter alia*.

105.    Upon information and belief, at all times relevant herein, the TSC's TSDB incorporated, and it incorporates, information from approximately twelve databases, including the NCTC's TIDE, DOJ's Violent Gangs and Terrorist Organizations File

("VGTOF,") and Integrated Automated Fingerprint Identification System ("IAFIS,") and DHS's Interagency Border Inspection System ("IBIS,") No-fly, Automated Biometric Identification System ("ABIS,") Selectee, and National Automated Immigration Lookout System ("NAILS") databases.

106.    Upon information and belief, the FBI's VTGOF is a database and pointer system used to track and share information about individuals allegedly associated with purported gangs and terrorist organizations, which became a component of the National Crime Information Center ("NCIC,") a nationwide information system maintained by the FBI's Criminal Justice Information Services Division that provides its partners with immediate access to information on various law enforcement data, in 1995.

107.    Upon information and belief, prior to September 11, 2001, the VGTOF was used primarily to track "urban street gangs," but its purpose was "quietly expanded to include all subjects of FBI domestic or international terrorist investigations" in 2002, when, prior to the 2002 Olympics in Salt Lake City, Utah – a NSSE - the FBI expanded the scope of information in the VGTOF to include information regarding the following types of purported gangs or terrorist organizations or their alleged members:   (1) Anarchist, (2) Militia, (3) White Supremacist, (4) Black Extremist, (5) Animal Rights Extremist, (6) Environmental Extremist, (7) Domestic Extremist, (8) Radical Islamic Extremist, (9) European Origin Extremist, (10) Latin Origin Extremist, and (11) Asian Origin Extremists.

108.    Upon information and belief, each record within the TSC's consolidated watch list – including VGTOF records - contains information about the law enforcement action to be taken when encountering an individual on the watch list which is conveyed

through a handling code expressed on a scale of 1 through 4 to provide insight into the level of "threat" posed by that individual.

109.    Upon information and belief, the first step in the screening process when a person is encountered domestically is that the identity of an individual is searched in a law enforcement system such as NCIC and, if the queried identity appears to match a record in the TSDB, the law enforcement official receives a response to contact the TSC so that call center staff can assist in determining if the encountered individual positively matches the identity of a known or suspected terrorist on the consolidated watch list.

110.    For all calls received, the call screeners record details about the inquiry on a Call Intake Form, and if the subject is positively identified or the match attempt is inconclusive, the TSC call screener forwards the Call Intake Form, via facsimile, to the FBI's CT Watch, which is then responsible for coordinating the law enforcement response to the encounter, including making further attempts to establish positive identity and, if necessary, deploying nearby FBI agents or coordinate with the Joint Terrorism Task Force ("JTTF") within the area of the encounter.

111.    Upon information and belief, in early 2004 after approximately January, the TSC began to give briefings to such organizations as the DOD, the FBI, and defendant NYPD, and various federal, state, and local law enforcement agencies gathered together for a conference on Homeland Security, who also articulated the importance of each agency's terrorism-related data and asked that such information be shared in order for the TSC to receive the information for screening purposes.

112.    Upon information and belief, individuals with any degree of "terrorism nexus" were included in the TSDB, as long as at least part of the person's name was

known plus one other identifying piece of information, such as date of birth, and individuals who were deemed to pose lower threats were included in the TSDB were included so that their movements could be monitored through the TSC's screening process, which could in turn provide useful information to investigators.

113.    On August 27, 2004, in addition to establishing the TSC by Executive Order 13354, by Executive Orders 13355, "STRENGTHENED MANAGEMENT OF THE INTELLIGENCE COMMUNITY," the President assigned to the Director of Central Intelligence enhanced functions regarding the President's "enhanced, joint unified national intelligence effort."  The President also issued Executive Order 13356, "STRENGTHENING THE SHARING OF TERRORISM INFORMATION TO PROTECT AMERICANS," on that date, directing that the heads of each agency that possesses or acquires terrorism information promptly give access to the terrorism information to the head of each other agency that has counterterrorism functions, giving (a) the highest priority to (i) the detection, prevention, disruption, preemption, and mitigation of the effects of terrorist activities against the territory, people, and interests of the United States of America, (ii) the interchange of terrorism information among agencies, (iii) the interchange of terrorism information between agencies and appropriate authorities of States and local governments, and (iv) the protection of the ability of agencies to acquire additional such information; and protect the freedom, information privacy, and other legal rights of Americans in the conduct of activities implementing subsection (a).

114.    Upon information and belief, at all times relevant herein, before an individual could be entered into the VGTOF/Watchlist as a suspected "terrorist," there

must have been an entry for the "terrorist" group itself, which is to say that "1.  The group must be an ongoing organization, association, or group of three or more persons; and 2.  The group must be engaged in a conduct or a pattern of conduct which involves the use of force or violence; and 3.  The purpose of the group in using violence must be to intimidate or coerce a government, civilian population, or segment thereof, in furtherance of political or social objective."

115.    Upon information and belief, at all times relevant herein, individual "terrorists" could gain VGTOF entries if they "admit membership" upon "arrest or incarceration" or if the individual "meets any two of the following:  a.  Has been identified by an individual of proven reliability as a group member [of an already entered group]; b.  Has been identified by an individual of unknown reliability as a group member and that information has been corroborated in significant respects; c.  Has been observed by members of the entering agency to frequent a known group's area, associate with known group members and/or affect that group's style of dress, tattoos, hand signals, or symbols; d.  Has been arrested on more than one occasion with known group members for offenses consistent with group activity; [or] e.  Has admitted membership in the identified group at any time other than arrest or incarceration."

116.    Upon information and belief, information in the VGTOF, the TSC's watchlist, and other, similar information systems used as pointers and otherwise in connection with planning for and policing the RNC had not been subjected to an independent judicial review, and there exists no mechanism by which a group or person entered into such information systems can purge, or even challenge, her or his suspected

inclusion, or test the quality of the information or the appropriateness of the circumstances under which it was gathered, collected, and/or disseminated.

117.    Upon information and belief, at all times relevant herein, the DOD collected, analyzed, and disseminated information regarding anti-war protesters and protests, including, but not limited to, by utilizing the Threats and Local Observations Notice ("TALON") database, "[a]n antiterrorist database used by the Defense Department in an effort to prevent attacks against military installations [which] included tips about antiwar planning meetings held at churches, libraries, college campuses and other locations."

118.    Upon information and belief, documents from the TALON database obtained by the American Civil Liberties Union through the Freedom of Information Act "showed that the military used a variety of sources to collect intelligence leads on antiwar protests, including an agent in the Department of Homeland Security, Google searches on the Internet and e-mail messages forwarded by apparent informants with ties to protest groups," including, but not limited to, New York City-based groups including, but not limited to, the International Action Center and the No Police State Coalition.

119.    Upon information and belief, throughout 2003 and 2004, the FBI engaged in national and international investigations of alleged "domestic terrorism" and other activities involving persons with an alleged nexus to planned protest activity at the 2004 Democratic and Republican national conventions.

120.    Specifically, upon information and belief, the FBI's New York and Boston Divisions assigned responsibilities to one or more Joint Terrorism Task Force Squads (JTTFs) comprised of squads of FBI and other unidentified city, state, and/or local law

enforcement agents to investigate domestic terrorism matters related to the conventions, who received intelligence support from their respective Field Intelligence Groups (FIGs) to collect, analyze, and disseminate domestic terrorism matters related to the conventions, while, at the headquarters level, its Domestic Terrorism Operations ("DTOS") Special Event Management Unit ("SEMU") coordinated threat assessments and provided other support to the host field divisions, while its Domestic Terrorism Operations Unit ("DTOU") was heavily involved in forwarding convention-related threat information.

121.     Upon information and belief, the FBI's preparations for the RNC began in approximately July of 2002, and the FBI was especially concerned about the alleged threats posed by "anarchist groups" when, "[t]o improve its intelligence capabilities regarding threats to the conventions, the FBI undertook various preparations, including convening organizational meetings, conducting training, creating planning documents and materials, evaluating threats, and canvassing its agents and databases for available information," and, beginning in late 2003, the FBI's DTOS organized meetings to prepare for, *inter alia*, the RNC.

122.     Upon information and belief, at one organizational meeting convened by the FBI in approximately late 2003, "a consensus was reached that the FBI should examine available information on persons with a history of committing violent acts at any demonstration" and "once this information was identified, field supervisors would decide whether additional investigative activity, such as interviews, was warranted."

123.     Upon information and belief, during the RNC, the FBI in New York did not deploy its own crisis management software to manage threat and public safety

information, but instead relied upon a comparable service maintained by the NYPD which connected law enforcement agencies throughout the state.

124.    Upon information and belief, *inter alia*, the FBI identified, and coordinated attempts to interview and/or interviews of, 74 persons and the residents of 3 addresses for contact who 1) were likely convention demonstrators or, through affiliation with one or more organizations or persons, were individuals with access to information about potential protest activity at the conventions; and 2) they were persons who may have knowledge about "planned criminal acts" at the convention, and actually interrogated approximately 60 or more of them.

125.    Upon information and belief, the FBI also issued written threat assessments also issued written threat assessments that evaluated potential threats to the conventions and gathered and shared intelligence with other law enforcement agencies.

126.    Against this backdrop, throughout 2003 and 2004, organizers across the United States and beyond planned protests in New York City around and during the week of August 30th to September 2, 2004 to coincide with the RNC.

127.    Upon information and belief, as a result of their intelligence gathering efforts, defendants RNC Planning Officials knew that the vast majority of individuals and groups planning to come to NYC during the RNC to engage in protest-related activities were intent on doing so lawfully and peacefully, by speaking, chanting, holding signs, occupying space on the public streets and sidewalks, and otherwise.

128.    Upon information and belief, as a result of their intelligence gathering efforts, defendants RNC Planning Officials knew where and when the vast majority of individuals and groups planning to come to NYC during the RNC planned on protesting.

129.    In preparation for the RNC, defendants Graham and other RNC Planning Officials took steps to increase defendant NYPD's mobility to address spontaneous incidents, including unscheduled protests or marches, and to assist the movement of delegate buses, hotel security, and increase the uniformed coverage at transportation facilities, by training and organizing enhanced mobile field forces, to be deployed in teams in vans, on scooters and bicycles, and otherwise.

130.    Upon information and belief, throughout 2003 and 2004, defendant RNC Planning Officials organized and participated in a Civil Disturbance/Prisoner Processing Subcommittee, co-chaired by the NYPD and the USSS, which included representatives of defendant City, including agents of the NYCDOCS and defendant Bloomberg's office, along with representatives of DANY, AMTRAK Police, FDNY, MTA Police, New Jersey State Police, New York State Police, NYS Office of Homeland Security, NY State Courts, Port Authority Police Department, US Attorney's Office, US Marshals Service, and US Park Police, an explicit objective of which was to develop a coordinated plan of interagency responsibilities for the containment and mediation of civil disturbance, as well as the arrest, processing, and housing of large numbers of prisoners, and many of the issues of the subcommittee were legal concerns surrounding "public viewing areas" and protest litigation.

131.    Additionally, upon information and belief, throughout 2003 and 2004, RNC Planning Officials organized and participated in an Intelligence & Counter-Terrorism Subcommittee co-chaired by the NYPD, the FBI, and the USSS, the purpose of which was "[t]o obtain, assess, and share information about individuals, and groups who might pose a threat to protectees, designated venues, and/or the RNC itself."   Upon

information and belief, through establishing an Intelligence Fusion Center ("IFC") and Joint Terrorism Task Force/Fusion Center ("JTTF/FC") – one for "classified" and one for "unclassified" information -  which functioned as nexus for the flow of incoming raw intelligence data during the RNC, through which this subcommittee achieved its primary objective of sharing threat and demonstration intelligence among the subcommittee members and allowing the NYPD to immediately disseminate incoming intelligence to command and control elements.

132.    Upon information and belief, in connection with their Operation Overlord II inter-agency planning efforts, agents of defendants NYC, RNCHC, and Committee communicated to RNC Planning Officials their desires that RNC-related events of any kind, and pedestrian or vehicular traffic to and from events related to the RNC in locations throughout Manhattan at all hours of the day and night, be unobstructed by civil disturbances of any kind, including apparently RNC-related protests or traffic related to apparently RNC-related protests or their policing.

133.    Upon information and belief, in connection with their Operation Overlord II inter-agency efforts, NYC Planning Officials and unidentified city, state, and/or federal law enforcement agencies, including the USSS, DOD, DHS, and/or the FBI, established a Multi-Agency Coordination Center ("MACC"), which functioned as a command center where information was shared among the agencies and where the activities of such agencies – including command and control decisions such as whether and when to take law enforcement actions - were coordinated.

134.    Upon information and belief, in connection with their Operation Overlord II inter-agency efforts during the RNC and based on intelligence gathered prior to the

RNC, NYC Planning Officials and unidentified city, state, and/or federal law enforcement agents, including those of the USSS, DHS, DOD, and/or the FBI, gathered intelligence information that was more of a tactical nature, through the use of, *inter alia*, undercover agents, to monitor and report on the activities and movements of various individuals and groups.

135.    Upon information and belief, in connection with their Operation Overlord II inter-agency efforts during the RNC, NYPD Planning Officials and unidentified city, state, and/or federal law enforcement agencies, including the USSS, DOD, DHS, and/or the FBI, gathered intelligence information in the form of information regarding the identities of arrestees, some of whom they had identified as "persons of interest" or "individuals of concern" prior to the RNC.

136.    Upon information and belief, in connection with their Operation Overlord II inter-agency efforts during the RNC and based on intelligence gathered prior to the RNC, NYC Planning Officials and unidentified city, state, and/or federal law enforcement agencies, including the USSS, DOD, DHS, and/or the FBI, gathered intelligence information in the form of the videotaped surveillance of detainees and the analysis of items of an intelligence value contained in property confiscated from and/or discarded by detainees.

137.    In the period just before the RNC, defendants Bloomberg and Kelly, acting in concert with other city, state, and/or federal law enforcement agencies including, but not limited to, DHS and the FBI, embarked on a press campaign that led to prominent articles demonizing protesters and protest activities in mainstream newspapers with titles including, but not limited to, "Fury at anarchist convention threat," "Finest

Prep for Anarchy," "Protests May Turn Bloody, Feds Warn," "Anarchists Hot for Mayhem," "Top Troublemakers on Cops' Sights," and "Kelly: Peaceful Must Ax Anarchy."

138.    During the RNC, defendants NYPD agents ranking sergeant and above, acting in concert with other unidentified city, state, and/or federal law enforcement agencies, deployed unidentified resources, including, but not limited to, NYPD officers outfitted in riot gear helmets and batons, undercover NYPD officers, and officers charged with videotaping protest activity with the purpose and effect of creating a sense of omni-presence to deter protest.

139.    Upon information and belief, in consideration of and pursuant to the various Agreements entered into by and between defendants Bloomberg and Committee and the RNCHC, defendants NYC Planning Officials determined to treat participating in "protest-related" traffic, such as that created by demonstrations on the sidewalk or roadway, as an arrestable offense, and facilitate and/or escort RNC-related traffic.

140.    Accordingly, upon information and belief, the Transportation Plan preferred the accommodation of "RNC-related" traffic over the accommodation of "protest-related" traffic.

141.    Upon information and belief, as a result of their experience and knowledge in connection with other, similar large-scale events in NYC at which large-scale demonstrations related to the events had occurred, and as a result of the aforementioned intra-agency intelligence fusion efforts regarding other, similar events, demonstrations, and demonstrators across the country and internationally, defendants NYC Planning Officials knew that the vast majority of arrests at any such events in NYC would be for

violations of law such as disorderly conduct in violation of New York State Penal Law ("PL") § 240.20 or parading without a permit in violation of New York City Administrative Code ("NYCAC") § 10-110(c), which are not classified as crimes under the New York State Penal Law and in connection with which NYPD policy permits the issuance of a summons in lieu of fully booking and either arraigning a violator or issuing her or him a Desk Appearance Ticket ("DAT").

142.    Upon information and belief, well in advance of the RNC, acting in concert with unidentified city, state, and/or federal law enforcement agents and pursuant to the Site City Agreement, the City Agreement, and/or the Convention Security Plan, defendant Kelly and/or other defendant NYC Planning Officials determined that no summonses would be issued in connection with RNC-related violations.

143.    Upon information and belief, well in advance of the RNC, acting in concert with unidentified city, state, and/or federal law enforcement agents and pursuant to the Site City Agreement, the City Agreement, and/or the Convention Security Plan, defendant Kelly and/or other defendant NYC Planning Officials determined that RNC-related arrestees would not be given DAT's.

144.    Defendant Kelly and/or other defendants publicly announced that defendant NYPD anticipated making "up to 1,000 arrests a day" in connection with RNC-related protest activities.

145.    Upon information and belief, defendants Bloomberg and/or Kelly caused or authorized the submission of budget requests for funding to the New York City Council and/or other agencies based on the potential for making "up to 1,000 arrests a day" in connection with RNC-related protest activities.

146.    Acting in concert with unidentified city, state, and/or federal law enforcement agents and pursuant to the Site City Agreement, the City Agreement, and/or the Convention Security Plan, defendants NYPD Planning Officials determined to fingerprint all RNC-related arrestees.

147.    Upon information and belief, unidentified defendant NYPD officers associated with the CJB Cadre, acting with the assistance of defendant Bloomberg's Criminal Justice Coordinator, Michael Feinblatt, coordinated efforts among, *inter alia*, NYCDOCS, DANY, and the New York State Office of Court Administration ("OCA") to plan for the capacity to process the arrests and initiate the criminal prosecutions of up to 1,000 RNC-related arrestees a day.

148.    Defendants NYPD Planning Officials, including specifically defendants Hammerman, Colgan, Albano, and the CJB and DCLM Cadres, knew that, in New York State, "arrestees held in custody for more than 24 hours without arraignment are entitled to release unless an acceptable explanation for the delay is given" and "a period of delay over 24 hours raises a presumption that the delay is unnecessary within the meaning of CPL 140.20(1)."  See People ex Rel. Maxian on Behalf of Roundtree v. Brown, 77 NY2d 422, 424, 426 (1991).

149.    Defendants RNC Planning Officials knew or should have known that the decisions to arrest, fingerprint, and fully book up to 1,000 arrestees a day during the RNC would each and all adversely impact arrest to arraignment time.

150.    Defendants RNC Planning Officials knew or should have known that the decisions to arrest, fingerprint, and fully book up to 1,000 arrestees a day during the RNC

would each and all have a chilling effect on activities protected by the First Amendment during the RNC.

151.    In recognition that arrest to release time would exceed normal standards when the number of arrests exceeds normal parameters, defendants NYC Planning Officials knew or should have known that it was necessary to develop and implement a plan for releasing detainees with summonses or DATs when and if their volume was negatively impacting the system's capacity to process them and, upon information and belief, no such protocol was designed or implemented in connection with the RNC.

152.    Upon information and belief, prior to the RNC, in connection with Operation Overlord II inter-agency planning efforts and in recognition of issues that had arisen repeatedly in the past in the prosecutions of cases arising from prior arrests and mass arrests in connection with demonstrations in New York City and elsewhere, defendants RNC Planning Officials knew or should have known that each arresting officer's personal knowledge of the circumstances leading up to an arrest for a violation must be based on their actual observation, not information and belief, and that, in cases where supervising officers assign arrests of individuals who had committed crimes to arresting officers, the arresting officers must have the name of, and speak with, the supervisor who witnessed the conduct prior to swearing out the criminal court complaint charging the arrestee with the crime, and the supervisor must swear out corroborating affidavits in order for the case to proceed beyond arraignment based on a facially sufficient accusatory instrument.

153.    Upon information and belief, in 2003 and 2004, in connection with their Operation Overlord II inter-agency planning efforts and in apparent recognition of the

need to ensure that arresting officers personally observe violations of law such as disorderly conduct or parading without a permit, defendant Graham, unidentified members of the CJB Cadre, and other unidentified defendant NYPD supervisors developed a "Mass Arrest Pedigree Label" to be used in mass arrest situations and designed mass arrest processing plans contemplating that two Polaroid photographs would be taken of each arresting officer and prisoner for use in arrest processing and prosecution.

154.    Upon information and belief, defendants NYC Planning Officials designed and implemented training procedures for supervisory and/or rank and file defendant NYPD officers regarding RNC mass arrests and RNC mass arrest processing.

155.    Numerous mass arrest processing plans designed by defendants RNC Planning Officials, including defendant Colgan and others in the CJB Cadre, in 2003 and 2004, including defendant NYPD's final RNC Mass Arrest Processing Plan, incorporated steps wherein DCLM attorneys were to interview each arresting officer and CJB supervisors would review each arresting officer's arrest-related paperwork.

156.    In the course of planning for and implementing the aforementioned training procedures, defendants Kelly, Cohen, Hammerman, Albano, Smolka, Graham, Colgan, and/or other defendants intentionally and/or negligently failed to train defendants O'Neil, Mercandetti, Murphy, Holmes, Wohl, Hudecek, Deckert, Martinez, and other unidentified defendants, including DCLM attorneys and CJB supervisors, regarding, *inter alia*, the Constitutions and laws of the United States and the State of New York and the New York City Administrative Code applicable to arrests and mass arrests in connection with First Amendment activities, proper procedures for using plastic handcuffs, use of

force, and the requirement that probable cause to arrest an individual for a violation must be based on an appropriate degree of personal knowledge of the circumstances leading up to it.

157.    Upon information and belief, throughout 2003 and 2004, personally and through channels, defendant Kelly and/or other unidentified city, state, federal, and/or RNCHC and/or RNC agents informed defendant Bloomberg regarding RNC Planning Officials' plans in connection with Operation Overlord II as they progressed.

158.    Upon information and belief, throughout 2003 and 2004, defendant Kelly and/or unidentified NYPD agents had communications with agents of defendants RNC and RNCHC on a regular basis regarding the NYPD and its partners' plans in connection with Operation Overlord II as they progressed.

159.    Upon information and belief, in 2003 and 2004, defendant HRPT was seeking a developer to transform Pier 57 into a commercial and park destination.

160.    At or about the same time, upon information and belief, defendants Betts, Bloomberg, Fishman, and HRPT and/or Governor Pataki had close and frequent personal contacts regarding defendant Betts's bid as Chairman of Chelsea Piers Management for the private development rights over Pier 57.

161.    Upon information and belief, prior to July of 2004, unidentified agents of defendants RNC and/or RNCHC contacted defendant HRPT to inquire about possible uses of Pier 57, including as, *inter alia*, a storage space for RNC-related vehicles as part of a broader plan to house conventiongoers on cruise ships.

162.    Upon information and belief, in approximately July of 2004, agents of defendant NYPD contacted defendant HRPT to inquire about possible uses of Pier 57, including, but not limited to, as an arrest processing site.

163.    Upon information and belief, in connection with what were then ongoing efforts to rehabilitate Pier 57 for commercial use, defendant HRPT paid contractors to inspect the premises and produce reports analyzing the environmental and other conditions within Pier 57.

164.    According to an April 2004 Inspection Report prepared for defendant HRPT by Ove Arup & Partners Consulting Engineers PC documenting "the structural, mechanical, electric and plumbing inspections conducted for the purpose of determining existing conditions of systems and immediate requirements for repair and winterization of the facility," as of April 2004,

- The pier's exhaust and ventilation systems were "in very poor condition" and "beyond their useful service life."
- "The piping throughout the building is in very poor condition. Much of it is disconnected and corroded. Most of the insulation is stained, torn, and damaged by water leaks. . . . [All such systems should be] decommissioned and removed."
- "The building's electrical and life safety systems have code deficiencies, are in poor physical conditions and are in need of replacement."
- "The majority of the wiring is from the original 1953 construction and has outlived its design life. . . . This violates present electrical codes. . . [and i]t is possible that some of the support and cable spacers for the 'aerial' wiring system may contain hazardous materials."
- "There is no emergency power system installed at Pier 57."
- "The emergency lighting system layout is inadequate and would need to be redesigned to meet present codes."
- "The exit signs with phosphorescence material have outlived their usefulness and are inoperable."
- "Key components of the existing plumbing and fire protection systems have code deficiencies and/or are in poor physical condition and are in need of replacement."
- Inspectors "could not locate any detection devices such as smoke and/or heat detection in the facility. The system appears to have been modified

throughout the years but has exceeded its design life. The audible devices do not meet code-required coverage and visual devices will need to be installed to comply with current codes."

- It is unclear from the Report whether the sprinkler system was even operable.

165.    The next month, in May of 2004, AKRF, Inc., released its Pier 57 Preliminary Asbestos and Lead Paint Inspection Report, which found that:

- "Floor tiles and associated mastics, spray-applied fireproofing, heater (radiator) insulation, window caulk and glazing, pipe and pipe fitting insulation, duct insulation, transite siding and panels, linonelum, fire door insulation, door frame insulation, door caulk, and roof flashing materials were determined to be 'Asbestos Containing Materials.'"
- ." . . Friable ACMs in damaged condition, including spray-applied fireproofing, duct insulation, and pipe and pipe fitting insulation, were observed above the hung plaster ceiling on the second floor and basement of the head house and within pipe chases through the pier. Access to these areas must be limited until these materials can be removed."
- Paint containing toxic levels of lead was found in metal elevator doors and casing, concrete stair risers, handrails, stringers and balusters, concrete walls and floors, metal columns, guardrails, piping, conduit and electrical panels, and metal overhead doors, throughout the pier."

166.    AKRF recommended "removal of all affected ACMS in the building by a qualified, licensed asbestos abatement contractor prior to commencing the renovation project."

167.    On or about May 3, 2004, a "Preliminary Engineering Estimate" based on a series of site visits conducted at Pier 57 in November 2003 by engineers and inspectors from Arup Consulting Engineers and AKRF Environmental Consultants that included "costs associated with establishment of basic building services and life safety systems and environmental cleanup of asbestos, lead and contaminated soils, spills, tanks and miscellaneous equipment" put the total estimate of such costs at $33,690,302.00.

168.    Upon information and belief, defendants Betts, Bloomberg, Fishman, HRPT, and other defendants involved in the process of exploring uses for Pier 57 during

45

the RNC knew or should have known the contents of the aforementioned reports, and at no time did any of the defendants take any steps to remediate the conditions cited in them.

169.    By late July of 2004, defendants NYC Planning Officials adopted a Mass Arrest Processing Plan that envisioned the use of a Post Arrest Staging Site ("PASS") at Pier 57 and a Mass Arrest Processing Center ("MAPC") at 100 Centre/125 White Street.

170.    Rather than attempt to use existing resources, such as Old Central Booking, Central Booking, or the numerous precincts throughout NYC, including the at least 20 precincts in Manhattan, all of which were capable of processing mass arrests, and/or the Brooklyn and/or Queens Houses of Detention, defendants RNC Planning Officials determined to use Pier 57 as a PASS.

171.    Upon information and belief, at some time between on or about August 2, 2004 and August 27, 2004, the NYPD erected 11 chain-link pens within Pier 57, 10 of which had the capacity to hold approximately 60 people each and one of which "had the capacity to hold several hundred."

172.    According to the final Mass Arrest Processing Plan designed by defendants RNC Planning Officials and designed and implemented by defendants NYC Planning Officials and their agents, the following six arrest processing steps were to occur at Pier 57:   (1) prisoner sorting; (2) prisoner searching; (3) prisoner property vouchering; (4) interview by NYPD attorneys of arresting officers; (5) review of the arresting officers' paperwork by NYPD CJB Online Booking System supervisors; and (6) transportation of the prisoner out of the facility.

173.    Upon information and belief, in mid-July of 2004, NYPD requested the NYCDOCS's assistance "to detain the protestors at the Bernard B. Kerik – 100 Centre Street Court Detention facility."

174.    Upon information and belief, on July 22, 2004, unidentified agents of defendant NYPD requested that the New York State Commission of Correction ("NYSCOC") conduct a "site visit to One Police Plaza . . . in order to discuss the re-opening of several closed holding cells."  The NYSCOC is a New York State agency established pursuant to NYC Corrections Law that has jurisdiction and authority over prisons, jails, station houses, and other detention facilities throughout New York State, including detention facilities set up to hold detainees prior to arraignment such as Pier 57, which has promulgated and enforces minimum standards for such detention facilities.  On July 27, 2004, an agent of NYCDOC requested that the NYSCOC monitor "the situation for liability reasons."

175.    Upon information and belief, NYSCOC staff met with NYCDOC Chief Leroy Grant, an agent of defendant Horn, on August 17, 2004 and "discussed the anticipated plans for the upcoming monitoring project," during which meeting Chief Grant explained that "the Bernard B. Kerik Correctional Center ("BBKC"), the Brooklyn House of Detention Center ("BKHD"), and the Queens House of Detention Center ("QNHD") were to be utilized by the NYC DOC to hold the pre-arraigned detainees." – but not Pier 57.

176.    Upon information and belief, at no time prior to the RNC did defendants inform the NYSCOC of their intention to use Pier 57 in connection with arrest processing during the RNC at all.

177.    On or about July 9, 2004, defendant Fishman executed a Memorandum of Understanding ("MOU") on behalf of defendant HRPT granting defendant NYPD "the right to exclusively occupy and use the entire first floor of the facility located on Pier 57 . . . for the period August 2 through September 7, 2004" for use as "a secondary arrest processing and temporary holding center for detainees."

178.    In violation of the MOU, Pier 57 was actually used as the "primary arrest processing and detention center rather than as its secondary facility" for all RNC-related arrests.

179.    Defendants RNC Planning Officials' design and implementation of plans to engage in the mass arrests of individuals they believed were associated with planning for or engaging in, or in the vicinity of, protest activities during the RNC, without first obtaining warrants, for violations such as disorderly conduct and parading without a permit, instead of facilitating their First Amendment activities or issuing them summonses or DATs without arresting them, were malicious, retaliatory, lacked narrow tailoring, failed to provide ample alternatives for expression, and violated the prohibition on viewpoint discrimination.

180.    The use of Pier 57 as a PASS during the RNC had the purpose and effect of limiting the number of demonstrators on the streets during the RNC, discouraging unarrested others from demonstrating, and using detention as a means of crowd control, information gathering, and retaliation against individuals who had engaged in lawful, peaceful protest activity during the RNC.

181.    During the RNC, defendants RNC Planning Officials only had ten LiveScan fingerprinting machines, allowing for the printing of approximately just over 50

total prisoners per hour under optimal conditions at its downtown MAPC.  The plan to use Pier 57 as a site for RNC-related mass detention, without providing any processing equipment to expedite moving the detainees through the system at Pier 57 (such as LiveScan machines for fingerprinting or terminals for the entry of information into the Online Booking System) exhibited a malicious disregard for the rights of persons arrested in connection with violations to safe and expedient arrest processing.

182.    Upon information and belief, defendants RNC Planning Officials subsequently planned to forward and actually forwarded fingerprints (including plaintiffs') and other information regarding those arrested in connection with the RNC to the FBI, DHS, and other unidentified city, state, and/or federal law enforcement agencies.

183.    Upon information and belief, defendants Wolfowitz, Ridge, Mueller, Kelly, Horn, Hammerman, and Cohen developed and/or authorized policies and procedures under which other information regarding plaintiffs and others arrested at RNC-related events was gathered and/or disseminated, including, but not limited to, information regarding their alleged political associations.

184.    Defendants Wolfowitz, Ridge, Mueller, Kelly, Horn, Hammerman, and Cohen failed to develop and implement proper training procedures regarding lawful and constitutional investigations of and restrictions on political activities and the collection, analysis, and dissemination information regarding the same and intentionally and/or negligently failed to train their subordinates involved in those aspects of the process of planning for and policing the RNC.

<u>MR. GROSS'S ARREST – AUGUST 28, 2004</u>

185.    In approximately May of 2004, the IWW petitioned the National Labor Relations Board ("NLRB") to hold a union election at the 36th St. and Madison Avenue Starbucks location.  Starbucks contested the petition and litigated the case and, on June 30, 2004, the regional NLRB ruled in the IWW's favor on the election issue.  Two days before the election was slated to be held in late July, the NRLB informed the IWW that the NLRB's Washington office had accepted Starbucks's appeal of the election issue.

186.    The IWW thereafter organized an event to be held in the area of the 37th St. Starbucks store on the afternoon of August 28, 2004 to protest the store's anti-union policies and the NRLB's conservative, anti-union Bush appointees.

187.    Upon information and belief, on August 28, 2004, defendants Smolka, Graham, Mercandetti, and other unidentified NYPD supervisors, including Deputy Inspector James Murtaugh, were in command of NYPD details assigned to police the event, and defendant Hudecek was among the officers under defendants Smolka's, Graham's, and Mercandetti's command.

188.    In the early afternoon of August 28, 2004, Mr. Gross participated in a peaceful protest in the vicinity of the 36th St. store.

189.    Upon information and belief, prior to the protest, defendant Mercandetti instructed numerous officers under his command, including, but not limited to, defendant Hudecek and NYPD Officer FNU Polletto, Shield Number 3762, to scrutinize Mr. Gross and arrest him "if even one foot went off the curb."

190.    Mr. Gross subsequently participated in a march which proceeded with police assistance and facilitation west on 36th Street to 5th Avenue and south on 5th Avenue toward Starbucks Regional Headquarters on 33rd Street and 5th Avenue, where

the police corralled protesters and a brief stationary demonstration occurred before the group marched, with police assistance, back to the 36th Street and 5th Avenue store.

191.    Upon returning, the police split the group in two, lining one group up along 36th Street and the other along Madison Avenue, presumably in order to facilitate the flow of pedestrian traffic in and around the store.

192.    As Mr. Gross was standing on the sidewalk thanking participants for making the event a success, defendant Mercandetti forcibly grabbed Mr. Gross and removed Mr. Gross from the sidewalk to the street, where, assisted by Officer Poletto, defendant Mercandetti grabbed Mr. Gross's left arm and twisted it behind his back as Deputy Inspector James Murtaugh forcibly placed Mr. Gross's right arm behind his back.

193.    Defendant Mercandetti used excessive force in arresting and assisting in handcuffing Mr. Gross, causing Mr. Gross pain and injury.

194.    Upon information and belief, Mr. Gross was subsequently removed by unidentified NYPD officers to an arrest vehicle, where, sitting handcuffed, he witnessed defendant Mercandetti order defendant Hudecek to write that he had personally witnessed the alleged misconduct – "you saw him blocking the way and resisting" - not that he had been informed of the circumstances surrounding the arrest.

195.    Upon information and belief, after defendant Mercandetti left, as defendant Hudecek began documenting information regarding the arrest with another officer nearby, remarking to the other officer that he was writing that he personally witnessed Mr. Gross's alleged misconduct, to which the other officer responded, "No you didn't, you were informed," and defendant Hudecek answered, "No, Captain says I witnessed it."

196.    Mr. Gross was subsequently transferred to Pier 57, where his property was seized and he was subjected to unreasonable conditions of confinement, as described more fully below.

197.    At approximately 7:46 P.M. on August 28, 2004, defendant Hudecek swore that, on August 28, 2004, at about 15:05 hours, at the Southwest Corner of 36th Street & Madison Avenue in the County and State of New York, he observed Mr. Gross

> standing at the above-mentioned location, a public place, with at least 100 other people without a permit from the police commissioner. Deponent states that deponent observed the defendant intentionally cause a public inconvenience, annoyance, and alarm in that the defendant was standing in the cross-walk blocking pedestrian and vehicular traffic.

> Deponent further states that at the time that deponent was placing defendant under arrest for the above-mentioned offense, the defendant refused to comply in that the defendant flailed his arms, refused to place them behind his back and refused to be handcuffed.

198.    At his arraignment at approximately 9:00 PM on approximately the afternoon of August 29, 2004, New York City Criminal Court, based, *inter alia*, on defendant Hudecek's allegations, Mr. Gross was charged with resisting arrest in violation of PL § 205.30 and disorderly conduct in violation of PL 240.20(5), and was offered, but declined to accept, an Adjournment in Contemplation of Dismissal ("ACD") pursuant to CPL § 170.10.

199.    Upon information and belief, Mr. Gross was in defendant NYC's custody for approximately 24 hours or more hours.

200.    Upon information and belief, Mr. Gross retained a private attorney and made numerous appearances in order to defend against the criminal charges against him before, on or about January 14, 2005, DANY moved to dismiss the case against him, citing an inability to prove the charges beyond a reasonable doubt.

## AUGUST 30, 2004

201.    On Monday, August 30, 2004, at approximately 10:00 PM, Mr. Kyne arrived at McSorley's Alehouse on 15 East 17th Street where, upon information and belief, RNC delegates and others, including Governor Pataki, had gathered for an RNC-related event.

202.    When Mr. Kyne and his friends approached the door to McSorley's Alehouse, an NYPD officer or NYPD officers barred him from entering and told Mr. Kyne that the event inside was a "private party."

203.    Mr. Kyne was then instructed by an NYPD officer or NYPD officers that he could not stand on the sidewalk near McSorley's Alehouse, either.

204.    Approximately as Mr. Kyne began to back up and/or backed up, he yelled words to the effect of "they lied to you, they lied to me, they're taking away our civil rights."    Upon information and belief, some of those interactions were recorded by NYPD officers and/or other unidentified city, state, and/or federal law enforcement agents using videocameras and/or other means of surveillance.

205.    As Mr. Kyne backed up, one NYPD officer said to him, "You made your point, let's head home," after which Mr. Kyne continued to disperse and left peacefully.

## AUGUST 31, 2004

206.    On August 31, 2004, over 1,200 people were arrested for alleged engaging in RNC-related protest activity in NYC.

207.    Upon information and belief, defendants Bloomberg, Graham, Hammerman, Smolka, Colgan, Mercandetti, O'Neill, and Kelly were in communication with each other and/or with other defendants personally and/or through their authorized

agents on August 31, 2004 regarding the events of the day as they unfolded, including events at and in the vicinity of the library, and/or directed and/or provided input into the command and control of law enforcement resources therein, including input into the decisions to take law enforcement actions at the library.

208.    In the late afternoon of August 31, 2004, Mr. Kyne arrived at the Fox News Building near 1211 Avenue of the Americas between 47th and 48th Streets. There, pedestrians, protesters, bystanders, onlookers, uniformed NYPD officers, and other city, state, and/or federal law enforcement officers had gathered, and a heavily policed, unpermitted, peaceful protest event ensued. Upon information and belief, some of those interactions were recorded by NYPD officers and/or other unidentified city, state, and/or federal law enforcement agents using videocameras and/or other means of surveillance.

209.    By approximately 5:30 PM, numerous unidentified defendant NYPD officers assigned to, *inter alia*, the Bronx Patrol Boro, Manhattan South, or other Task Forces and/or Mobile Reserve Sector were actually under the command of defendants Kelly, Mercandetti, Smolka, Graham, Hammerman, and/or other unidentified NYPD supervisors and/or city, state, and/or federal law enforcement agents, were pro-positioned on the steps and plaza near the library entrance.

210.    Between approximately 5:30 and 5:45PM, various forms of pedestrian traffic proceeded without difficulty on the sidewalk and up and down the steps leading to the library entrance.

211.    Mr. Lahoud, Mr. Boisvert, and Ms. Tejada arrived at the library between approximately 5:30 and 5:45 PM.

212.     Shortly thereafter, as Ms. Tejada looked on, Mr. Lahoud and Mr. Boisvert began to spread and/or drape a banner that said "Smash The Patriarchy" in French across one of the lions at the top of the library steps, defendant Mercandetti approached them and said, "You can't hang a sign on Parks Department Property.  You can hold it, but you can't hang it."

213.     Mr. Lahoud and Mr. Boisvert immediately took the banner off the lion and began to put it away.

214.     Within approximately five seconds, at least two unidentified NYPD Captains and several other uniformed NYPD officers rushed in from behind and, without issuing any verbal directions, defendant Mercandetti and several other unidentified NYPD officers physically grabbed and arrested the three.

215.     Numerous bystanders reacted to the their arrests by chanting "Let them go" and/or "shame" and/or saying or shouting, "What did they do?  They put up a banner," "You fucking fascists," and "You think this is a free country?"

216.     Defendant Albano was within sight and sound and within approximately five feet of Mr. Lahoud, Mr. Boisvert, and Ms. Tejada as they were detained and led away.

217.     A large group of NYPD officers, some of whom were holding the arrestees, then walked unobstructed down the library steps, across 5th Avenue in the crosswalk at approximately 41st Street, and approximately northeast on the eastern side of the roadway, until they arrived at a marked NYPD Prisoner Transport Vehicle bearing the label "CJB 4214" near the northeastern corner of 42nd Street and 5th Avenue ("Mercandetti's Wagon"), the back area of which was open and empty at that time.

218.    Upon information and belief, defendant Wohl was not present within sight or sound of the location at which Mr. Lahoud and Mr. Boisvert were placed under arrest on the library plaza immediately prior to or before they were physically seized by other NYPD officers.

219.    Nevertheless, upon information and belief, acting under orders from defendant Mercandetti and pursuant to defendant NYPD's RNC-related mass arrest policies and practices, defendant Wohl swore out an accusatory instrument and/or accusatory instruments charging Mr. Lahoud and Mr. Boisvert with violations and/or misdemeanors based on allegations that he personally observed them engage in unlawful conduct.

220.    Upon information and belief, defendant Hudecek was not present within sight or sound of the location at which Ms. Tejada was placed under arrest on the library plaza immediately prior to or before she was physically seized by other NYPD officers.

221.    Nevertheless, upon information and belief, acting under orders from unidentified defendant NYPD supervisors and pursuant to defendant NYPD's RNC-related mass arrest policies and practices, defendant Hudecek swore out an accusatory instrument charging Ms. Tejada with violations and/or misdemeanors based on allegations that he personally observed her engage in unlawful conduct.

222.    Upon information and belief, at all times related hereafter up until and including plaintiffs' arrests, defendant Wohl remained at or near Mercandetti's Wagon, well beyond sight or sound of the library steps and plaza areas on which their arrests subsequently occurred.

223.    When Mr. Kyne arrived at the library steps at approximately 5:45 PM, a few minutes after the above arrests had already occurred, there were numerous people spread across the steps and plazas.

224.    Upon information and belief, among them conducting surveillance were an unknown number of plainclothes and/or other defendant "Richard and Mary Roe" NYPD and/or other city, state, and/or federal agents, including defendant "Blue," a city, state, and/or federal agent wearing a light blue t-shirt.

225.    A stationary phalanx of uniformed NYPD police officers in riot gear helmets and equipped with and/or holding batons was positioned approximately next to where two young women were seated playing the guitar and singing on the southwestern end of one of the plaza areas and a row of uniformed NYPD officers dressed in riot gear helmets and equipped with and/or holding batons stood in a line blocking entry or exit from the library.

226.    Pedestrian traffic proceeded without difficulty on the sidewalk, up and down the steps leading to the library, and vehicular traffic proceeded without difficulty on the nearby roadway.

227.    Moments after Mr. Kyne arrived at the library, an unidentified NYPD Captain approached an unidentified NYPD "Task Force" Sergeant at the rear of the phalanx, put his hand on the Sergeant's chest, and said, "Let's go."

228.    The two then walked a few northerly steps to the east of the phalanx, when the unidentified NYPD Captain repeated "Grab him" at least three times in quick succession.

229.    In response, the unidentified NYPD "Task Force" Sergeant and other unidentified city, state, and/or federal agents, including defendant Blue, forcefully grabbed a "John Doe" arrestee wearing a backpack.

230.    At approximately the same time, within a few feet of where Mr. Kyne was standing, NYPD officer Felicia Alfred of the 94th Precinct, Shield Number 20292, and other unidentified NYPD officers physically placed their hands on a black-haired "Jane Doe" arrestee and, acting in concert unidentified city, state, and/or federal agents, searched her backpack, and subsequently released her.

231.    The sudden police activity stunned bystanders and onlookers; one reacted by pointing in surprise and saying, "Hey!" and, almost immediately, unidentified persons began to say, "Let him go."

232.    Mr. Kyne approached defendant Blue as she and other unidentified City, State, and or Federal agents forcefully took the "John Doe" arrestee's backpack off of his person a few feet away from the black-haired "Jane Doe" arrestee.

233.    Mr. Kyne expressed his alarm that at the NYPD officers' and other unidentified city, state, and/or federal agents' conduct peacefully, by verbally addressing the individuals he believed were effecting an unconstitutional search and seizure, indicating that, as a United States Army Veteran of Operation Desert Storm, he had risked his life to defend the Constitution of the United States of America, and asking why defendant Blue and the uniformed officers were searching the "John Doe" individual's backpack without any apparent legal justification..

234.    Mr. Kyne received no response.

235.     Unidentified NYPD officers and other city, state, and/or federal agents similarly seized, searched, and/or arrested numerous other unidentified individuals at approximately the same time.

236.     In response, unidentified persons began to shout, "Shame,"  "Let them go," "Illegal search!" and "I do not consent to this search."

237.     Unidentified NYPD officers then formed numerous "police lines" running approximately north to south, effectively creating a clearing, and in so doing physically pushed bystanders, forcing them backward.

238.     As people were forced suddenly backward, unidentified persons shouted, "Shame" and "You're violating our constitutional rights," among other things.

239.     Approximately then, as Mr. Duncan arrived at the library, Mr. Langley was taking photographs of an unidentified individual's arrest.

240.     Defendant Mercandetti stated "Move back" toward unidentified persons approximately six times in rapid succession as he moved from approximately the northwest through a crowd of people toward Mr. Langley.

241.     Defendant Mercandetti was pushing unidentified persons as he moved through the crowd saying "move back," although it was difficult, unsafe, and/or impossible for those persons defendant Mercandetti was addressing to move back.

242.     Although Mr. Langley began to move back as defendant Mercandetti approached, defendant Mercandetti pushed Mr. Langley on the chest, forcing him backward, and said, "Move back" two times, forcing Mr. Langley backward so that he collided with other unidentified persons the second time just before grabbing Mr. Langley's left arm and shouting the word "collar" twice.

243.    In response to defendant Mercandetti's order, defendant Murphy moved rapidly toward Mr. Langley, grabbing Mr. Langley and pushing Mr. Langley into the people who were standing behind him, one of whom said, "What are you doing?" to defendant Murphy.

244.    A total of approximately 25 or 30 seconds had elapsed from the moment the unidentified NYPD Captain and Sergeant grabbed the first "John Doe" arrestee to the moment of Mr. Langley's arrest.

245.    Defendants Murphy, Mercandetii, O'Neill, and other unidentified NYPD officers used excessive force in physically pushing bystanders back.

246.    Defendant Mercandetti, an unidentified NYPD Captain, and an unidentified uniformed NYPD officer placed Mr. Langley in plastic handcuffs as he lay face-down on the ground.

247.    Mr. Langley was physically and otherwise compliant at all times following his seizure by defendants Mercandetti and Murphy.

248.    Defendant Mercandetti physically touched Mr. Langley on the arms and wrists and assisted in placing plastic handcuffs on Mr. Langley.

249.    Mr. Duncan was within a few feet of defendant Mercandetti and Mr. Langley as defendant Mercandetti and the other NYPD officers placed Mr. Langley under arrest, taking photographs of the rapidly unfolding events.

250.    Upon information and belief, defendant O'Neill utilized a wooden baton to push individuals, including Mr. Mulligan, backward, although it was difficult, unsafe, and/or impossible for him to do so.

251.    As defendant Mercandetti was still physically touching and/or within approximately one foot of Mr. Langley, defendants O'Neill and/or Murphy and/or Holmes forced Mr. Mulligan onto the ground several feet away and behind defendant Mercandetti, without provocation.

252.    Upon information and belief, Mr. Langley was subsequently transported by unidentified NYPD officers down the library steps, across 5th Avenue, and to Mercandetti's Wagon, at or in the immediate vicinity of which defendant Wohl had remained.

253.    At approximately that time, an unidentified NYPD officer told Mr. Langley, "Your rights end where my rights begin."

254.    Defendant Holmes twisted Mr. Mulligan's right arm around his back and defendant Murphy placed Mr. Mulligan's hands in a pair of plastic handcuffs.

255.    Mr. Duncan knelt down approximately five to 15 feet to approximately the south and west of Mr. Mulligan as Mr. Mulligan was being handcuffed and took a picture or pictures of defendants Murphy and Holmes handcuffing Mr. Mulligan.

256.    Defendant Murphy grabbed Mr. Mulligan by his left arm and/or shoulder, defendant Martinez grabbed Mr. Mulligan by his right arm and/or shoulder, defendant Holmes grabbed Mr. Mulligan by his right leg and/or ankle, and an unidentified NYPD officer wearing a DCLM uniform grabbed Mr. Mulligan by his left leg and/or ankle.

257.    The four NYPD officers then lifted Mr. Mulligan off the ground and carried him approximately northeast down the steps, past defendants Mercandetti and Albano.

258.    Mr. Duncan stood approximately ten to 15 feet to the southeast of the four officers as they carried Mr. Mulligan down the steps holding his cellular telephone up to his left ear with his left hand and holding his camera in his right hand, facing the entrance to the library, away from the direction in which the defendants were carrying Mr. Mulligan.

259.    Approximately one second after passing Mr. Duncan, defendant Holmes dropped Mr. Mulligan's right leg and/or ankle without warning, spun around and ran directly at Mr. Duncan, whose back was to defendant Holmes, forcibly grabbing Mr. Duncan from behind with both hands and forcing him to the ground face-down so quickly that at least two of the people standing near him physically jumped away, colliding with other people, and Mr. Duncan's arrest caused bystanders to respond by saying, "Whoa" and "No" and "He wasn't doing anything" and "he didn't do anything."

260.    Mr. Duncan was physically and otherwise compliant at all times.

261.    Defendant Holmes held Mr. Duncan pinned to the ground by twisting Mr. Duncan's right arm around his back and applying pressure for approximately one minute while he consulted with at least three other unidentified NYPD officers.

262.    During that approximately one minute, Mr. Duncan asked defendant Holmes several times, "What did I do" and stated "I didn't do anything."

263.    Mr. Duncan was subsequently placed in tight plastic handcuffs.

264.    At approximately the same time, to Mr. Duncan's south and west, an unidentified NYPD Captain cupped his hands over his mouth and shouted words to the effect of, "The plaza is closed.  You must clear the plaza.  You are blocking pedestrian traffic.  If you do not clear the plaza, you will be arrested."

265.    Apparently in response, one person shouted, "We are pedestrian traffic."

266.    Approximately as Mr. Kyne addressed the unidentified NYPD Captain who had shouted "If you do not clear the plaza, you will be arrested," NYPD Lt. Joe Maher physically pushed Ms. Gwynn Galitzer onto the ground a few feet away.

267.    Mr. Kyne said words to the effect of, "I didn't almost die for this" and Captain, come on" as the unidentified NYPD Captain walked away from Mr. Kyne.

268.    Mr. Kyne then pointed his finger at the unidentified NYPD Captain and said, "You nazi."

269.    Over the course of the next approximately 15 to 30 seconds, as Mr. Kyne walked down the library steps, he shouted words to the effect of "fucking nazis" approximately 10 to 15 times.

270.    As defendant Holmes and an unidentified NYPD officer pulled Mr. Duncan off the ground a few feet away, Mr. Duncan asked defendant Holmes, "What did I do?," and defendant Holmes replied, "You spit in my face."

271.    Mr. Duncan responded, "I did not."

272.    After Mr. Kyne reached the bottom of the steps, he continued walking approximately to the north, past defendant Murphy, when defendants Mercandetti, Martinez, and/or Murphy physically restrained Mr. Kyne without warning.

273.    At all times thereafter, Mr. Kyne was completely compliant, physically and otherwise.

274.    Defendant Mercandetti, Martinez, or Murphy then said, "Get on your knees."

275.    Defendant Mercandetti placed his hands on Mr. Kyne's back and defendant Martinez placed his right hand on the back of Mr. Kyne's neck, forcefully pushing Mr. Kyne to his knees.

276.    As defendants Mercandetti and Martinez forcefully pushed Mr. Kyne onto his knees, defendnat Hammerman looked on.

277.    Defendant Murphy then handed defendant Mercandetti a pair of plastic handcuffs.

278.    Defendant Hammerman walked over and pointed at Mr. Kyne and said words to the effect of, "This one is dis con and resisting."

279.    Defendant Mercandetti responded to defendant Hammerman's orders by saying, "Yes sir."

280.    Mr. Kyne responded by repeating "I'm not resisting" several times.

281.    Mr. Kyne was handcuffed less than two feet away from where the defendants had placed Mr. Mulligan, face-up.

282.    Defendant Mercandetti stated words to the effect of, "We'll carry him and get him out," upon information and belief referring to Mr. Mulligan.

283.    Defendant Mercandetti then stated, "Bring him, he's going right to my wagon in the back.  Just inform whoever you're giving it –."

284.    At or about that time, defendant Holmes walked Mr. Duncan across 5th Avenue and approximately northeast on the eastern side of the roadway, until they arrived at Mercandetti's Wagon, as defendant Martinez walked Mr. Kyne behind defendant Holmes and Mr. Duncan.

285.     At the back of Mercandetti's Wagon, defendants Martinez and Holmes encountered defendant Wohl, who had not, upon information and belief, observed Mr. Duncan's or Mr. Langley's arrests.

286.     Upon information and belief, at or about that time, unidentified defendant NYPD officers carried Mr. Mulligan approximately to the area of Mercandetti's Wagon.

287.     At approximately the same time, at the library steps, defendant Hammerman approached defendant Albano and said words to the effect of, "Hey Danny, one of the guys was the troublemaker from Pataki's from the night before, so we got him now," referring to Mr. Kyne.

288.     Mr. Kyne, Mr. Langley, Mr. Duncan, Mr. Boisvert, Mr. Lahoud, Mr. Mulligan, and Ms. Tejada (the "library arrestees") sat with their hands cuffed behind their backs in the back of Mercandetti's Wagon for approximately 45 minutes before it left the library area.

289.     At some point during that time period, shortly after he was loaded into the wagon, Mr. Kyne began to lose sensation in his wrists due to tight cuffing.  Mr. Kyne complained, which prompted another arrestee to yell that Mr. Kyne needed to have his cuffs loosened.  At some point, unidentified NYPD officers responded to Mr. Kyne's complaints.  Accordingly, Mr. Kyne backed up inside the wagon toward the door, kneeling down with his back toward the door and offering his cuffed hands to the unidentified NYPD officers for loosening.

290.     Mr. Kyne craned his neck around and observed defendant Wohl leaning and/or sitting on the front of the NYPD vehicle facing the back of the wagon, smoking a cigarette.

291.    An unidentified NYPD officer said words to the effect of, "Whose collar is this?" and "There's no numbers on his plastic."

292.    Defendant Wohl said words to the effect of, "I'll take him" or "I'll take care of him."

293.    After approximately 45 minutes, the library arrestees and the others in Mercandetti's Wagon were driven around for an unknown period of time.

294.    Mercandetti's Wagon subsequently stopped on the side of the road, somewhere on Manhattan's West side, along with another Prisoner Transport Vehicle and numerous other marked NYPD vehicles.

295.    Mr. Kyne overheard an NYPD officer indicate that they had stopped because their destination was "too full."

296.    Defendant Wohl approached Mr. Kyne and asked his name and birth date.

297.    Defendant Wohl removed the plastic handcuffs Mr. Kyne was wearing and replaced them with another pair of plastic handcuffs.

298.    At some point during that time period, defendant Wohl told Mr. Langley words to the effect of, "You guys are being arrested for bullshit, we'll take you in, you'll be processed, and you'll be let out."

299.    Defendant Wohl asked Mr. Duncan, "What are you, 5'11'?," to which Mr. Ducan responded, "I wish – I'm about 5'8.'"

300.    Upon information and belief, at approximately that time, Polaroid photographs of defendant Wohl and Mr. Duncan, Mr. Langley, and Mr. Kyne were taken, and defendant Wohl appeared to write on the back of one or some of the Polaroid photographs.

301.    Upon information and belief, when plaintiffs arrived at Pier 57 on the evening of August 31, 2004 or shortly thereafter, defendants Kelly, Colgan, Cohen, Hammerman, and/or Mercandetti were present at Pier 57.

302.    Upon information and belief, prior to the arrests on August 31, 2004, NYSCOC staff then informed NYCDOC officials that RNC-related detainees were complaining that they were being detained close to the <u>Roundtree</u> 24 hour limit, as a result of which NYCDOC Lt. Jorge Ocasio "called his counsel's office and discussed this matter with them" and then informed NYSCOC staff that "this rule did not apply to the detainees."  As of August 31, 2004, the NYSCOC did not even know the location of Pier 57, although several hundred RNC-related arrests had already been made by then.

303.    Upon information and belief, prior to 1:05 PM on August 31, 2004, NYSCOC counsel Michael Donegan he spoke with Chief Colgan and informed him of detainees' complaints regarding the lengths and conditions of confinements.

304.    On August 31, 2004, defendants Kelly and/or Colgan barred the NYSCOC from inspecting the premises at Pier 57.

305.    The library arrestees were unloaded from Mercandetti's Wagon inside Pier 57 and ordered to join a line or lines of arrestees and NYPD officers.

306.    Defendant Wohl waited with Mr. Kyne, Mr. Langley, and Mr. Duncan in line.

307.    As Mr. Kyne and Mr. Duncan waited in line, an NYPD officer with a Polaroid camera approached defendant Wohl and said words to the effect of, "We need you to take some more pictures."

308.    Upon information and belief, additional Polaroid photographs of several of plaintiffs and defendant Wohl were then taken.

309.    Upon information and belief, defendant Wohl was given one of those photographs to provide to the District Attorney's Office per plaintiff.

310.    As plaintiffs and defendant Wohl waited in line, Mr. Duncan observed a group of people he believed to be supervisory NYPD officers approximately ten or 20 yards away.

311.    Defendant Wohl then left the plaintiffs and walked over to the group of NYPD officers.

312.    Defendant Wohl shortly returned and said words to the effect of "You must have really pissed some off" and "that's the Commissioner."

313.    The library arrestees were each subsequently searched by unidentified NYPD officers and/or other city, state, and/or federal law enforcement agents physically and with a magnetometer.

314.    Mr. Kyne's 12 copies of <u>Support the Truth</u>, the book he has written concerning, *inter alia*, the dangers of DU, and six copies of a CD he produced of the same name, were seized and vouchered as alleged "arrest evidence."

315.    Mr. Duncan's camera bag and everything in it, along with all of the flyers Mr. Duncan had gathered the previous two days, were seized and vouchered as alleged "arrest evidence."

316.    The rest of their property, along with the rest of the library arrestees', was seized and vouchered as alleged "arrest evidence."

317.    The library arrestees and approximately 60 other people were subsequently ordered into another metal, chain-link cage within Pier 57.

318.    Each plaintiff, in turn, was subsequently summoned from the cages and searched.

319.    As Mr. Kyne was being searched, and while defendant Wohl stood closeby and within earshot, an unidentified NYPD Sergeant interrogated Mr. Kyne, asking Mr. Kyne if he were affiliated with any "organizers," what Mr. Kyne was doing in New York, and whether he came to New York to get arrested.

320.    As Mr. Duncan was being searched, an unidentified NYPD officer referred to the flyers Mr. Duncan had gathered over the course of the two days preceding his arrest as "seditious material."

321.    Mr. Duncan asked defendant Wohl and the unidentified NYPD officer what he was being charged with.

322.    Both shrugged but did not reply verbally.

323.    Mr. Duncan stated he believed it was his right to know what he was being charged with.

324.    Defendant Wohl said words to the effect of, "I don't give a fuck."

325.    As Mr. Langley was being searched, defendants asked him why he had been carrying four containers of saline solution.

326.    Mr. Langley replied that it was for use in washing pepper spray out of peoples' eyes.

327.    Defendants seized a USB Drive that was on Mr. Langley's person at that time, on which Mr. Langley had stored personal information, including information regarding his activities as an organizer with the IAC.

328.    Upon information and belief, the USB Drive was not vouchered as "arrest evidence" or other evidence.

329.    The USB Drive was never returned to Mr. Langley.

330.    As the library arrestees were searched and re-searched – and throughout their detention at Pier 57 – buses and other vehicles used by the defendants for prisoner transport were driven in and out of Pier 57, sometimes idling with their motors on for long periods of time on the Pier's poorly-ventilated first floor.

331.    The temperature at Pier 57 fluctuated from hot to cold, depending on where plaintiffs were ordered to stay.

332.    The floor at Pier 57 was covered in what Mr. Duncan later described as a "thick coat of oil and soot."

333.    At Pier 57, approximately six "Raw Materials Storage Signs" hung just outside some of the pens, listing words including, but not limited to, "Mobil XHP 222 Special diesel oil, antifreeze, 15 w-40, TranSynd heavy-duty automatic transmission fluid, soap, and ZEP drying agent."

334.    Upon information and belief, after plaintiffs were searched and their property was vouchered, plaintiffs were ordered into a metal, chain-link cage approximately 15 feet high, the top of which was surrounded by barbed wire, along with approximately 60 other people.

335.    There the library arrestees remained until the early morning of September 1, 2004.

336.    At Pier 57, there were no beds for detainees to sleep in or even chairs for detainees to sit on.

337.    All told, in the cage in which plaintiffs were primarily housed at Pier 57, there were one or two benches available for the approximately 60 arrestees to share.

338.    During that time period, plaintiffs sat and/or lay on the ground, and their clothing and exposed parts of their bodies, including, but not limited to, their hands and face, came into contact with the "soot."

339.    During that time period, plaintiffs had access to a single bathroom in the form of one port-a-potty, and food in the form of cheese sandwiches, which Mr. Kyne declined to eat because he believed they were inedible.

340.    Mr. Duncan witnessed numerous individuals experience asthma attacks.

341.    At no time during their detentions at Pier 57 were any of the plaintiffs read their <u>Miranda</u> rights or offered access to legal counsel.

342.    At no time during their detentions by the defendants did any of the plaintiffs engage in so-called "jail solidarity" by, for example, refusing to eat, refusing to identify themselves, or making false medical complaints.

343.    At no time during plaintiffs' detention at Pier 57 were plaintiffs allowed to make telephone calls to contact friends or family members or attorneys.

344.    Upon information and belief, at some time during plaintiffs' detentions and prior to the time defendants Deckert, Hudecek, and Wohl swore out criminal court complaints charging the library arrestees with criminal conduct, defendants Kelly,

Hammerman, Cohen, Colgan, O'Neill, Mercandetti, Albano, Murphy, Holmes, Martinez, Deckert, and/or other unidentified persons met and discussed the circumstances surrounding plaintiffs' (and other persons') arrests at the library with defendants Deckert, Hudecek, and Wohl.

345.    Upon information and belief, at or about that time, defendant Wohl was ordered by defendant Mercandetti and/or and/or other unidentified defendants and/or city, state, and/or federal law enforcement agents to fill out arrest paperwork with respect to Mr. Kyne, Mr. Duncan, Mr. Langley, Mr. Lahoud, and Mr. Boisvert and the events surrounding their arrests.

346.    Upon information and belief, at or about that time, defendant Deckert was ordered by defendant  Mercandetti and/or defendants Kelly, Hammerman, and/or Colgan and/or other unidentified defendants and/or city, state, and/or federal law enforcement agents to fill out arrest paperwork with respect to Mr. Mulligan and the events surrounding his arrest.

347.    Upon information and belief, at or about that time, defendant Hudecek was ordered by unidentified and/or city, state, and/or federal law enforcement agents to fill out arrest paperwork with respect to the events surrounding Ms. Tejada's arrest.

348.    Upon information and belief, the library arrestees were detained at Pier 57 for between approximately eight and 15 hours.

349.    Upon information and belief, by approximately 10:00 AM on September 1, 2004, the library arrestees were all in defendant NYC's custody at the MAPC at 125 White Street and/or the MCS at 100 Centre Street, where they were subsequently fingerprinted.

350. According to defendant Colgan, "[a]s arrestees were being fingerprinted, the arresting officers were interviewed by an Assistant District Attorney at 100 Centre Street in the Early Case Assessment Bureau ("ECAB"). The Assistant District Attorney determined whether there was sufficient evidence to prosecute the arrestee, and the Assistant District Attorney prepared the Criminal Court Complaint." The accusatory instruments defendant Colgan referred to as "Criminal Court Complaints" contained the following words, in bold-face, just above the "Deponent" signature line: "False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law."

351. Upon information and belief, in accordance with the foregoing, the library arrestees' fingerprints were taken approximately as or after defendants Wohl, Hudecek, and Deckert met with an ADA or ADA's in DANY's ECAB unit in order to describe the circumstances surrounding the arrests .

352. Upon information and belief, at approximately 3:15 AM, Officer Deckert swore out an accusatory instrument swearing that, on August 31, 2004, at about 18:00 hours opposite of 505 5th Avenue, he

> observed the defendant [John Mulligan] in a group of approximately one hundred (100) people on the steps of the library and on the sidewalk at the above location, blocking pedestrian traffic, in that numerous people were forced to walk around the defendant. Deponent further states that deponent observed Captain Roland Mercandetti of the Patrol Boro Bronx Task Force repeatedly ask the defendant to move and the defendant refused.

> Deponent further states that deponent observed Captain Roland Mercandetti of the Patrol Boro Bronx Task Force advise the defendant that he was under arrest for the offenses described above, and thereafter, deponent observed the defendant lay on the ground and refuse to get up or put his hands behind his back, and that five (5) police officers had to carry the defendant.

353.     At approximately 4:50PM on September 1, 2004, defendant Hudeck swore out an accusatory instrument swearing that, on August 31, 2004, at about 18:40 hours on the corner of 42 Street and 5th Avenue in the County and State of New York, he observed Ms. Tejada

> Congregated with a crowd of people at the above location, obstructing the entire intersection, so that no cars or pedestrians could pass through said intersection.

> Deponent further states that he observed police officials tell the defendants ot leave the area on numerous occasions and the defendant refused.

> Deponent further states that he observed the defendant parading upon the street at the above location, a public place, with at least fifty other individuals without a permit from the police commissioner.

> Deponent further states that the defendant was hanging a banner on the property of the New York City Parks Department.  The deponent further states that the defendant was hanging a banner on the property of the New York City Parks Department.  The deponent further states that he is a custodian of said property and that the defendant did not have permission or authority to post any sign or hang any banner upon said property at the above location.

354.     At approximately 10:11 AM on September 1, 2004, defendant Wohl swore out at an accusatory instrument swearing that, on August 31, 2004, at about 18:00 hours, on the southwest corner of 42nd Street and 5th Avenue in the County and State of New York, he observed Mr. Langley

> congregated with a crowd of people at the above location, obstructing the entire intersection, so that no cars or pedestrians could pass through said intersection.  Deponent further states that he told the defendant to leave the area on numerous occasions and the defendant refused.

> Deponent further states that the defendant sat down and refused to move.

> Deponent further states that he observed the defendant parading upon the street at the above location, a public place, with at least fifty other individuals without a permit from the police commissioner.

355.    At approximately 10:11 AM on September 1, 2004, defendant Wohl swore out at an accusatory instrument swearing that, on August 31, 2004, at about 18:00 hours, at the intersection of 42nd Street and 5th Avenue, he observed Mr. Kyne

> at the above location yelling and screaming and behaving in a violent, tumultuous, and threatening manner, as follows:  inciting a crowd by yelling: "Look what they are doing.  The government is taking away our rights.  They lied to you; they lied to me.
>
> Deponent further states that the defendant's conduct created a public disturbance and inconvenience in that it caused a crowd to gather, disruption of the normal flow of traffic, and people to express alarm.
>
> Deponent further states that the defendant was told repeatedly to calm down and leave the area and the defendant refused.
>
> Deponent further states that when dhe was placing the defendant under arrest for the offenses described above, the defendant was punching and kicking and trying to throw himself onto the ground to prevent the officers from effecting the arrest.
>
> Deponent further states that the defendant's above described behavior prevented the police officers from effectively managing the crowd and maintaining peace among the individuals congregated at the above location.

356.    At approximately 9:07 AM on September 1, 2004, defendant Wohl swore out at an accusatory instrument swearing that, on August 31, 2004, at about 18:00 hours, on the southwest corner of 42nd Street and 5th Avenue in the County and State of New York, he observed Mr. Duncan

> congregated with a crowd of people at the above location, obstructing the entire intersection, so that no cars or pedestrians could pass through said intersection.
>
> Deponent further states that the defendant sat down and refused to move.
>
> Deponent further states that he observed the defendant parading upon the street at the above location, a public place, with at least fifty other individuals without a permit from the police commissioner.

357.    Upon information and belief, at or about the same time, defendant Wohl also swore out accusatory instruments swearing that he personally observed Mr. Lahoud and Mr. Boisvert engaged in unlawful conduct.

358.    Defendants Wohl, Hudecek, and Decekert knew the sworn statements in the accusatory instruments contained factual misrepresentations.

359.    Defendant Mercandetti and other defendants involved in plaintiffs' arrests and arrest processing also knew, or should have known, that the sworn statements in those accusatory instruments were false.

360.    Defendants Wohl, Hudecek, and Deckert were acting under unidentified NYPD supervisory defendants' orders and pursuant to their training in defendants' special RNC mass arrest processing procedures when they swore falsehoods in the aforementioned accusatory instruments.

361.    Upon information and belief, between the time plaintiffs were fingerprinted and the time each was arraigned, plaintiffs were shuffled from cell to cell within the MAPC, without apparent rhyme or reason, and subjected to numerous searches.

362.    Upon information and belief, at approximately 8:00 PM on September 1, 2004, Mr. Duncan met with an attorney, who informed him that he would be arraigned shortly thereafter and charged with at least two counts of disorderly conduct.

363.    At Mr. Duncan's arraignment on approximately the evening of September 1, 2004, Mr. Duncan was charged with violating PL §§ 240.20(5) and (6) and New York City Administrative Code ("NYCAC") § 10-110 based on defendant Wohl's accusatory

instrument, and the ADA offered, and Mr. Duncan accepted, an Adjournment in Contemplation of Dismissal ("ACD") pursuant to CPL § 170.10.

364.    At Mr. Langley's arraignment on September 1, 2004, Mr. Langley was charged with violating PL §§ 240.20(5) and (6) and NYCAC § 10-110 based on defendant Wohl's accusatory instrument.  Just prior to his arraignment, Mr. Langley met with an attorney from the Legal Aid Society, who showed him the accusatory instrument defendant Wohl had sworn out.  Mr. Langley pleaded not guilty at his arraignment because the statements in the accusatory instrument were false.  At approximately 6:00 PM on September 1, 2004, Mr. Langley was released.  At his next court appearance, Mr. Langley accepted an ACD in order to avoid having to return to court repeatedly.

365.    Upon information and belief, at their arraignments on September 1, 2004, Mr. Lahoud and Mr. Boisvert were charged with violations based on defendant Wohl's complaints, and were offered and accepted ACD's in order to avoid having to travel from their home in Canada to return to court repeatedly.

366.    At Ms. Tejada's arraignment on September 1, 2004, Ms. Tejada was charged with violating NYPL §§ 240.20(5) and (6), NYCAC § 10-110, and NYCAC § 10-119(A) ("Unlawful Posting") based on defendant Hudecek's complaint, and Ms. Tejada was offered, and accepted, an ACD in order to avoid having to travel from her home in Portland, Oregon to return to court repeatedly.

367.    At Mr. Mulligan's arraignment on September 1, 2004, Mr. Mulligan was charged with violating NYPL §§ 240.20(5) and (6) and 205.30 based on defendant Deckert's complaint.  Upon information and belief, Mr. Mulligan pleaded not guilty,

retained a private attorney, and eventually, after numerous court appearances, obtained a favorable termination on the merits.

368.     In arresting plaintiffs and detaining them without probable cause for an excessive period of time in unsafe conditions, defendants intentionally and/or negligently inflicted emotional distress on plaintiffs and maliciously retaliated against them for exercising their constitutional rights to participate in speech and expressive association regarding matters of public concern.

369.     As a result of Mr. Duncan's false arrest and unlawful and excessive detention, Mr. Duncan was unable to file the story and pictures he had intended to file for his school newspaper.

370.     As a result of his false arrest and unlawful and excessive detention, Mr. Kyne lost wages and/or earnings.

371.     As a result of Mr. Duncan's false arrest and unlawful and excessive detention, Mr. Duncan feared to return to the streets after his release from defendants' custody, and remained largely indoors from his release on September 1, 2004 until he left NYC on September 3, 2004.

372.     As a result of the excessive force defendants used in effecting Mr. Duncan's arrest, Mr. Duncan had pain in his wrists for several weeks.

373.     Mr. Duncan sought treatment for the same from his parents, who are doctors.

374.     As a result of the excessive force defendants used in effecting Mr. Kyne's arrest, Mr. Kyne experienced pain in his wrists for approximately six weeks.

375.    As a result of plaintiffs' false arrests, unlawful and excessive detentions, and malicious prosecutions, several plaintiffs reasonably believe that the NYPD and/or the USSS, FBI, DHS, and/or other city, state, and/or federal agencies have engaged in and/or continue to engage in unlawful surveillance of them, which may chill, or has actually chilled, their ability to engage in lawful political organizing and other constitutionally and otherwise protected activities.

376.    At his arraignment at approximately 9:00 PM on September 1, 2004 before Hon. Patricia Nunez in Part AR3 of the New York City Criminal Court, Mr. Kyne was charged with engaging in Riot in the Second Degree in violation of PL § 240.05, Resisting Arrest in violation in PL § 205.30, Obstruction of Governmental Administration in the Second Degree in violation of PL § 195.05, and four counts of Disorderly Conduct in violation of PL §§ 240.20 (1), (2), (5), and (6), based on an accusatory instrument defendant Wohl swore out swearing that he had observed Mr. Kyne engage in allegedly unlawful conduct.

377.    Mr. Kyne pleaded not guilty to all of the charges.

378.    Upon information and belief, Judge Nunez set bail in Mr. Kyne's case at $500.00.

379.    Mr. Kyne was not released from custody until approximately 5:30 PM on September 2, 2004, after his mother posted bail.

380.    Mr. Kyne's case was adjourned for Response and Decision to Part C on October 25, 2004.

381.    Mr. Kyne appeared in Part C on 10/25/04 before Hon. Melissa C. Jackson represented by Oliver & Oliver.

382.    Hon. Jackson denied Mr. Kyne's omnibus motion in its entirety, and Mr. Kyne's case was adjourned to November 17, 2004 for hearings and trial in Part JP2.

383.    On or about November 15, 2004, the People faxed defense counsel a Voluntary Disclosure Form indicating that the People intended to call defendants Mercandetti and Wohl at Mr. Kyne's trial.

384.    On November 17, 2004, Mr. Kyne appeared in Part JP2 before Hon. Neil Ross, at which time there were no Court parts available.

385.    During that appearance, the People dismissed the charge of Riot in the Second Degree (PL § 240.05), and Judge Ross granted defense counsel leave to file and serve an additional motion to dismiss some of the charges on constitutional grounds.

386.    Mr. Kyne's case was adjourned for hearings and trial until 12/13/04 in Part C.

387.    Mr. Kyne's jury trial began on or about December 14, 2004 in New York City Criminal Court, Jury Part 1, before Hon. Gerald Harris.

388.    Defendants NYPD Planning Officials knew or should have known that any Polaroid photographs created for use in arrest processing and prosecution would constitute evidence discoverable as a matter of law in a criminal trial under, *inter alia*, New York State Criminal Procedure Law.

389.    Defendants NYPD Planning Officials failed to preserve and/or produce to DANY any and all photographs created in connection with plaintiffs' arrests or arrest processing.

390.    Mr. Kyne arrived at his trial wearing his United States Army uniform.

391.    The People turned over a Witness List in connection with Mr. Kyne's case indicating that the People intended to call defendants Wohl and Mercandetti to testify against Mr. Kyne.

392.    Prior to jury selection, the People produced a copy of a United States Department of Defense Directive Number 1334.1 dated May 17, 2004 signed by defendant Wolfowitz ("DOD Directive").

393.    The DOD Directive prohibited the wearing of the uniform by members of the Armed Forces, including retired members and members of Reserve components,

> 3.1.1   At any meeting or demonstration that is a function of, or sponsored by an organization, association, movement, group or combination of persons that the Attorney General of the United States has designated, under E.O. 10450 as amended (reference (b)), as totalitarian, fascist, communist, or subversive, or as having adopted a policy of advocating or approving the NYSCOC or acts of force or violence to deny others their rights under The Constitution of the United States, or as seeking to alter the form of Government of the United States by unconstitutional means.
>
> 3.1.2   During or in connection with the furtherance of political activities, private employment or commercial interests, when an inference of official sponsorship for the activity or interest may be drawn.
>
> 3.1.3   Except when authorized by competent Service authority, when participating in activities such as public speeches, interviews, picket lines, marches, rallies or any public demonstration (including those pertaining to civil rights), which may imply Service sanction of the cause for which the demonstration or activity is conducted.
>
> 3.1.4   When wearing of the uniform would tend to bring discredit upon the Armed Forces.
>
> 3.1.5   When specifically prohibited by regulations of the Department concerned.

394.    The DOD Directive also prohibited former members of the Armed Forces from wearing the uniform in many cases:

    3.2        Former members of the Armed Forces, unless under another provision of this Directive or under the terms of 10 USC 722 (reference(c)), who served honorably during a declared or undeclared war and whose most recent service was terminated under honorable conditions may wear the uniform in the highest grade held during such war service only upon the following occasions and in the course of travel incident thereto:

3.2.1   Military funerals, memorial services, weddings, and inaugurals.

3.2.2   Parades on National or State holidays' or other parades or ceremonies of a patriotic character in which any Active or Reserve United States military unit is taking part.

3.2.3   Wearing of the uniform or any part thereof at any other time or for any other purposes is prohibited.

395.    Presented with the DOD Directive, Hon. Harris was hesitant to send out for a panel and begin voir dire.

396.    Having preserved their objection to the People's position, defense counsel suggested that Mr. Kyne remove his dress jacket, which would have left him wearing a plain white shirt and pants with a stripe on them.

397.    The People objected, stating, "As your Honor duly noted, they are military pants. People will be introducing an arrest photo of the defendant when he was – in which, in that photo, he is wearing a camouflage jacket. It is the People's position that could undulate uniforms to the jury. There may be former military people on the jury who may recognize his pants. There may be other people who has family in the military who recognize the United States army pants."

398.    In the interests of proceeding with the trial, defense counsel suggested that Mr. Kyne simply swap pants with a witness, which is precisely what happened.

399.    The next morning, defense counsel presented the Court with a letter-application requesting that Mr. Kyne be allowed to wear his uniform.

400.    *Inter alia*, defense counsel argued that, if the DOD Directive were interpreted to prohibit from wearing the uniform in the Court, it would violate the First Amendment of the United States Constitution.

401.    The People argued, "If they have regulations prescribed by the President to allow them to wear that uniform in this court, we have no objections to that."

402.    The Trial Court denied defense counsel's motion to allow Mr. Kyne to wear his uniform during the trial.

403.    At trial, defendant Wohl testified that he arrived at the library as part of an eight-officer detail under the supervision of a Lieutenant and Captain assigned to a "demonstration in front of a public library . . . probably an hour prior" to the time the alleged demonstration started.

404.    Defendant Wohl testified that he personally observed Mr. Kyne yelling in a "boisterous" manner just before he was placed under arrest, although he could not specifically remember what Mr. Kyne was yelling.

405.    Defendant Wohl twice testified that he did not remember Mr. Kyne ever shouting "fucking nazis."

406.    Defendant Wohl testified that he personally effected Mr. Kyne's arrest along with two other unidentified officers.

407.    According to him, Mr. Kyne was "screaming, yelling, and moving around" throughout the process.

408.    When asked how Mr. Kyne had resisted arrest, defendant Wohl testified that his "mouth, heart, and eyes" were moving, and that he lunged in a number of different directions, "almost like what a little kid would do."

409.     Defendant Wohl also testified that Mr. Kyne "went down to the ground himself" and that defendant Wohl and three others had to pick him up and carry him across the street "while he squirmed and screamed" all the way to the back of the NYPD transport vehicle.

410.     Defendant Wohl also testified that he arrested four (4) others along with Mr. Kyne.

411.     During Mr. Kyne's trial, the People entered a photograph of Mr. Kyne as identification evidence.

412.     Mr. Kyne's defense counsel objected, and asked defendant Wohl whether, prior to putting Mr. Kyne into the police transport vehicle for prisoners, pictures of him were taken.

413.     Defendant Wohl confirmed that there had been.

414.     The People made a motion *in limine* asking that the Court direct that Mr. Kyne's defense counsel not ask defendant Wohl as to the arrest photo of Mr. Kyne and the alleged Polaroid.

415.     The People took the position that it was not Rosario, Brady, or evidence, and that "[t]his photo was taken during the arrest processing time, as were all photos in these protesting cases.  It has nothing to do with the issues at hand and the issues Mr. Kyne is on trial for."

416.     The Court granted the People's motion *in limine* insofar as it directed Mr. Kyne's defense counsel to establish "the fact that such a photo was taken and the fact that this officer has no knowledge of its present whereabouts could be established."

417.    Later, when asked who else defendant Wohl had arrested at the library along with Mr. Kyne, defendant Wohl identified Mr. Langley.

418.    When questioned about where Mr. Langley was when defendant Wohl arrested him, defendant Wohl testified, "I would have to look back at my notes. . . . My arrest processing sheet.  It gives the story that was on the pictures. . . . The photographs we took next to the arrest van, I wrote on the back where, and then, obviously, I would know the story because I was there."

419.    Defendant Wohl testified that two Polaroid pictures were taken of him and Mr. Kyne at the back of the prisoner transport van, and that he kept the pictures.

420.    Defendant Wohl testified that he did not have the picture that was taken there that he had made notes on the back of.

421.    Defendant Mercandetti was actually present at 100 Centre Street inside the courthouse directly outside the courtroom in which Mr. Kyne's trial was proceeding and prepared to testify against Mr. Kyne.

422.    However, at the close of defendant Wohl's testimony, Mr. Kyne's attorneys produced a copy of a videotape that showed that material elements of defendant Wohl's testimony had been patently false.

423.    The next morning, after reviewing the videotape and discussing its contents with defendant Wohl, the People moved to dismiss the charges against Mr. Kyne, stating on the record:

> the People have reviewed the videotape provided by defense counsel
> yesterday and the photos provided by defense counsel this morning.  The
> events depicted on the tape and in the photographs are, in some respects,
> inconsistent with the People's original theory of prosecution.  We have
> discussed this matter with our witnesses and shown him the video.  Under
> these circumstances, and as a result, the People do not believe we can

prove the crimes charged beyond a reasonable doubt, and, therefore, we are moving to dismiss the crimes charged.

424.     In granting the motion to dismiss on December 16, 2004, Hon. Harris stated:

> Ladies and gentlemen of the jury, this case has been disposed of. The District Attorney's Office acted in accord with the highest standards of proper exercise of quasi judicial authority and has made further investigation and has concluded the defendant's guilt cannot be proven beyond a reasonable doubt.

425.     Mr. Kyne, Mr. Langley, and Mr. Duncan were further injured by Mr. Kyne's malicious prosecution in that they traveled to New York City and/or were present and available in New York City for Mr. Kyne's trial – either as the defendant, in Mr. Kyne's case, or as potential witnesses – missing work and wages and incurring travel and other expenses in the process.

426.     Defendants' policies and practices of engaging in unlawful surveillance and making mass arrests of persons lawfully planning for, participating in, or observing demonstrations, without ensuring that the arrests of individuals are support by individualized determinations of probable cause, using excessive force in effecting those arrests, effecting widespread illegal seizures and searches, detaining those arrested on minor offenses for prolonged periods of time in unhealthy conditions without access to phones, lawyers, or adequate medical, sleeping, sanitary, and/or bathroom facilities, routinely fingerprinting persons arrested for minor offenses, ordering and/or encouraging and/or facilitating the swearing out of false accusatory instruments, maliciously prosecuting, and otherwise retaliating against individuals for exercising their Constitutional rights violated the First, Fourth, Fifth, Eighth, and Fourteenth

Amendments to the United States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law.

427.    By their acts and omissions, defendants acted in concert under color of state and/or federal law intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, and caused injury and damage to plaintiffs in violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, their counterpart provisions in the New York State Constitution, and New York statutory and common law.

428.    By failing properly to train and/or to remedy the wrongs committed by their subordinates and/or co-defendants, defendants NYPD Planning Officials and other fellow officers and/or agents deprived plaintiffs of liberty and property and caused plaintiffs to suffer bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and otherwise damaged and injured them.

## AS AND FOR A FIRST CAUSE OF ACTION

429.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 428 above as if fully set forth hereat and incorporate the same herein by reference.

430.    Plaintiffs' false and retaliatory arrests, which were made without probable cause or other justification in the law, violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

431.    Plaintiffs were arrested in retaliation for exercising their First Amendment rights while speaking out on matters of public concern and/or attempting to observe

individuals who were so doing and/or attempting to observe law enforcement responses thereto.

432.    The mass arrests of individuals at demonstrations substantially chills the exercise of First Amendment rights, particularly when the mass arrests in question pay short thrift to the doctrine of probable cause.

433.    When the police arrest large numbers of people engaged in lawful activity at or near demonstrations, those arrested are far less likely to be comfortable engaging in future protest activity.

434.    When such arrests take place at highly publicized events such as the RNC, the public at large is given the message that participation in protest activity – or even observation of protest activity or law enforcement responses thereto - is likely to lead to arrest.

<u>AS AND FOR A SECOND CAUSE OF ACTION</u>

435.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 434 above as if fully set forth hereat and incorporate the same herein by reference.

436.    Defendants' use of excessive force in connection with plaintiffs' false and retaliatory arrests violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>

437.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 436 above as if fully set forth hereat and incorporate the same herein by reference.

438.    Defendants' subjection of plaintiffs to unlawful and excessive detentions in connection with plaintiffs' false and retaliatory arrests violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>

439.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 438 above as if fully set forth hereat and incorporate the same herein by reference.

440.    Defendants' subjection of plaintiffs to cruel and unusual and/or otherwise inadequate and/or unsafe conditions of confinement without access to phones, lawyers, or adequate medical, sleeping, sanitary, and/or bathroom facilities in connection with their unlawful and excessive detentions springing from their plaintiffs' false and retaliatory arrests violated the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>

441.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 440 above as if fully set forth hereat and incorporate the same herein by reference.

442.    Defendants' subjection of plaintiffs to unlawful surveillance prior to and/or after their arrests violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

<u>AS AND FOR AN SIXTH CAUSE OF ACTION</u>

443.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 442 above as if fully set forth hereat and incorporate the same herein by reference.

444.    Defendants' subjection of plaintiffs to criminal prosecution was malicious and violated the First, Fourth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>

445.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 444 above as if fully set forth hereat and incorporate the same herein by reference.

446.    The DOD Directive is unconstitutional on its face and/or as applied to Mr. Kyne.

447.    Defendants' promulgation of the same and/or articulation of the same against Mr. Kyne violated the First and Fourteenth Amendments to the United States Constitution and the attendant provisions of the New York State Constitution and New York State statutory and common law.

<u>AS AND FOR A EIGHTH CAUSE OF ACTION</u>

448.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 447 above as if fully set forth hereat and incorporate the same herein by reference.

449.    Defendants did inflict assault and battery upon plaintiffs and in so doing directly and proximately caused plaintiffs injury and damage and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

<u>AS AND FOR AN NINTH CAUSE OF ACTION</u>

450.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 449 above as if fully set forth hereat and incorporate the same herein by reference.

451.    Defendants caused plaintiffs to be falsely arrested and/or falsely arrested plaintiffs and in so doing directly and proximately caused plaintiffs injury and damage and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

AS AND FOR A TENTH CAUSE OF ACTION

452.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 451 above as if fully set forth hereat and incorporate the same herein by reference.

453.    Defendants engaged in extreme and outrageous conduct, intentionally and/or negligently causing severe emotional distress to plaintiffs and violating plaintiffs' statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

AS AND FOR A ELEVENTH CAUSE OF ACTION

454.    Plaintiffs restate and reallege the allegations contained in ¶¶ 1 through 453 above as if fully set forth hereat and incorporate the same herein by reference.

455.    Defendants employed regularly issued process against plaintiffs compelling the performance or forbearance of prescribed acts, the purpose of which was defendants' intent to harm plaintiffs without economic or social excuse or justification, and defendants were seeking a collateral advantage or corresponding detriment to plaintiffs which were outside the legitimate ends of the process, and in so doing directly and proximately caused plaintiffs injury and damage and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

WHEREFORE, each plaintiff demands the following relief jointly and severally against all of the defendants:

A.    A declaratory judgment declaring that the DOD Directive is unconstitutional and that its implementation with respect to Mr. Kyne was unconstitutional;

B.    A declaratory judgment declaring that New York City Administrative Code § 10-110 and its implementing regulations are facially unconstitutional and/or unconstitutional as applied to the circumstances of the arrests of those plaintiffs who were charged with violating it;

C.    Permanent injunctive relief in the form of an order enjoining defendants from engaging in the policies, practices, and/or customs complained of herein;

D.    Awards of compensatory and punitive damages to each of the plaintiffs;

E.    An award of attorney's fees and costs and disbursements; and

F.    Other such relief as this Court may deem just and proper.

DATED:    NEW YORK, NEW YORK
          JUNE 27, 2007

                              RESPECTFULLY SUBMITTED,


                              _____/S/_____
                              GIDEON ORION OLIVER (GO 8799)
                              LEWIS B. OLIVER, JR. (LO 5153)
                              OLIVER & OLIVER
                              ATTORNEYS FOR PLAINTIFFS
                              c/o 200 E. 10th St. #917
                              New York, New York   10003
                              (646) 602-9242